MCI COMMUNICATIONS CORPORATION and MCI Telecommunications Corporation, Plaintiffs-Appellees,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Defendant-Appellant.

Nos. 80–2171, 80–2288.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1982.*

Decided Jan. 12, 1983.

As Modified Feb. 9, 1983.

As Modified on Denial of Rehearing April 11, 1983.**

As Modified After Denial of Rehearing April 18, 1983.**

Certiorari Denied Oct. 11, 1983. See 104 S.Ct. 234.

---

* This case was originally argued on April 30, 1981, before a panel consisting of Circuit Judge Harlington Wood, Jr., Senior Circuit Judge Thomas E. Fairchild, and Senior District Judge Inzer B. Wyatt, of the United States District Court for the Southern District of New York. Judge Wyatt subsequently was forced to withdraw from the case on his physician's orders, and Circuit Judge Richard D. Cudahy was selected by lot from the judges of this court not disqualified from hearing this case to replace him. The case was then reargued on April 19, 1982, before Judges Wood, Cudahy and Fairchild.

** Chief Judge WALTER J. CUMMINGS and Circuit Judges WILBUR F. PELL, Jr. and RICHARD A. POSNER disqualified themselves and did not participate in consideration of the petitions for rehearing *en banc.*

Harlington Wood, Jr., Circuit Judge, concurred in part and dissented in part and filed an opinion.

Chester T. Kamin, Chicago, Ill., for plaintiffs-appellees.

Howard J. Trienens, Sidley & Austin, Chicago, Ill., for defendant-appellant.

## TABLE OF CONTENTS

OPINION OF THE COURT

I. FACTS ............................................... 1092

 A. Background and Initial Entry of MCI ..................... 1093
 B. The Interconnection Disputes .......................... 1096
 C. The *Execunet* Decision ............................... 1097
 D. The Pricing Controversies Between
 MCI and AT&T .................................... 1098
 E. MCI's Damage Evidence ............................. 1099

II. REGULATION AND THE ANTITRUST LAWS ............. 1100

 A. The Federal Regulatory Scheme for
 Telecommunications ............................... 1100
 B. Implied Immunity .................................. 1101
 C. The Impact of Regulation ............................ 1105

III. PREDATORY PRICING ................................. 1111
 A. Jury Instructions ...................................... 1111
 B. Below Cost Pricing ................................... 1112
 C. Defining Measures of Cost ........................... 1114
 D. The Proper Cost Standard ............................ 1119
 E. Cross-subsidization ................................. 1123
 F. Insufficiency of the Evidence ....................... 1125
 G. Pre-announcement ................................... 1128
 H. Telpak Marketing Plan .............................. 1130
IV. INTERCONNECTIONS ................................ 1131
 A. FX–CCSA Interconnections ........................... 1132
 1. The Essential Facilities Doctrine ............... 1132
 2. The Meaning of the *Specialized Common
 Carrier* Decision .............................. 1133
 3. "Retroactive" Application of *Execunet* ........ 1136
 4. Instructions on Regulatory Policy .............. 1137
 5. Insufficient Evidence .......................... 1139
 6. Evidentiary Rulings ........................... 1141
 7. Substantial Impact ............................ 1143
 B. Tying .............................................. 1144
 C. Disconnections ..................................... 1145
 D. Denial of Interconnections for Service
 Outside of Local Distribution Areas ................ 1145
 E. Multipoint Service ................................. 1147
 F. Inappropriate or Inefficient Interconnections ........ 1150
V. BAD FAITH NEGOTIATIONS AND *NOERR–PENNINGTON* 1153
 A. The State Tariff Filings ............................. 1153
 B. Bad Faith Negotiations ............................. 1158
 C. Other Conduct ..................................... 1159
VI. DAMAGES ........................................... 1160
 A. MCI's Proof of Damages ............................. 1160
 B. Causation of Damages .............................. 1161
 C. The Flawed Assumptions of the Lost
 Profits Study ...................................... 1164
 D. Remand for a Partial New Trial ..................... 1166
VII. THE CONDUCT OF THE TRIAL ....................... 1169
 A. Fair Trial .......................................... 1169
 B. Theories of Defense ................................ 1173
VIII. CONCLUSION ........................................ 1174
DISSENT ...................................................... 1174
I. HI–LO AND PREDATORY PRICING ..................... 1175
 A. The Inappropriateness of Exclusively
 Cost-Based Standards .............................. 1175
 1. The History and Goals of the Sherman Act ...... 1177
 2. LRIC and Consumer Welfare in the Monopoly
 Context ...................................... 1180
 B. Evidence of AT&T's Predatory Pricing ............... 1184
II. PRE–ANNOUNCEMENT OF HI–LO ..................... 1186
III. DAMAGE PROOF ..................................... 1187
 A. Disaggregation .................................... 1187
 B. Assumptions ...................................... 1192
 1. The Revenue Assumption ....................... 1192

APPENDIX ................................................. 1195

 A. Jury Instructions ..................................... 1195

 B. Special Verdict ...................................... 1196

NOTE

Throughout the opinion the following abbreviations are used: Trial Transcript - Tr., Plaintiff's Exhibit - PX, Defendant's Exhibit - DX, and Appendix of this Opinion - App.

---

Before WOOD and CUDAHY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

In this extraordinary antitrust case,[1] defendant American Telephone and Telegraph Company ("AT & T") appeals from a judgment in the amount of $1.8 billion, entered on a jury verdict, in a treble damage suit brought by plaintiffs MCI Communications Corporation and MCI Telecommunications Corporation (collectively "MCI") under section 4 of the Clayton Act, 15 U.S.C. § 15 (1976).[2]

## I. FACTS

MCI's original complaint, filed March 6, 1974, contained four separate counts: monopolization, attempt to monopolize, and conspiracy to monopolize—all under section 2 of the Sherman Act[3]—and conspiracy in restraint of trade—under section 1 of the Sherman Act. MCI alleged that AT & T had committed twenty-two types of misconduct, classifiable into several categories including predatory pricing, denial of interconnections, negotiation in bad faith and unlawful tying. MCI claimed at trial, on the basis of a lost profits study originally prepared in part for financing purposes, that it had suffered damages of approximately $900 million as a result of AT & T's allegedly unlawful actions.[4]

The case was tried to a jury between February 6 and June 13, 1980. After completion of MCI's case in chief, the district court directed a verdict in favor of AT & T on seven of the twenty-two alleged acts of misconduct.[5] The remaining fifteen

---

1. The author of this opinion recognizes his debt and expresses his appreciation to Judge Wood, whose draft of this opinion plowed important ground and formed a basis for what has become the majority opinion. Although Judge Wood and the author disagree on some of the points at issue here, we agree fully about the Herculean joint efforts required to produce such a "weighty" finished product. Further, we both recognize the important contributions of Judge Fairchild to this product.

2. Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), provides as follows:
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

3. Section 2 of the Sherman Act, 15 U.S.C. § 2 (1976), provides in relevant part: "Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...."

4. AT & T also filed a counterclaim against MCI alleging that MCI attempted and conspired to monopolize the relevant market and actually monopolized the St. Louis-Chicago segment, conspired to restrain trade in the relevant market, and wrongfully acquired stock or share capital of other corporations, which substantially lessened competition. The district court did not permit any of these allegations to go to the jury, and AT & T does not challenge the propriety of that action on appeal.

5. *The district court directed a verdict in favor of AT & T on the following seven allegations:* (1) inducing Western Union to file a tariff which mirrored the St. Louis-Chicago charges of 'MCI; (2) increasing AT & T's capacity to conduct business in data communications for the purpose of destroying competition; (3) introducing experimental service to discourage potential customers from dealing with MCI; (4)

charges—all based on section 2 of the Sherman Act—were submitted to the jury. A special verdict form required the jury to make a separate finding of liability as to each of the fifteen charges, but permitted the jury to award damages in a single lump sum, without apportioning MCI's claimed financial losses among AT & T's various lawful and unlawful acts. The jury found in favor of MCI on ten of the fifteen charges submitted, and awarded damages of $600 million—a sum equal to two thirds the total damage figure claimed in MCI's aggregated lost profits study.[6] The district court trebled this damage award, as required by section 4 of the Clayton Act, resulting in a judgment of $1.8 billion, exclusive of costs and attorneys' fees.

AT & T filed motions for judgment notwithstanding the verdict or, in the alternative, for a new trial on June 23, 1980. These motions were denied without opinion on July 29, 1980. On August 25, 1980, AT & T filed its notice of appeal. On September 8, 1980, MCI filed a notice of cross-appeal.[7] In this opinion, we reject challenges to certain jury findings upon which AT & T's liability was based, sustain other challenges, and remand for a new trial on the issue of damages.

## A. Background and Initial Entry of MCI

Prior to 1969, the telecommunications industry was regulated as a lawful monopoly. Local exchange service was and still is provided exclusively by one of the twenty-three Bell System operating companies or by one of some 1600 independent telephone companies, depending upon the geographical area involved.[8] Long distance service was provided by the Long Lines Department of AT & T in partnership with these operating companies.[9] The network of long distance transmission facilities was owned in substantial part by Long Lines; however, the interexchange facilities of the local telephone companies, including both transmission and switching facilities, were used in conjunction with Long Lines facilities whenever efficiency required. The local exchange facilities and switching machines belonging to the local companies were also used at each end of a regular long distance call.

This same nationwide network was used as well by AT & T to provide other intercity telephone services, including point-to-point private lines, foreign exchange lines ("FX") and common control switching arrange-

---

disparaging MCI; (5) bringing sham proceedings before certain administrative and judicial bodies; (6) participating in a massive public propaganda campaign conducted against MCI; and (7) refusing to provide Joint Telpak (a special tariff) to MCI. MCI does not challenge the propriety of the district court's directed verdict on any of these issues.

6. The Special Verdict is reprinted in the Appendix. See *infra*, p. 1207.

7. Because we hold that Judge Grady did not err in refusing to admit evidence alleging destruction of documents by AT & T, we do not reach a motion filed by AT & T to strike a portion of MCI's reply brief on this issue.

8. Local exchange telephone service is the ordinary service provided in nearly all homes and businesses. From a technical standpoint, it involves a wire connection between the telephone set and a switching machine in a nearby telephone company central office which is connected by transmission trunks to the switching machines in other central offices within the exchange area. When the telephone is taken off the hook—or in the case of multiple tele-

phones behind a private branch exchange, when a designated access code such as "9" is dialed—a signal is sent to the central office. The switching machine in the central office responds to this signal by sending a dial tone that enables the calling party to dial any telephone connected to the switched network within that exchange area. *See* DX 1828.

9. Long distance service operates in a manner similar to local exchange service but typically involves a two-step process in which the user first gains access to the local switching machine through a dial tone and then requests access to the long distance toll switching machine by dialing an area code plus the number of the telephone the calling party wishes to reach. If a circuit is available to handle the call, it is routed through the calling party's central office to a toll office nearby, over an intercity circuit to a toll office in the city that is being called, and finally through the central office that serves the called telephone to that telephone. Wade, Tr. 3903–04; Marshall, Tr. 4893; DX 1828, 1833.

ments ("CCSA"). Point-to-point private lines (also called tie lines) are connections between two locations that do not require the use of local switching machines because the lines are available to the customer on a continuing and exclusive basis. FX and CCSA, although classified for tariff purposes as private line services, do require interconnection with local switching machines.[10]

In 1963, Microwave Communications, Inc., the predecessor corporation to MCI,[11] requested permission from the Federal Communications Commission ("FCC") to construct and operate a long distance telephone system between Chicago and St. Louis. The proposed system consisted of a terminal in each city and microwave radio relay towers connecting the terminals. Through this system, MCI intended to provide long distance, private line telephone service to business and industrial subscribers whose needs justified the exclusive or semi-exclusive use of a long distance telephone line. MCI also sought interconnections from its terminals to ordinary local telephone facilities, principally telephone wires running in conduits beneath the street. These interconnections were essential to MCI's ability to do business, since they provided the telephone or computer

linkage between MCI's terminals and its individual customers in each city.

In 1969, after lengthy administrative proceedings in which AT & T and the other general service carriers opposed MCI's application, the FCC approved MCI's proposal. *Microwave Communications, Inc.,* 18 F.C. C.2d 953, 966 (1969); 21 F.C.C.2d 190 (1970).[12] The FCC's decision specifically authorized MCI to provide only point-to-point private line service not requiring connection to the nationwide switched network—that is, tie lines that would connect two or more locations without the use of switching machines. 18 F.C.C.2d at 953–54. The FCC also retained jurisdiction to order appropriate local interconnections.

The *MCI* decision resulted in a deluge of new applications to the FCC for authority to construct and operate facilities for specialized common carrier services. MCI filed applications for authority to provide specialized services among more than 100 cities. Other companies filed similar applications, creating a situation in which, in many instances, more than one carrier was seeking to provide specialized services over the same route. To deal with this situation, the FCC instituted a broad rulemaking inquiry designed to permit consideration in one proceeding of the policy questions raised by these numerous applications.

---

**10.** From a technical standpoint, FX and CCSA services are similar to local exchange service in that they provide a connection into a switching machine in a telephone company central office which responds to requests for network access by sending a dial tone. The distinguishing aspect of FX service is that the switching machine to which the telephone is connected is not located in the nearby telephone company central office but is in a distant office, as, for example, where a telephone located in Chicago is connected to a switching machine in New York City. Such an arrangement permits the user to make and receive calls in the distant city as though they were local calls, *i.e.,* as if the subscriber had a local telephone in the distant city. For this reason, FX service is frequently used by such businesses as airlines and hotel reservation agents.

CCSA service offers a similar advantage to large subscribers who wish to link far flung branches or offices to each other via private telephone lines connected through switches in the local telephone company office. In essence, CCSA service allows a large subscriber

to obtain a personal mini version of the nationwide telephone network. The FTS line that connects federal government offices is one example of a CCSA-type service.

**11.** In this opinion, Microwave Communications, Inc., as well as its successor corporations, are collectively referred to as MCI.

**12.** The general service carriers argued that the entry of specialized common carriers into the telecommunications industry would be contrary to the public interest because telecommunications services could be provided more economically by a single supplier; because additional microwave systems would be duplicative and wasteful; and because specialized carriers without general service responsibilities would "cream-skim" the existing averaged rate structure by selectively competing only along the most profitable long distance routes, thus imposing a heavier rate burden on low density and local telephone users.

*Specialized Common Carriers*, 24 F.C.C.2d 318 (1970) (Notice of Inquiry).

In June 1971, the FCC handed down its *Specialized Common Carriers* decision, approving in principle the entry of specialized carriers into the long distance telecommunications field, and declaring as a matter of policy that there should be open competition in the specialized services to which the decision applied. 29 F.C.C.2d 870 (1970). Because AT & T, reversing its earlier position, agreed to negotiate with MCI and other new entrants for local interconnections, the FCC elected to defer consideration of MCI's claim that AT & T was misusing its power over local telephone service to gain a competitive advantage over potential specialized competitors.

The FCC's *Specialized Common Carriers* decision was hardly a model of clarity.[13] The decision did not define the specialized services to which it referred, nor did it define the corresponding obligations that the FCC expected the general carriers (primarily AT & T) to assume in order to assist the new carriers. AT & T contended, both at the time of the FCC decision and throughout the pendency of this lawsuit, that the *Specialized Common Carriers* decision authorized only point-to-point private line services *not* requiring switched network connections, and that the obligations of the Bell System extended only to providing local distribution facilities for these point-to-point private line services. MCI, by contrast, has consistently taken the position that the *Specialized Common Carriers* decision authorized it to provide FX and CCSA type services, as well as point-to-point private lines, and that AT & T had a corresponding obligation to provide it with the switched network connections required for these services. MCI also contended, both before and after the *Specialized Common Carriers* decision, that AT & T was obligated to provide it with local distribution facilities at the same rate at which AT & T provided such facilities to Western Union, under a longstanding contract between those two carriers. AT & T disagreed, claiming that the contract then in effect with Western Union did not reflect AT & T's current costs, and that the price charged to MCI for local distribution facilities should be set so as to recover AT & T's costs on a current basis.

In September 1971, AT & T entered into interim contracts with MCI defining the kinds of interconnections that AT & T would provide for MCI's initial Chicago-St. Louis route and establishing the price for those interconnections. These contracts did not permit switched network connections for FX or CCSA type services, nor was the price set by the contracts for local distribution facilities comparable to that charged to Western Union.

During this same time period, the original MCI investors joined forces with William McGowan, an experienced business executive and engineer, to form a venture that envisioned the eventual construction and operation of a nationwide long distance telephone system. After scrutiny of the market it believed had been opened by the *Specialized Common Carriers* decision, MCI created a plan contemplating sales of 74,000 circuits (leased telephone lines) having an average length of 500 miles per circuit, or approximately 37 million circuit miles[14] by the end of 1975. According to this plan, MCI expected its revenues to average $1.00 per circuit mile excluding AT & T's local connection charges, which MCI intended to pass on to its customers. Projected annual revenues for 1975 were approximately $350 million. Armed with these projections, MCI proceeded to raise $110 million by June 1972, making it one of the largest start-up ventures in the history of Wall Street. The funds were raised after review and analysis by leading lenders and large equipment suppliers who were either lending the funds or underwriting or guaranteeing the financing.

---

**13.** Indeed, the district judge in this case characterized the decision as an "abomination" and "one of the worst examples of legal draftsmanship I have ever seen." Tr. 3785.

**14.** Circuit miles measure the total distance covered by all lines leased by customers in a given month. McGowan, Tr. 355–56.

MCI commenced operations over its Chicago-St. Louis route on January 1, 1972. In the fall of 1972, MCI began construction of the first segment of its nationwide system, extending east and south from the original Chicago-St. Louis route. MCI initially expected to complete the first portion of its national network and commence customer service over major parts of the system by late summer 1973. Expansion to a second and a third group of smaller cities was to follow over the next three years. MCI planned to fund these capital expenditures from its initial $110 million capitalization, from substantial additional anticipated financing and from operating revenues.

### B. The Interconnection Disputes

During late 1972, while construction was progressing, MCI entered into negotiations with AT & T over the provision by AT & T of interconnections and local distribution facilities on the expanded MCI system. Because MCI had previously experienced difficulty obtaining satisfactory interconnections for its Chicago-St. Louis segment, MCI hired an experienced lawyer-negotiator to secure a national interconnection agreement with AT & T that would permit MCI to serve the entire market it believed the FCC had opened. These negotiations began in September 1972, and continued with little progress for the next nine months.

During this same period, MCI appealed to the FCC for help in breaking down what it viewed as AT & T's unreasonable negotiating stance. Through a series of informal complaints and conferences with FCC staff, MCI charged that AT & T was treating it unfairly, on the question of interconnections, in at least three respects:

(1) MCI claimed that AT & T was unlawfully denying it interconnections to the switched network for FX and CCSA services and for point-to-point service to customers located outside a local distribution area,[15] including multipoint service; [16]

(2) MCI claimed that it was being charged excessive and discriminatory prices for the local distribution facilities provided by the Bell System; and

(3) MCI claimed that it was being harassed by Bell System employees in the provision of local distribution facilities through delays, improper installation, improper maintenance and other similar practices.

AT & T denied each of these charges. Both in its direct dealings with MCI and in its responses to FCC staff members, AT & T adhered to the position that the *Specialized Common Carriers* decision authorized only private line service not requiring switched network connections. AT & T also contended that it was providing MCI with all the interconnections to which MCI was entitled and that the prices it was charging for those interconnections were not excessive or unfair.

In August 1973, with negotiations still pending, and without informing MCI, AT & T decided to file with forty-nine of the state utility commissions interconnection tariffs that would be equally applicable to all carriers—including MCI and Western Union. By filing interconnection tariffs with the state commissions rather than with the FCC, AT & T made it more difficult for MCI to oppose the tariffs, since, in the words of one AT & T official, the interconnection "controversy would spread to 49 jurisdictions." PX 2148 at 2031. Even after making this unilateral tariff decision, AT & T continued to "negotiate" with MCI. After MCI accidentally learned of the state tariff plan, however, AT & T formally broke off all contract negotiations.

15. The dispute over local distribution areas related to the geographic boundaries within which AT & T was obligated to provide local facilities to MCI. *See infra*, pp. 1145–1147.

16. Multipoint service involves a situation in which a customer has an AT & T private line between Cities A and B, and an MCI private line between Cities B and C. MCI claimed that it was entitled to an interconnection between its terminal and the AT & T terminal in City B so that the customer could obtain direct, *MCI-provided* service between City A and City C. Revenues for the City A to City B segment would, of course, redound to AT & T. *See infra*, pp. 1147–1150.

In early October 1973, several top MCI officials met with Bernard Strassburg, Chief of the FCC Common Carrier Bureau, to discuss a plan designed ·to resolve the interconnection controversies between MCI and AT & T. Pursuant to this plan, FCC Chairman Burch, on October 4, 1973, issued a letter on behalf of the Commission, rejecting AT & T's resort to state regulatory agencies as unlawful and asserting exclusive FCC jurisdiction over the interconnection dispute. Shortly thereafter, MCI wrote to Mr. Strassburg, inquiring as to the nature and scope of the services that MCI was authorized to provide and for which AT & T was obliged to supply interconnections under the *Specialized Common Carriers* decision. Mr. Strassburg replied by letter dated October 19, 1973, that these services included FX and CCSA, as well as services outside local distribution areas and multipoint services. On November 2, 1973, MCI filed a complaint in federal district court under section 406 of the Communications Act asking that AT & T be ordered to provide interconnections for these services.

On December 31, 1973, the United States District Court for the Eastern District of Pennsylvania issued a preliminary injunction ordering AT & T to provide all of the interconnections sought by MCI, on the theory that such interconnections were contemplated and required by the FCC's *Specialized Common Carriers* decision. *MCI Communications Corp. v. AT & T,* 369 F.Supp. 1004 (E.D.Pa.1973). AT & T provided the required interconnections, but immediately appealed the district court's injunction. Meanwhile, the FCC, on December 13, 1973, issued its own order requiring AT & T to show cause why it should not be held to have violated the *Specialized Common Carriers* decision by refusing to provide the interconnections requested by MCI.

On April 15, 1974, the Third Circuit reversed the preliminary injunction issued against AT & T. *MCI Communications Corp. v. AT & T,* 496 F.2d 214 (3d Cir.1974).

On April 16, 1974, despite assurances that the FCC's "show cause" decision was expected "any day now," and despite FCC warnings that disconnection of MCI's customers would violate the Communications Act, AT & T ordered its local operating companies to disconnect MCI's customers on twenty-four hours notice. MCI alleged that the resulting disconnections caused turmoil among its customers and seriously damaged its reputation for reliable service. On April 23, 1974—eight days after the Third Circuit had vacated the injunction obtained by MCI—the FCC issued a decision ordering AT & T to provide the disputed interconnections.[17] *Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers,* 46 F.C.C.2d 413, aff'd sub nom. *Bell Telephone Co. v. FCC,* 503 F.2d 1250 (3d Cir.1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975). The FCC held that it had intended to include both FX and CCSA services within the terms "specialized" or "private line" services as those terms were used in the *Specialized Common Carriers* decision. 46 F.C.C.2d at 425–27. AT & T provided the requested interconnections within ten days of the FCC's order.

### C. *The Execunet Decision*

In October 1974, MCI filed a tariff with the FCC for what the tariff referred to as metered use private line services, principally a service called "Execunet." Although the FCC did not immediately perceive it as such, this tariff was apparently designed to permit MCI to provide ordinary switched long distance service to users in any city to which its microwave system extended. *See MCI Telecommunications Corp.,* 60 F.C.C.2d 25, 40–43 (1976) (the "Execunet decision"). When the FCC discovered the nature and purpose of the new tariff, it declared the tariff unlawful and ordered MCI to discontinue providing ordinary long distance message service on the ground that the *Special-*

---

**17.** Before its 1974 clarification, the FCC had taken the position, in a brief filed in the Ninth Circuit, that the *Specialized Common Carriers* decision did *not* permit the offering of "switched" service (such as FX and CCSA service). This apparent contradiction in the FCC's position was fully presented at trial.

*ized Common Carriers* decision limited MCI's authorization to the provision of private line services. 60 F.C.C.2d at 35–44, 58.

MCI appealed the FCC's Execunet decision to the Court of Appeals for the District of Columbia Circuit and, in July 1977, the Court of Appeals set the decision aside. *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978). In its opinion, the Court of Appeals assumed, without deciding, that "a service like Execunet was not within the contemplation of the [FCC] when it made the *Specialized Common Carriers* decision," 561 F.2d at 378, but held that the FCC had not conducted a sufficient hearing—either during the *Specialized Common Carriers* proceeding or at any subsequent time—to justify *any* limitation on the operating authority of MCI and the other new specialized carriers. *Id.* at 378–80.

This decision by the District of Columbia Circuit—handed down long after the events involved in the instant case occurred—rendered virtually meaningless the debate between MCI and AT & T over the proper interpretation and definition of the specialized private line services to which the *Specialized Common Carriers* decision applied. AT & T also claims that it was only by virtue of this Court of Appeals decision that MCI was able to achieve profitability since, according to AT & T, MCI's costs for private line services (including FX and CCSA) substantially exceeded the rates AT & T was then charging its large users under the Telpak tariff. *See infra,* pp. 1099–1100.

D. *The Pricing Controversies Between MCI and AT & T*

From the time of MCI's entry into the telecommunications field, AT & T's prices for specialized long distance services had been a significant source of controversy. Initially the principal controversy centered on AT & T's Telpak tariff. The Telpak tariff, which accounted for most of AT & T's private line circuits at the time MCI commenced operations, offered private line service to large users under two schedules: (1) the user could obtain the right to up to 60 circuits between any two points for $30 per mile per month, or an average of $.50 per circuit mile per month if all circuits were being used; or (2) the user could obtain the right to up to 240 circuits between any two points for $85 per mile per month, or an average of $.35 per circuit mile per month if all 240 circuits were being used. PX 821.

AT & T originally instituted its Telpak tariff in 1961 as a competitive response to the FCC's decision to permit large telephone users to construct and operate their own private microwave systems.[18] At the time MCI entered the industry, in 1969, a number of microwave manufacturers were contending in proceedings before the FCC that Telpak rates were too low and unfairly hindered efforts to interest large users in building their own microwave systems. At the same time, however, a number of large users, including the federal government, were resisting any efforts to increase the Telpak tariff and, indeed, were contending that Telpak rates were already too high.

In 1968, shortly before MCI obtained its first authorization to enter the telecommunications industry, AT & T was permitted to increase its Telpak rates on an interim basis. During the period 1969–1972, AT & T was able—over the strenuous objections of some Telpak users—to obtain FCC approval for two additional rate increases. Although MCI contended strongly before the FCC that AT & T's Telpak tariff did not cover its fully distributed costs and was therefore predatory, the FCC, in 1977, ultimately rejected all of the attacks upon the Telpak tariff.[19]

---

**18.** For a detailed description of Telpak and how it works, see *American Trucking Ass'ns v. FCC,* 377 F.2d 121, 124–27 (D.C.Cir.1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967).

**19.** *AT & T, Revisions of Tariff F.C.C. No. 260 Private Line Services, Series 5000 (TELPAK),* 64 F.C.C.2d 971, 983–89 (1977). This holding was affirmed by the Court of Appeals for the District of Columbia Circuit after the completion of the trial in the instant case. *Aeronauti-*

Concurrent with MCI's entry into the telecommunications field, AT & T also initiated studies to consider nationwide deaveraging of its rates for individual private line service. Pursuant to these studies, AT & T formulated a plan known as the Hi-Lo tariff, which provided for the deaveraging of AT & T's individual private line service into two principal rate categories.[20] Under Hi-Lo, AT & T would *lower* its rates on certain "high density" long distance routes, many of which MCI planned to serve. At the same time, AT & T would increase its rates between so-called "low-density" cities, most of which MCI was not planning to serve. In February 1973, the month after MCI had announced its plans and prices for nationwide service, AT & T announced Hi-Lo to the public and sought permission from the FCC to file the new tariff. AT & T did not actually receive permission to file its Hi-Lo tariff until November 15, 1973, and the new tariff finally became effective on June 13, 1974.

### E. *MCI's Damage Evidence*

Faced with unproductive negotiations, a "chilled" market caused by AT & T's early announcement of Hi-Lo, and curtailed sales commitments stemming in part from customer awareness of MCI's interconnection difficulties, MCI in mid-1973 began to pare down its construction program. Because the company's revenues were substantially lower than originally anticipated, MCI decided to defer construction on fifteen of the thirty-four routes contained in its original plan. In addition, MCI terminated almost one-third of its employees and renegotiated its bank loans to secure permission to use loan proceeds for working capital rather than for additional construction. Although MCI survived and eventually prospered, it alleges in the instant lawsuit that by the time the interconnection dispute was finally resolved, in May 1975, it had a far smaller system, slower growth rate and related lower net cash flows and profits than it would have had absent AT & T's unlawful interference.

At trial, MCI's proof of damages was based almost entirely on a lost profits study authored by MCI's former controller, Mr. Uhl. This study compared the profits that a hypothetical MCI—undamaged by AT & T's allegedly unlawful actions—would have enjoyed with MCI's actual and projected profit figures for the years 1973–1984.[21] The revenues posited for the "undamaged" MCI were based upon projections made by MCI in 1971–1972 and previously used for financing purposes. Among other presumptions, these revenue projections assumed that AT & T's Telpak service—which the jury in this case found to be lawfully priced and marketed—would not be in existence during the relevant time period. Costs for the "undamaged" MCI were derived from MCI's actual operating experience. These revenue and cost projections were then used to compute MCI's "lost profits," measured in net cash flow, for each of the years 1973–1994.[22] These computations resulted in an aggregated before-tax damage claim of $900,468,000.

AT & T, at trial, sharply disputed the accuracy of MCI's revenue projections. AT & T argued that MCI's own lost profits study demonstrated that MCI could never

*cal Radio, Inc. v. FCC,* 642 F.2d 1221, 1223 (D.C.Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981).

**20.** AT & T had initiated studies to consider a deaveraged rate structure as early as 1970, shortly after the FCC's approval of MCI's Chicago-St. Louis line. The initial proposal resulting from those studies was a so-called "exception tariff" which would have matched MCI's rate over the Chicago-St. Louis route as soon as MCI commenced operations. Warned by its economic advisors that such an exception tariff could be perceived as violative of the antitrust laws, AT & T decided against this approach and opted, instead, for the development of a broadly deaveraged national rate structure. deButts, Tr. 4038–39.

**21.** The revenue projections for the "undamaged" MCI were adjusted downward to account for some delays and uncertainties that MCI officials felt were not fairly attributable to AT & T. *See* Uhl, Tr. 3228–37; PX 1203.

**22.** MCI assumed that the effects of AT & T's allegedly unlawful conduct would be completely eliminated as of 1995.

have achieved profitability in the private line business, even including FX and CCSA services, since MCI's costs for such services substantially exceeded the rates AT & T was then charging its large business users under the Telpak tariff. According to AT & T, MCI's lost profits study showed MCI's costs to be $.63 per circuit mile per month assuming that it could obtain local distribution facilities at the Western Union contract rates and $.74 per circuit mile per month, if it had to pay for those facilities on the basis of the current prices charged by AT & T. On either basis, AT & T argued that MCI's costs were substantially in excess of the Telpak rates and, hence, that MCI could not have undercut these rates and still have covered its costs.[23] AT & T also argued that because its ordinary long distance rates are averaged on a nationwide basis, and because state and federal regulatory policy has traditionally required AT & T to set its long distance rates high enough to subsidize its less profitable local telephone service, MCI and other specialized carriers, by competing exclusively in the most lucrative long distance markets, could easily undercut AT & T's artificially elevated long distance rates.

## II. REGULATION AND THE ANTITRUST LAWS

### A. *The Federal Regulatory Scheme for Telecommunications*

The first venture of the federal government into the regulation of telecommunications was section 7 of the Mann-Elkins Act of 1910,[24] which added telephone and telegraph companies to the list of common carriers regulated by the Interstate Commerce Commission ("ICC"). The Mann-Elkins Act imposed upon the newly-designated common carriers the obligation to provide service upon request at just and reasonable

rates, without unjust discrimination or undue preference.[25] The Act did not, however, subject the telecommunications industry to the broad tariff and regulatory jurisdiction enjoyed by the ICC over railroads. *See Essential Communications Systems v. AT & T,* 610 F.2d 1114, 1117–19 (3d Cir. 1979) (detailing early regulation of telecommunication and railroad industries).

Competition among telephone services in the same geographic area was, in the early part of the century, a fact of life. Thus, the enactment, in 1914, of the Clayton Act's antimerger provisions[26] presented a serious obstacle to the development of an integrated national telephone network. The Willis-Graham Act addressed this problem by authorizing the ICC to approve the consolidation of telephone company properties into single companies if such consolidation was "of advantage to the persons to whom service is to be rendered and in the public interest." Willis-Graham Act of 1921, ch. 20, 42 Stat. 27 (1921) (current version at 47 U.S.C. § 221(a) (1976)). The statute granted express immunity from the antitrust laws for such consolidations. *Id.*

Thus, as of 1921, federal law recognized the telecommunications industry as a common carrier, subject to the consumer protection and non-discrimination provisions of the Mann-Elkins Act and exempt from antitrust liability for consolidations of competing local service systems. In other respects, however, the industry was subject to the antitrust laws. Indeed, in 1914, a government antitrust suit produced a consent decree against AT & T. *See Essential Communications,* 610 F.2d at 1119 & n. 19. Aside from the ICC's jurisdiction to enforce AT & T's common carrier obligations, AT & T was free to determine its own rates, return on investment and service obliga-

---

**23.** MCI countered this contention by arguing, *inter alia,* that AT & T's Telpak rate computations did not include applicable termination charges and that they failed to account for the percentage of base capacity actually used by a customer (the "fill factor"). *See infra,* pp. 1165–1166.

**24.** Mann-Elkins Act of 1910, ch. 309, § 7, 36 Stat. 539, 544 (1910).

**25.** *See* Mann-Elkins Act of 1910, ch. 309, §§ 7, 12, 36 Stat. 539, 544, 551 (1910).

**26.** Clayton Act, ch. 323, § 7, 38 Stat. 731 (1914) (current version at 15 U.S.C. § 18 (1976)).

tions. Federal law did not even impose upon AT & T an obligation to interconnect with other communications common carriers, although AT & T's local subsidiaries were subject to regulation at the state level. *Id.* at 1119.

In 1934, Congress enacted the Federal Communications Act, 47 U.S.C. § 151 *et seq.* (1976), which constitutes the primary federal regulatory mechanism for the telecommunications industry today. The 1934 Act severed regulation of the telephone, telegraph and radio industries from the ICC, and vested regulatory jurisdiction over those industries in the newly created Federal Communications Commission. The Act carried forward, almost verbatim, many provisions of the Mann-Elkins Act of 1910—for example, the just and reasonable tariff requirement and the prohibition against unjust or unreasonable discrimination.[27] The 1934 Act also imposed certain new obligations on the telecommunications industry—for example, the requirement that regulated carriers interconnect or establish through routes with other common carriers. *See* 47 U.S.C. § 201(a) (1976).

With respect to tariffs, the 1934 Act continued the prior practice that tariffs be generated, at least in the first instance, by the carriers themselves. Under section 203(a) of the Act, these tariffs must be filed with the FCC, and carriers must give the FCC and the public ninety days notice of any proposed changes. 47 U.S.C. § 203(a) (1976); 47 U.S.C.A. § 203(b) (West Supp. 1982). No charge may be demanded or collected, or any service rendered, except in accordance with a filed tariff. *Id.* § 203(c). Section 204 of the Act further authorizes the FCC, either *sua sponte* or upon request, to conduct a hearing concerning the lawfulness of the rates embodied in a proposed tariff and to suspend operation of the tariff for up to five months. *Id.* § 204. If the Commission determines that the new tariff does not meet the requirements of the Act,

it may prescribe a "just and reasonable" substitute, or set maximum and/or minimum charges to be observed. *Id.* § 205; *see American Broadcasting Companies v. FCC,* 643 F.2d 818, 822 (D.C.Cir.1980). Any carrier which knowingly fails to obey an FCC order issued under this section is liable for a fine of $1000 per violation per day. In addition, any common carrier which does or causes to be done any act prohibited or declared unlawful by the Communications Act shall be liable "to the person or persons so injured thereby for the full amount of damages," plus attorneys' fees. 47 U.S.C. § 206 (1976).

## B. *Implied Immunity*

AT & T contends that the district court should have dismissed this suit on its motion because the FCC's regulatory control over AT & T's conduct renders AT & T immune from antitrust liability.[28] The trial court denied the motion in a well-reasoned memorandum opinion. *MCI Communications Corp. v. AT & T,* 462 F.Supp. 1072 (N.D.Ill. 1978). Judge Grady traced the legislative history of the Federal Communications Act, and concluded that while AT & T is subject to considerable regulatory control and supervision, there is no indication that the Act was meant to immunize a carrier such as AT & T from the antitrust laws. 462 F.Supp. at 1086–87. Moreover, he concluded, the regulatory scheme to which AT & T is subject is not so wholly inconsistent with the antitrust laws as to require immunity. AT & T is not subject to conflicting requirements, nor would it be held liable for decisions which were not its own business judgment. The district court noted that the FCC did not sanction AT & T's conduct with regard to interconnections nor dictate its tariffs. Thus, while certain actions might ultimately have been subject to agency review, the initial decisions were the product of AT & T's private business judg-

---

**27.** *Compare* Mann-Elkins Act of 1910, ch. 309, §§ 7, 12, 36 Stat. 539, 544, 551 (1910) *with* Communications Act of 1934, ch. 652, §§ 201, 202, 43 Stat. 1064, 1070 (1934) (current version at 47 U.S.C. §§ 201(b), 202(a) (1976)).

**28.** We acknowledge the brief on this issue of the United States as *amicus curiae.*

ment, and were not so heavily regulated as to remove them from AT & T's control.

On appeal, AT & T contends that the district court's decision incorrectly focused on blanket immunity rather than immunity for the particular actions of which MCI complained. Thus, AT & T argues that the critical question left unconsidered by the district court is "whether the charges in this case do in fact relate to matters basic to the pervasive regulatory scheme to which AT & T is subject." Appellant's Br. at 188. Our reading of the district court's opinion, however, convinces us that it did not, as AT & T insists, miss the point now raised on appeal. While the district court did address the question of "blanket immunity" (*i.e.*, whether regulation by the FCC under the public interest standard contained in the Communications Act is wholly inconsistent with the antitrust laws), 462 F.Supp. at 1078, 1080–82, it also fully considered AT & T's "fall back position ... that even though all of AT & T's conduct may not be immunized, the FCC, in its pervasive regulation, has approved each of the allegedly anticompetitive activities of which MCI complains and that therefore AT & T should obtain at least ad hoc immunity from antitrust laws." *Id.* at 1078, 1082–1102. For the reasons largely set forth in the district court's memorandum opinion denying AT & T's motion to dismiss, we reject AT & T's assertion of implied immunity.

As the district court recognized, the Communications Act of 1934 does not expressly grant AT & T immunity from the antitrust laws for the conduct challenged in the instant case. Nor does the legislative history of the Communications Act indicate how Congress intended that the Act and the antitrust laws were to be reconciled. *See United States v. AT & T,* 461 F.Supp. 1314, 1321 (D.D.C.1978); Comment, *AT & T and the Antitrust Laws: A Strict Test for Implied Immunity,* 85 Yale L.J. 254, 269 (1975). It is well established, however, that regulated industries "are not *per se* exempt from the Sherman Act." *Georgia v. Pennsylvania R.R.,* 324 U.S. 439, 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051 (1945). "Repeal of the antitrust laws by implication is not favored and

not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon v. New York Stock Exchange,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975) (quoting *United States v. Philadelphia National Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963)). As a further limitation, repeal is to be regarded as implied only where necessary to make the regulatory scheme work, and even then, only to the minimum extent necessary. *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963); *see National Gerimedical Hospital & Gerontology Center v. Blue Cross,* 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981).

Application of these general principles to a particular claim of implied immunity requires an evaluation of the specific regulatory scheme involved and the administrative authority exercised pursuant to that scheme. *Northeastern Telephone Co. v. AT & T,* 651 F.2d 76, 83 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *see National Gerimedical Hospital & Gerontology Center v. Blue Cross.* Thus, in our case, the inquiry must focus upon (1) whether the activities that are the subject of MCI's complaint were required or approved by the Federal Communications Commission, pursuant to its statutory authority, in a way that is incompatible with antitrust enforcement, *see, e.g., Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), or (2) whether these activities are so pervasively regulated "that Congress must be assumed to have forsworn the paradigm of competition." *Northeastern Telephone,* 651 F.2d at 82; *see United States v. AT & T,* 461 F.Supp. 1314, 1324 (D.D.C.1978).

 With respect to interconnections, we conclude, as did the district court, that the FCC's regulatory authority under the

Communications Act does not preclude application of the Sherman Act. *See* 462 F.Supp. at 1089–96. The mere pervasiveness of a regulatory scheme does not immunize an industry from antitrust liability for conduct that is voluntarily initiated. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973); *see* Comment, *The Application of Antitrust Law to Telecommunications,* 69 Calif.L.Rev. 497, 509 (1981). Although the FCC has authority to compel interconnection under section 201(a) of the Act, the initial decision whether to interconnect rests with the utility, and the record shows that the FCC did not control or approve of AT & T's actions here. Nor has the FCC supervised AT & T's interconnection practices so closely that the FCC's approval could be inferred. *Cf. Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975).

Other circuits that have considered AT & T's implied immunity in interconnection-type disputes have uniformly rejected arguments the same as or similar to those made by AT & T in the instant case. *See, e.g., Northeastern Telephone Co. v. AT & T,* 651 F.2d 76 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *Phonetele, Inc. v. AT & T,* 664 F.2d 716 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983); *Mid-Texas Communications Systems v. AT & T,* 615 F.2d 1372, 1377–82 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Sound, Inc. v. AT & T,* 631 F.2d 1324, 1327–31 (8th Cir.1980) (citing with approval Judge Grady's memorandum opinion); *Essential Communications Systems v. AT & T,* 610 F.2d 1114 (3d Cir.1979); *see also United States v. AT & T,* 461 F.Supp. at 1320–30. *But see Southern Pacific Communications Co. v. AT & T,* 556 F.Supp. 825 (D.D.C. 1982). We agree with the reasoning of these decisions and are not persuaded that a contrary result is warranted here.

AT & T relies heavily on *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), and *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d

325 (1963), to support its claim that "matters at the heart of a pervasive scheme of common carrier, or public utility, regulation [here, presumably, AT & T's interconnection and pricing policies] are immune from antitrust liability." Appellant's Br. at 183. In both of these cases, however, the Supreme Court found that the transactions challenged as violative of the antitrust laws fell precisely within the detailed scheme of administrative oversight established by Congress. Thus, in *Hughes Tool,* the Court held that where the Civil Aeronautics Board (CAB) had specifically authorized certain transactions between a parent and its subsidiary, those transactions were immunized from antitrust liability by section 414 of the Federal Aviation Act, 49 U.S.C. § 1378 (1976). Similarly, in *Pan American Airways,* the Court held that section 411 of the Federal Aviation Act granted to the CAB the very jurisdiction over the division of territories and allocation of air carrier routes that was the subject of the government's antitrust complaint. In the instant case, by contrast, neither AT & T's interconnection decisions nor its price structure policies are dictated, in the first instance, by the FCC (although, of course, AT & T's overall rate of return is subject to continuing surveillance). Moreover, to the extent that any FCC decisions are relevant to AT & T's claim of implied immunity, those decisions disapprove of, rather than condone, AT & T's actions. Thus, this is not a case like *Hughes Tool* or *Pan American Airways,* where the refusal to grant antitrust immunity could subject AT & T to conflicting and potentially irreconcilable liability standards. *See also Phonetele, Inc.,* 664 F.2d at 732–34.

AT & T also cites the case of *FCC v. RCA Communications, Inc.,* 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), for the proposition that the public interest standard embodied in the Communications Act is inconsistent and thus presumably irreconcilable with the policy of the antitrust laws favoring competition. However, the Eighth Circuit, in *Sound, Inc. v. AT & T,* 631 F.2d 1324 (8th Cir.1980), recently rejected precisely

this irreconcilability argument. In *Sound, Inc.*, AT & T argued that it was exempt, by virtue, *inter alia,* of the public interest standard contained in the Communications Act, from antitrust liability arising out of its rate structure and marketing practices for terminal telephone equipment. In rejecting AT & T's assertion that the public interest standard of the Communications Act was necessarily inconsistent with the pro-competition standard of the antitrust laws, the Eighth Circuit noted that the FCC had exercised its supervisory authority so as to *encourage* rather than discourage competition in the terminal equipment market. In light of this policy, the court concluded that "the maintenance of an antitrust suit will not conflict with the operation of the regulatory scheme authorized by Congress but will supplement that scheme." 631 F.2d at 1330. Similarly, in the instant case, the interconnection policies adopted by the FCC during the time period relevant to this litigation appear designed to promote rather than inhibit competition in the specialized telecommunications field. Thus, the allowance of antitrust liability is likely to complement rather than undermine the applicable statutory scheme.

■ AT & T's assertion of implied immunity with respect to MCI's predatory pricing allegations presents a closer question. Because section 201(b) of the Communications Act requires that AT & T's rates be "just and reasonable," and because both AT & T's rates and rate making methodology are subject to continuing supervision by the FCC, it is probable that AT & T enjoys less flexibility in setting rates than it does, for example, in making initial interconnection decisions. Moreover, it can be argued that the hearing and enforcement provisions of the Communications Act itself afford competitors such as MCI an adequate opportunity to contest and seek relief from tariffs they consider unreasonable or unfair.[29] Al-

though these arguments are not entirely without merit, we believe that, under the particular circumstances of this case, AT & T is not entitled to antitrust immunity for the competitive rate filings which form the basis of MCI's predatory pricing claims.

Although the Communications Act grants the FCC potentially broad authority over interstate and foreign telephone rates, in practice this authority is considerably more circumscribed. First, as the district court in this case noted, the Act gives the carrier sole responsibility for filing a tariff, and a carrier may file a new or revised tariff at any time. *See* 47 U.S.C. § 204 (1976). Thus, it is AT & T, not the FCC, that has the primary responsibility for initiating and setting both regular and private line telephone rates. *See Sound, Inc.,* 631 F.2d at 1330. "When [such decisions] are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws." *Otter Tail,* 410 U.S. at 374, 93 S.Ct. at 1028.[30]

Moreover, although the Communications Act gives the FCC the right to conduct hearings on proposed tariffs, a new tariff automatically goes into effect after 90 days unless acted upon by the FCC in its discretion. *See* 47 U.S.C. § 203(b)(1) (Supp.1981). Thus, the FCC does not expressly approve or adopt as agency policy every tariff it permits to become effective. "By permitting a tariff to go into effect, the FCC does not assert that it has examined the content of the tariff and found it necessary or appropriate to effectuate the regulatory program, nor does it have an obligation under the Act to make such a finding." *Phonetele,* 644 F.2d at 733; *see Essential Communications,* 610 F.2d at 1124; *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365, 374 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978).

---

**29.** *But see Essential Communications,* 610 F.2d at 1120 (Communications Act intended for the benefit of customers, not competitors).

**30.** But we believe that FCC regulation of AT & T's rates may be more pervasive than Federal

Power Commission (now Federal Energy Regulation Commission) regulation of the wholesale rates of electric utilities. *Cf. Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

The less than comprehensive nature of the FCC's authority over tariffs is further reinforced by the huge volume of tariff filings received by the Commission. During the twelve month period between September 1974 and August 1975, for example, the FCC received 1,371 tariff filings, totaling 11,491 pages. Because of this volume, it was able to investigate only a small percentage of the tariffs filed. *See United States v. AT & T,* 461 F.Supp. at 1326. Recognizing these practical limitations on its regulatory jurisdiction, the FCC has acknowledged, in an antitrust case involving implied immunity questions similar to those at issue here, that "rate filings generally proceed from the carrier's independent judgment ..." *Id.* at 1326 (quoting Memorandum of FCC, filed December 30, 1975, pp. 19–20). Moreover, the FCC has consistently maintained—in contrast to the SEC in the stock exchange cases relied upon by AT & T—that antitrust enforcement is not precluded in this area.[31] *United States v. AT & T,* 461 F.Supp. at 1326. Finally, as is the case in the interconnection context, the actual FCC decisions relevant to the pricing policies challenged as predatory in the instant case have tended to disapprove of, rather than support, those policies.[32] We thus conclude that where, as here, the pricing decisions complained of are more the result of business judgment than regulatory coercion, and the FCC has neither dictated nor approved of those decisions, the challenged rate filings are not immune from antitrust scrutiny.[33] *See City of Kirkwood v. Union Electric Co.,* 671 F.2d 1173, 1176–

79 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983) (no immunity for rate filing under similar provisions of Federal Power Act); *City of Mishawaka v. Indiana & Michigan Electric Co.,* 560 F.2d 1314, 1318–21 (7th Cir.1977), *cert. denied,* 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978) (denying immunity for price squeeze claim arising out of relationship between electric utility's filed wholesale and retail rates); *cf. Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (denying state action immunity for light-bulb-exchange program contained in tariff approved by state public utility commission).

### C. The Impact of Regulation

■ Our conclusion that AT & T is not entitled to antitrust immunity in the instant case does not mean that AT & T's status as a regulated common carrier is irrelevant to our evaluation of AT & T's conduct. On the contrary, an industry's regulated status is an important "fact of market life," the impact of which on pricing and other competitive decisions "is too obvious to be ignored." *ITT v. General Telephone and Electronics Corp.,* 518 F.2d 913, 935–36 (9th Cir.1975) (footnote omitted). For this reason, the Supreme Court has repeatedly recognized that consideration of federal and state regulation may be proper even after the issue of antitrust immunity has been resolved. *United States v. Marine Bancorporation,* 418 U.S. 602, 627, 94 S.Ct. 2856, 2872, 41 L.Ed.2d 978 (1975) (application of antitrust doctrine to bank mergers

**31.** The FCC maintains, however, that when it has prescribed or specifically approved a tariff, its judgment must control. *See United States v. AT & T,* 461 F.Supp. at 1327 n. 39; *cf. Jeffrey v. Southwestern Bell Tel. Co.,* 518 F.2d 1129 (5th Cir.1975) (state action immunity from antitrust laws granted where challenged rate had been approved by municipality after thorough hearings).

**32.** *See, e.g., AT & T, Charges, Regulations, Classifications and Practices For Voice Grade/Private Line Service (High Density— Low Density),* 55 F.C.C.2d 224, 244 (1975) (Interim Decision); 58 F.C.C.2d 362, 364, 370 (1976) (Final Decision) (finding Hi-Lo tariff "unlawful" because AT & T had not submitted

sufficient cost data to justify the tariff); *AT & T, Revisions of Tariff FCC No. 260 Private Line Services, Series 5000 (TELPAK),* 61 F.C.C.2d 587, 651–62 (1976) (overall rate levels for AT & T's private line telephone service unlawful because not set in accordance with fully distributed cost methodology), *aff'd in part, rev'd in part sub nom. Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221 (D.C.Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981).

**33.** AT & T's claim that its tariff filings with *state* commissions are immune from antitrust liability under the *Noerr-Pennington* doctrine is analyzed separately *infra,* at pp. 1153–1158.

"must take into account the unique federal and state restraints on [defendant's conduct]. Failure to do so would produce misconceptions that go to the heart of the doctrine itself"); *see Silver v. New York Stock Exchange,* 373 U.S. 341, 360–61, 83 S.Ct. 1246, 1258–1259, 10 L.Ed.2d 389 (1963) (although applicable statutory scheme not sufficiently pervasive to create antitrust immunity, particular acts of self regulation—even if in restraint of trade—may be justified with reference to that scheme); *Otter Tail,* 410 U.S. at 381, 93 S.Ct. at 1031 (court, in fashioning antitrust remedy, "should [not] be impervious to [regulated utility's] assertion that compulsory interconnection or wheeling will erode its integrated system and threaten its capacity to serve adequately the public").

Similarly, several recent decisions of the courts of appeals involving regulated industries have emphasized the "continuing significance of regulation" in evaluating alleged antitrust violations. *Mid-Texas Communications Systems v. AT & T,* 615 F.2d 1372, 1385 (5th Cir.1980), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980) (antitrust laws "are not so inflexible as to deny consideration of government regulation."); *Almeda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343, 354 (5th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980) ("Monopolization cases involving . . . regulated industries are special in nature and require close scrutiny."); *Jacobi v. Bache & Co.,* 520 F.2d 1231, 1237–39 (2d Cir.1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976) (rejecting application of *per se* liability rule in light of regulation of stock exchange); *ITT,* 518 F.2d at 935–36 (impact of regulations must be assessed as fact of market life). As Professors Areeda & Turner have stated:

> [A]ntitrust courts can and do consider the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation. Just as the administrative agency must consider the competitive premises of the antitrust laws, the antitrust court must consider the peculiarities of an industry as recognized in a regulatory statute.

1 P. Areeda & D. Turner, Antitrust Law ¶ 223d (1978).

Whether in a regulated context or not, the broad outline of the offense of monopolization is well understood. Most recently, the Supreme Court has stated:

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966); *see Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274–76 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Cases dealing with non-regulated industries have developed a number of analytic tools designed to aid courts in identifying each of these elements. In many instances, however, these tools are of only limited value in resolving monopolization charges against regulated monopolies. *See* Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards,* 22 Antitrust Bull. 559, 563 (1977). In particular, the presence of a substantial degree of regulation, although not sufficient to confer antitrust immunity, may affect both the shape of "monopoly power" and the precise dimensions of the "willful acquisition or maintenance" of that power. *Id.*

According to the Supreme Court, monopoly power may be defined as "the power to control prices or exclude competition" in a relevant market. *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). In many cases involving unregulated industries, however, courts have eschewed examination of the ostensible monopolist's actual degree of control over prices or competition, and have relied solely on statistical data concerning the accused firm's share of the

market. Where that data reveals a market share of more than seventy to eighty percent, the courts have inferred the existence of monopoly power. *See, e.g., United States v. Grinnell,* 384 U.S. at 571, 86 S.Ct. at 1704; *American Tobacco Co. v. United States,* 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946); *Standard Oil Co. v. United States,* 221 U.S. 1, 33, 31 S.Ct. 502, 505, 55 L.Ed. 619 (1911).

■ Such a heavy reliance on market share statistics is likely to be an inaccurate or misleading indicator of "monopoly power" in a regulated setting. In many regulated industries, each purveyor of service, regardless of absolute size, is in a monopoly position with regard to its customers. Indeed, while a regulated firm's dominant share of the market typically explains *why* it is subject to regulation, the firm's statistical dominance may also be the *result* of regulation. *See United States v. Marine Bancorporation,* 418 U.S. at 633, 94 S.Ct. at 2875. For these reasons, the size of a regulated company's market share should constitute, at most, a point of departure in assessing the existence of monopoly power. Ultimately, that analysis must focus directly on the ability of the regulated company to control prices or exclude competition—an assessment which, in turn, requires close scrutiny of the regulatory scheme in question.[34]

■ In the instant case, the district court properly instructed the jury that, in determining whether AT & T possessed monopoly power in the relevant market,

> you may consider the effect of the FCC's exercise of regulatory authority over prices and entry, including interconnection. Similarly, you may consider the effect of the exercise by state regulatory agencies of regulatory authority over

prices and entry in connection with the provision of local services and facilities. That AT & T may have had the largest share or the entire share of the telephone business in certain areas would not be sufficient to establish that AT & T possessed monopoly power if in fact regulation by regulatory agencies prevented AT & T from having the power to restrict entry or control prices.

App. 1200.

■ Although the district court's instructions in this area might have been more helpful if they had described, in more detail, the specific regulatory scheme to which AT & T was subject, *see Mid-Texas,* 615 F.2d at 1386–87, we believe the instructions, taken as a whole, adequately apprised the jury of its duty "to take into account the unique federal and state regulatory restraints" to which AT & T was subject. *Id.* at 1387. We, therefore, reject AT & T's contention that the trial court's instructions on this issue left the jury without any meaningful way to assess the impact of regulation on the existence or non-existence of AT & T's monopoly power and constituted reversible error.

■ AT & T's status as a regulated public utility also bears on the second element of a monopolization offense: the willful acquisition or maintenance of monopoly power. The precise dimensions of the "willfulness" standard have been the subject of considerable litigation and varying formulations even in cases involving unregulated industries. Some courts, building upon Judge Learned Hand's noted opinion in *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945), have concluded that monopolistic conduct can be presumed from the possession of monopoly power unless the accused firm affirmatively demon-

---

**34.** *See, e.g., Travelers Insurance Co. v. Blue Cross,* 361 F.Supp. 774, 780 (W.D.Pa.1972), *aff'd,* 481 F.2d 80 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973) (company was not a monopoly since it lacked control over rate-making mechanism); *Nankin Hospital v. Michigan Hospital Service,* 361 F.Supp. 1199, 1209–10 & n. 33 (E.D.Mich.1973) (company did not possess monopoly power

since rates were controlled and actively reviewed by state insurance commission). *Cf. International Railways of Central America v. United Brands Co.,* 532 F.2d 231, 240 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976) (consent decree which fixed freight rates removed ability of banana grower to coerce lower freight rates from railroad and thus negated finding of monopoly power).

strates that its monopoly position has been "thrust upon it." *Id.* at 432; *see American Tobacco Co. v. United States,* 328 U.S. at 813–14, 66 S.Ct. at 1140–1141. Under this analysis, if the ordinary business conduct of a dominant firm leads to the acquisition or maintenance of monopoly power, that conduct is presumed to reflect the requisite willful monopolistic intent. Whatever merit this presumption may have in other contexts,[35] we believe it is a particularly inappropriate means of identifying monopolistic conduct by a regulated utility or common carrier. For these industries, anticipating and meeting all reasonable demands for service is often an explicit statutory obligation. *See, e.g.,* 47 U.S.C. § 201(a) (1976) ("It shall be the duty of every common carrier . . . to furnish such communication service upon reasonable request therefor."). To apply the *Alcoa* presumption to such conduct would be tantamount to holding that adherence to a firm's regulatory obligation could, by itself, constitute improper willfulness in a section 2 monopolization case.

This circuit has already declined to endorse such an anomalous result. In *City of Mishawaka v. American Electric Power Co.,* 616 F.2d 976, 985 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981), we specifically held that "[i]n the particular circumstances of a regulated utility . . . entitled to recover its cost

of services and provide its investors with a reasonable rate of return, we believe that something more than general intent should be required to establish a Sherman Act violation." *See also* Watson & Brunner, *supra,* at 574–79 (willfulness by a regulated monopoly should be demonstrable only by evidence of predatory conduct or other exclusionary acts contrary to public policy). We reaffirm our holding in *Mishawaka* and, therefore, reject MCI's contention on cross-appeal that the trial court erred in requiring MCI to prove that each allegedly anticompetitive act or practice attributed to AT & T was done with the intent to maintain a monopoly in the relevant market.[36]

The impact of regulation was also an important element of AT & T's defense in the instant case. Particularly with regard to the interconnection controversy, AT & T argued that its dealings with MCI were reasonable and that they represented a good faith attempt to comply with AT & T's regulatory obligations under section 201 of the Communications Act. AT & T claims that the trial court's instructions improperly prevented the jury from considering this defense, in that the instructions were fatally "silent concerning the overall structure of the Communications Act, the public interest standards under which the provisions of that Act are administered by the FCC and to which common carriers are

**35.** Although many cases make reference to *Alcoa*'s innovative presumption, in the more than three decades since that case was decided, courts have consistently found monopolization only in circumstances where predatory or exclusionary conduct was proven. Watson & Brunner, *supra* at 590 n. 83; *see Hanover Shoe, Inc. v. United Shoe Machine Corp.,* 392 U.S. 481, 485–86, 88 S.Ct. 2224, 2227, 20 L.Ed.2d 1231 (1968); *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 343–44 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). In most successfully prosecuted section 2 monopolization cases, predatory or exclusionary practices held to constitute a violation of section 1 of the Sherman Act have also been present. *See, e.g., United States v. Grinnell,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Griffith,* 334 U.S. 100, 106–07, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct.

1125, 90 L.Ed. 1575 (1946); *United States v. Reading Co.,* 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760 (1920); *cf. Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 273–76 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (integrated monopolist's failure to predisclose innovations and its ability to sell monopolized and competitive products as a system are not unlawful uses of monopoly power, but legitimate advantages of size and integration); *Telex Corp. v. IBM,* 510 F.2d 894, 927–28 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) (reversing finding of section 2 liability in the absence of predatory conduct).

**36.** We reject MCI's suggestion that our holding in *Mishawaka* is limited to the unique situation of an alleged price squeeze by an electric utility subject to both federal and state rate regulation.

required to conform their conduct, and the requirements set forth in the Act relating to the particular interconnection and pricing controversies presented to the jury for resolution." Appellant's Br. at 138.

[13] MCI, by contrast, argues in its cross-appeal that the district court gave *too much* credence to AT & T's regulatory defense. In particular, MCI claims that the district court improperly held it to an "over-rigorous burden of proof" by instructing the jury that, if AT & T believed in good faith that interconnection with MCI would have violated established regulatory policies, then AT & T's refusal to interconnect could not be considered anticompetitive conduct. We reject both parties' contentions. The district court in this case properly allowed AT & T to assert a defense based on good faith adherence to its regulatory obligations. *See Mid-Texas,* 615 F.2d at 1388–90. The district court also properly articulated this defense in its instructions to the jury. Thus the district court instructed the jury that

> MCI must prove more, however, than the fact that AT & T refused to provide the interconnections. As you know, AT & T contends that it refused to provide the connections because it believed that it had not been ordered to do so, that MCI was not authorized to provide the service, and that it would have violated established regulatory policies for MCI to receive the connections. If AT & T refused the interconnections because of such reasons, believing in good faith that they justified the refusal, then the refusal to provide the interconnections was not anti-competitive conduct and cannot be considered conduct engaged in for the purpose of maintaining a monopoly.

> MCI has the burden of proving that in refusing the FX and CCSA interconnections AT & T acted with anti-competitive

intent, for the purpose of maintaining a monopoly, rather than for what it in good faith regarded as legitimate reasons. App. 1201.

Similarly, with respect to the charge that AT & T unlawfully pre-announced its Hi-Lo tariff, the jury was told to consider AT & T's contention that the time interval involved was reasonable and required by applicable regulations. In addition, the district court instructed the jury that:

> With respect to those facilities and interconnections which AT & T did not provide, its position is that its failure to do so was based upon a good faith belief that it would have violated established regulatory policies and therefore that it acted reasonably in all the circumstances.[37]

App. 1200.

We believe these instructions adequately conveyed to the jury the substance of AT & T's regulatory defense and, thus, allowed the jury to "consider the effect of regulation in ascertaining whether Bell misused its monopoly power." *Mid-Texas,* 615 F.2d at 1389. We reject AT & T's contention that the trial court's failure to provide a more detailed exposition of the standards contained in the Communications Act constitutes reversible error. We also reject MCI's counter-argument that the district court's instructions in this area improperly placed upon MCI the burden of disproving AT & T's subjective good faith. *See California Computer Products, Inc. v. IBM Corp.,* 613 F.2d 727, 736 (9th Cir.1979) (holding that a verdict must be directed in favor of defendant when plaintiff's evidence is insufficient to establish that defendant acted unreasonably). In the particular context of an industry subject to extensive and rapidly changing regulatory demands, we believe that an antitrust defendant is entitled both to raise and to have the jury

---

**37.** Moreover, the trial court assured the jury that

> the Sherman Act allows a regulated firm with monopoly power to compete vigorously whenever it may be faced with competition. So long as the defendant's competitive responses to plaintiffs were based on legitimate

business decisions and on the merits of defendant's services, defendant cannot be found to have unlawfully maintained a monopoly. This is so even if plaintiffs were hurt by the competition and defendant sought to retain as much of its business as possible. App. 1199–1200.

consider its good faith adherence to regulatory obligations as a legitimate antitrust defense. *See Mid-Texas,* 615 F.2d at 1389–90; *City of Mishawaka,* 616 F.2d at 985.

Finally, we believe the fact of FCC regulation is relevant to our analysis of antitrust principles in another, more subtle way. AT & T, as the dominant firm in a regulated industry recently opened in part to competition, is subject to dual, and sometimes conflicting, principles of regulatory and antitrust law. As already indicated, we believe the trial court properly reconciled these bodies of law by allowing AT & T to present evidence as to its good faith belief in its compliance with regulatory requirements. In addition, the fact of FCC regulation to some extent affects our view of the appropriate purposes and proper scope of antitrust law in the present context—specifically, whether we should focus our examination on economic efficiency and consumer benefit or whether we should more expansively consider the political and social consequences of bigness or concentration of economic power. *Compare* R. Bork, *The Antitrust Paradox* (1978) *and* R. Posner, *Antitrust Law* (1976) *with* L. Sullivan, *Handbook of the Law of Antitrust* § 2 (1977) *and* Pitofsky, *The Political Content of Antitrust,* 127 U.Pa.L.Rev. 1051 (1979) *and* Schwartz, *"Justice" and Other Non-Economic Goals of Antitrust,* 127 U.Pa.L. Rev. 1076 (1979).

Certain factors may tend to distinguish this from ordinary monopolization cases. AT & T is a *public utility* subject to *public regulation,* occupying a unique place in the American industrial scene. To the extent that it may have enjoyed economies of scale and significant technological resources, the political and regulatory judgment, until recently, has been to tolerate the political and social consequences of its size in the ostensible interest of reliable, effective and economic telecommunications service. Now this regulatory judgment has been drastically modified, and competition—with all its economic, political and social consequences—is transforming the telecommunications industry.

Certainly this transformation, carried out at the behest of regulatory authorities, is meeting the broadest objectives of the antitrust laws at least as effectively as they might be pursued by this court in this case. The FCC has exercised its powers under the Communications Act and has instituted sweeping pro-competitive changes in the telecommunications industry to accommodate the broad demands of national communications policy. We also note the role of the Justice Department, AT & T itself and the federal district court in the consent decree entered recently between AT & T and the government in the District Court for the District of Columbia. *See United States v. AT & T,* 552 F.Supp. 131 (1982). The massive restructuring of AT & T accomplished in that decree is an additional avenue through which the issues of the concentration of economic power in the Bell System, as well as its political power, are being addressed.

We acknowledge with approval the populist origins of the antitrust laws as well as the preeminent role of the Sherman Act as a charter of economic freedom.[38] But we also believe that, as we have pointed out, larger concerns about broad pro-competitive policy, economic concentration and political power have been, and are being at this very moment, effectively addressed by the regulators, and possibly by the Congress. Hence, we have tended to believe it appropriate to focus at this time and in this case upon the specific issues of economic efficiency and consumer benefit which are directly presented. Thus, our resolution of the allegations of predatory pricing and unlawful failure to interconnect MCI to Bell's local distribution facilities has centered on the questions whether prices cover costs and whether the denied facilities are essential. We are, of course, not insensitive to broader social and political issues, but as indicated,

---

**38.** *See Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958).

we think that our principal task is to deal in depth with the specific questions presented.

## III. PREDATORY PRICING

At trial MCI alleged that AT & T had engaged in predatory pricing of both its Telpak and Hi-Lo services for long distance business communications. The jury found that Telpak was lawfully priced, but that Hi-Lo was priced below its fully distributed costs and was predatory. We disapprove this finding with respect to Hi-Lo because of erroneous instructions, the use of an improper cost standard and insufficiency of the evidence. We also disapprove the jury's finding that AT & T unlawfully pre-announced its Hi-Lo tariff. Further, we reject MCI's cross-appeal on Telpak's marketing plan and sustain the jury's finding that Telpak was lawfully priced and marketed.

### A. Jury Instructions

One of the crucial issues presented at trial concerned the proper standard for determining predatory pricing. Both parties presented expert testimony on this issue. AT & T argued that unless its prices for a particular service failed to cover that service's long-run incremental costs the price could not be found predatory. MCI contended that proof of price below fully distributed cost was sufficient to establish predation.

At trial Judge Grady refused to instruct the jury as to which cost measure was the correct legal standard to determine predatory pricing. Instead, he left the choice of a cost-based standard for predation—in this case fully distributed costs ("FDC") or long-run incremental costs ("LRIC")—for the jury to decide as a question of fact. Judge Grady instructed the jury:

> [Y]ou're going to have to decide whether it should be fully distributed costs on the one hand, or incremental costs on the other hand; and in doing that you'll have

to look at all the evidence and decide which is the cost that truly reflects the actual cost of producing the service.

. . . .

The test for determining whether Hi-Lo was predatory is the same as for Telpak. Again, it is a question of whether the price covered what you consider the applicable cost. If it did, you may not infer predatory intent. If it did not, you may infer predatory intent.

Tr. 11486–87.[39] As a result, the special verdict required the jury to check which cost standard it felt was appropriate and then decide whether AT & T's prices were below that measure of cost: either LRIC or FDC.

This we hold to be error. The choice of a cost-based standard for evaluating claims of predatory pricing is a question of law to be decided by the trial judge. Thus, while several courts have stated that the appropriate cost-based standard for predation may differ depending on the facts of the case, see, e.g., Chillicothe Sand & Gravel Co. v. Martin Marietta Corp., 615 F.2d 427 (7th Cir.1980), both courts and commentators are united in regarding the selection of that standard as a question of law. Indeed, the entire judicial and academic struggle to enunciate an appropriate definition of predatory pricing reflects the legal rather than factual nature of the question. Since a finding of below-cost pricing permits the jury to infer, or even presume, anticompetitive intent, it is imperative that the judge instruct the jury on the relevant cost standard to compare with defendant's prices. See 2 P. Areeda & D. Turner, supra, at ¶ 315.

MCI relies on Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d 391 (4th Cir. 1974), to support the proposition that the jury may select the appropriate cost standard to evaluate a predatory pricing claim. MCI's reliance here reflects an overly broad

---

**39.** In the course of instructing the jury, Judge Grady noted that the term "average costs" had also been referred to at trial as "fully distributed costs" or "embedded costs," and the term "marginal costs" had also been used inter-changeably with "incremental" or "long-run incremental costs." Tr. 11485. This arguably imprecise terminology, see infra, was repeated in the special verdict. App. 1207–1209.

interpretation of that case. In *Greenville Publishing* the Fourth Circuit reversed a grant of summary judgment for the defendant in a case charging monopolization and attempted monopolization. On the issue of predatory pricing the court took note of affidavits by the defendant purporting to show that the operation of the advertising guide in question was profitable and that prices covered average variable costs. Plaintiffs challenged both the actual calculation of these costs and the failure of the defendant to include in its cost calculations "any portion of the company's fixed expenses or personnel costs." *Id.* at 397 & n. 10.

The court in *Greenville Publishing* reversed the grant of summary judgment in favor of the defendant stating "[t]he sum of this evidence presents an issue of disputed fact." *Id.* at 398. It is misleading, however, in the context of the instant case, to place much reliance on this sentence. The court in *Greenville Publishing* was not concerned with which entity—judge or jury—is empowered to select the proper cost-based standard for determining predation. Rather, the *Greenville Publishing* court was addressing the much more general issue of the propriety of summary judgment in a complex antitrust case. At the summary judgment stage, the plaintiffs in *Greenville Publishing* had presented no evidence on the issue of anticompetitive intent other than the pricing policies of the defendant. Hence, the propriety of summary judgment on plaintiffs' monopolization and attempted monopolization claims turned entirely on whether any inferences of intent could be drawn from the relationship between the defendant's prices and costs. The Fourth Circuit's refusal to uphold the grant of summary judgment in *Greenville Publishing* merely represents the traditional view that summary judgment is generally inappropriate in complex antitrust cases where intent may be difficult to discern. *Id.* at 398 (citing *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)).

There is no support in the cases for the proposition that a jury may simply choose the cost-based standard it feels is most appropriate. Indeed, the only other purportedly apposite case cited by MCI in its brief, the district court's opinion in *Northeastern Telephone Co. v. AT & T,* 497 F.Supp. 230 (D.Conn.1980), has been reversed on this very point, with the Second Circuit stating that the cost standard used to determine whether a monopolist's prices were predatory was a legal question. 651 F.2d 76, 87 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), *rev'g in part* 497 F.Supp. 230, 240–41 (D.Conn.1980). Judge Grady himself acknowledged that it is inappropriate for the jury to consider all possible economic theories of predation in ruling that MCI's originally proffered profit-maximizing theory was inadequate as a matter of law.

B. *Below Cost Pricing*

██ Liability for predatory pricing represents an exception to the general antitrust regime which contemplates that no limits on price competition shall be imposed. Predatory pricing is prohibited because of the fear that a monopoly or dominant firm will deliberately sacrifice present revenues for the purpose of driving rivals from the market and then recoup its losses through higher profits earned in the absence of competition. *See Northeastern Telephone Co. v. AT & T,* 651 F.2d 76, 86 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L. Rev. 697, 698 (1975). [Hereinafter cited as Areeda & Turner, *Predatory Pricing*].

There is at present, in cases such as the one before us, no reliable way to determine whether predatory pricing has occurred without some comparison between the prices charged and a properly defined measure of the cost of production. A subjective test based wholly upon intent is almost incapable of distinguishing between pro- and anticompetitive price cuts by a monopolist. Areeda, *Predatory Pricing (1980),* 49 Antitrust L.J. 897, 899 (1980); R. Posner, *supra,* at 188. Nor is a subjective test

capable of identifying which pricing strategies represent rational business decisions and which have no legitimate business purpose and are designed only to injure competition.

█ In addition, a test based wholly on intent is unworkable.[40] Even if it were possible to identify those persons within a firm whose intentions are relevant, the meaning of the evidence will usually be obscure. After all, competition consists of winning business from rivals. The intent to preserve or expand one's market share is presumptively lawful. To encourage judges and juries to rely overly on nonprobative data allegedly bearing on a firm's "state of mind" invites the twin mischiefs of (1) burdening litigation with thousands of documents about the firm's motives and calculations; and (2) encouraging inconsistent and quixotic results. Areeda, *Predatory Pricing (1980),* 49 Antitrust L.J. 897, 899 (1980); *see* R. Posner, *supra,* at 189–90.[41]

In the absence of an objective standard, firms making pricing decisions in the presence of competition would be unable to ascertain what price reductions may be legally undertaken. Because the antitrust laws are designed to encourage vigorous competition, as well as to promote economic efficiency and maximize consumer welfare, such uncertainty seriously undermines the goals of antitrust enforcement. As one commentator has recently emphasized:

> It is imperative that courts timely establish objective and understandable pricing standards which bring into sharp focus the line which separates commenda-ble price reductions from predatory pricing practices. Such standards are necessary for the guidance of businessmen ... Businessmen should not be put into the position where they must either forego competitive price decreases or risk treble damages in Sherman Act suits.

Sherer, *Predatory Pricing: An Evaluation of its Potential for Abuse Under Government Procurement Contracts,* 6 J.Corp.L. 531, 539 (1981).

Within the past decade, both economists and lawyers have recognized the need for an objective standard to evaluate predatory pricing claims.[42] Advocates of an objective test agree that price cuts by a dominant firm or monopolist are nothing more than lawful competition on the merits *if* prices remain above costs. Since such price cuts benefit consumers by providing greater output of desired goods at lower prices, they are pro-competitive and cannot result in the elimination of equally efficient competitors.

Similarly, the courts have nearly unanimously adopted some form of a cost-based standard in deciding questions of predation. *E.g., Northeastern Telephone Co. v. AT & T,* 651 F.2d 76 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 430–32 (7th Cir.1980); *California Computer Products, Inc. v. IBM Corp.,* 613 F.2d 727, 742–43 (9th Cir.1979); *Janich Bros. v. American Distilling Co.,* 570 F.2d 848, 857 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Pacific Engi-*

---

**40.** We do not mean to imply that direct probative evidence of a defendant's intent is inadmissible. *See infra,* note 59.

**41.** Early antitrust cases could define predatory pricing only in vague verbal formulations relating to predatory intent and ruinous competition. *See Moore v. Mead's Fine Bread Co.,* 348 U.S. 115, 118, 75 S.Ct. 148, 149, 99 L.Ed. 145 (1954); *Forster Mfg. Co. v. FTC,* 335 F.2d 47, 52–53 (1st Cir.1964), *cert. denied,* 380 U.S. 906, 85 S.Ct. 887, 13 L.Ed.2d 794 (1965); *Porto Rico Am. Tobacco Co. v. American Tobacco Co.,* 30 F.2d 234, 236 (2d Cir.), *cert. denied,* 279 U.S. 858, 49 S.Ct. 353, 73 L.Ed. 999 (1929). Such vague definitions resulted in erratic application of the law as well as lengthy and complex inferences of intent, which were of little predictive or precedential value. *See* Brodley & Hay, *Predatory Pricing: Competing Economic Theories and the Evaluation of Legal Standards,* 66 Cornell L.Rev. 738, 765–67 (1981) [hereinafter cited as Brodley & Hay, *Predatory Pricing* ]; Areeda & Turner, *Predatory Pricing* at 699.

**42.** *See, e.g.,* 3 P. Areeda & D. Turner, *supra,* at ¶ 711–15 (1978); R. Posner, *supra,* at 189; Areeda & Turner, *Predatory Pricing* at 709–13; Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213 (1979).

*neering & Production Co. v. Kerr-McGee Corp.,* 551 F.2d 790, 797 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *National Association of Regulatory Utility Commissioners v. FCC,* 525 F.2d 630, 637–38 & n. 34 (D.C.Cir.), *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).

MCI nonetheless argues in its cross-appeal that the district court erred in requiring it to prove that AT & T priced its Hi-Lo service below any measure of cost. MCI contends that, if AT & T knowingly sacrificed revenue (*i.e.,* failed to maximize its profits) with the intent to injure competition, this court should hold that behavior to constitute unlawful predatory pricing. In support of this "profit maximization" theory, MCI cites a trio of cases. *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358 n. 5 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 724 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423, 432 (N.D.Cal.1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981).

■ Each of these cases contains language to the effect that a price may be predatory if it is below the short-run profit-maximizing price and barriers to new entry are great. Assuming, *arguendo,* that these statements are more than mere dicta, we must reject such a "profit maximization" theory as incompatible with the basic principles of antitrust. The ultimate danger of monopoly power is that prices will be too high, not too low. A rule of predation based on the failure to maximize profits would rob consumers of the benefits of any price reductions by dominant firms facing new competition.[43] Such a rule would tend to freeze the prices of dominant firms at

their monopoly levels and would prevent many pro-competitive price cuts beneficial to consumers and other purchasers. In addition a "profit maximization" rule would require extensive knowledge of *demand* characteristics—thus adding to its complexity and uncertainty. Another, and related, effect of adopting the "profit maximization" theory advocated by MCI would be to thrust the courts into the unseemly role of monitoring industrial prices to detect, on a long term basis, an elusive absence of "profit maximization." Such supervision is incompatible with the functioning of private markets. It is in the interests of competition to permit dominant firms to engage in vigorous competition, including price competition. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 273 (2d Cir. 1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). We therefore reject MCI's "profit maximization" theory, and reaffirm this Circuit's holding that liability for predatory pricing must be based upon proof of pricing below cost. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427 (7th Cir.1980).

### C. Defining Measures of Cost

The first commentators to propose a specific cost-based standard for predatory pricing were Professors Areeda and Turner, who argued that pricing below a firm's short-run marginal cost should be deemed unlawful, and that prices above that level should be deemed lawful. Areeda & Turner, *Predatory Pricing* at 709–13. *See also* 3 P. Areeda & D. Turner, *supra,* at ¶ 711–15. In economic terms, short-run marginal cost represents the increment to total cost that results from producing an additional unit of output, where some inputs of production are variable and others are fixed. 3 P. Areeda & D. Turner, *supra,* at ¶ 712 at 155. Because short-run marginal cost is an economic concept that cannot be derived by conventional accounting methods, Areeda and Turner advocate the use of "average

---

**43.** It should also be noted that AT & T is a regulated public utility. A dominant purpose of public utility regulation is to deny AT & T profits attributable to its monopoly power. It would be anomalous indeed in this context to require AT & T, as a matter of antitrust law, to maximize its profits.

variable cost" ("AVC") as a proxy in predatory pricing cases. Variable costs, as the name implies, are costs that vary with changes in output. They typically include such items as materials, fuel, maintenance, and labor directly used to produce the product. *Id.* A product's average variable cost is the sum of all its variable costs divided by the number of units of output.

The Areeda-Turner rule has engendered much discussion about whether short-run marginal (or, its proxy, average variable) cost represents the proper cost standard for evaluating predatory pricing claims.[44] Much of the economic literature, as well as the case law, has examined whether average *variable* cost or some measure of average *total* cost (which includes "fixed" as well as variable costs) represents the better cost standard for measuring predatory pricing.

It is unfortunate that in the course of trial the case before us was characterized as a contest between the supporters and opponents of the Areeda-Turner rule. At trial long-run incremental cost was incorrectly equated with average variable cost while fully distributed cost was incorrectly equated with average total cost. In fact, the validity of the Areeda-Turner rule, based on *short-run* marginal costs, is not at issue in this case because neither party ever argued for a *short-run* cost standard. Rather, AT & T introduced evidence, unrefuted by MCI, showing that its prices for both Telpak and Hi-Lo were above those services' *long-run* incremental costs.

There are important economic differences between long-run incremental cost and short-run marginal cost. First, *incremental*

costs (LRIC) represent the average cost of adding an entire new service or product rather than merely the last unit of production. Professor Alfred Kahn has highlighted this distinction by stating:

> [M]arginal cost, strictly speaking, refers to the additional cost of supplying a single, infinitesimally small additional unit, while "incremental" ... refer[s] to the *average* additional cost of a finite and possibly a large change in production or sales.

1 A. Kahn, *The Economics of Regulation* 66 (1970) (emphasis in original).

Second, and more important, long-run incremental cost differs from average variable cost in that it is a *long-run* rather than a *short-run* cost measure. Because variable costs, by definition, are associated with the limited time period in which a firm cannot replace or increase its plant or equipment, the cost of plant and equipment is regarded as fixed and is not included in the calculation of a product's short-run marginal, or average variable, cost. Long-run incremental cost, by contrast, measures *all* the costs of adding a new product or service—"fixed" as well as variable costs (and "capital" as well as "operating" items).[45] Essentially, the LRIC approach assumes that *all* costs become variable in the long run. Hence, a number of the criticisms that have been leveled against the choice of a short-run marginal cost standard are not applicable to the use of long-run incremental cost. The use of long-run cost analysis may be particularly appropriate to capital-intensive processes where growth of plant and equipment is marked.

**44.** *See* Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 Harv.L.Rev. 868 (1976); Areeda & Turner, *Scherer on Predatory Pricing: A Reply,* 89 Harv.L.Rev. 891 (1976); Scherer, *Some Last Words on Predatory Pricing,* 89 Harv.L.Rev. 901 (1976); Williamson, *Predatory Pricing: A Strategic and Welfare Analysis,* 87 Yale L.J. 284 (1977); Areeda & Turner, *Williamson on Predatory Pricing,* 87 Yale L.J. 1337 (1978); Williamson, *A Preliminary Response,* 87 Yale L.J. 1353 (1978); Williamson, *Williamson on Predatory Pricing II,* 88 Yale L.J. 1183 (1979); Greer, *A Critique of Areeda and Turner's Standard for Predatory*

*Practices,* 24 Antitrust Bull. 233 (1979); Koller, *When is Pricing Predatory?,* 24 Antitrust Bull. 283 (1979). *See also* R. Posner, *supra,* at 184–196.

**45.** Professor William Baumol has defined long-run incremental costs of product X as "total company cost minus what the total cost of the company would be in the absence of production of X, all divided by the quantity of X being produced." Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1, 9 n. 26 (1979).

In addition to incorrectly equating long-run incremental cost with short-run marginal (or average variable) cost, the district court (without adequate guidance from the parties) incorrectly equated fully distributed cost ("FDC") with average total cost. *Both these notions are incorrect because LRIC and FDC can be viewed as simply different ways of defining the average total cost ("ATC") of a particular product or service for a firm that produces multiple products or services.*[46]

For a single product firm, average total cost can be easily defined as the sum of all costs, both fixed and variable, divided by the total units of output produced by the firm. Such simple concepts of average total cost, however, lose their meaning when one considers a multi-service firm such as AT & T. Joint and non-joint common costs shared among products of the same firm render it impossible to calculate ATC simply by adding up costs and dividing by the number of units of output. This is possible only in a firm which produces a single product. One cannot proceed in this fashion for multiproduct firms because the total number of units produced include many different products each with different costs and different price and sales data. It is there-fore necessary, in the multiproduct context, to determine what costs are *caused* by which products and services, and this requires some sort of differential (*e.g.*, incremental) methodology.

■ In an antitrust context, fully distributed cost is not an economically relevant definition of average total cost and must be rejected as determinative.[47] First, FDC is a quite arbitrary allocation of costs among different classes of service. There are countless FDC methods, each allocating costs by a different mathematical formula.[48] Despite trenchant criticism on economic grounds,[49] FDC continues to be widely used for regulatory purposes, *inter alia,* because of its ease of application in dividing an authorized total revenue requirement among individual products or services—much as a pie is divided into slices. But FDC cannot purport to identify those costs which are *caused* by a product or service, and this is fundamental to economic cost determination.

FDC also fails as an economically relevant measure of cost for antitrust purposes because it relies on historical or embedded costs. For it is current and anticipated cost, rather than historical cost that is rele-

**46.** "Average total cost" as we use it here refers to average total *economic* cost, as the term is employed by economists in predatory pricing analysis. *See generally* Brodley & Hay, *Predatory Pricing.* The term "average total costs" is also sometimes used in utility ratemaking to refer to the revenue required to meet all the *accounting* costs of an entire utility enterprise. *See infra,* note 52.

**47.** No objection has been made in the instant case to the introduction of fully distributed cost evidence. Thus, nothing in this opinion should be construed as reflecting on the admissibility of fully distributed cost evidence. Under some circumstances—for example, the operation of a single product enterprise in a stable economy—average balance sheet costs may provide an acceptable proxy for LRIC. *See* R. Posner, *supra,* at 190. The use of FDC, as a proxy, in various contexts, is always open to examination.

**48.** Thus, various FDC methods will normally produce quite different calculations of the cost of a product or service. In one electric utility rate case one witness testified to the existence of at least 29 different methods of apportioning costs among services. J. Bonbright, *Principles of Public Utility Rates* 351 (1961). The FCC itself has required AT & T to submit at least seven different FDC cost studies. In the instant case, cost studies using these seven different FDC methods were introduced at trial. Not surprisingly, each method yielded a significantly different cost profile.

A simple example helps to highlight the arbitrariness of FDC methodology. Imagine a railroad line that simultaneously transports three different products: gold, lead and feathers. If the railroad attempted to calculate, on a fully distributed cost basis, the cost of shipping each of these products, it would reach radically different results depending on whether it allocated joint and common costs on the basis of the value, weight, or bulk of the respective commodities shipped.

**49.** *See generally,* 1 A. Kahn, *supra,* at 150; J. Bonbright, *supra; Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221, 1236–47 (D.C.Cir.1980) (Wilkey, J., dissenting), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981).

vant to business decisions to enter markets and price products. The business manager makes a decision to enter a new market by comparing anticipated additional revenues (at a particular price) with anticipated additional costs. If the expected revenues cover *all* the costs caused by the new product, then a rational business manager has sound business reasons to enter the new market. The historical costs associated with the plant already in place are essentially irrelevant to this decision since those costs are "sunk" and unavoidable and are unaffected by the new production decision. This factor may be particularly significant in industries such as telecommunications which depend heavily on technological innovation, and in which a firm's accounting, or sunk, costs may have little relation to current pricing decisions.[50]

In particular, FDC fails as a relevant measure of cost in a competitive market. FDC is, at best, a rough indicator of an appropriate rate *ceiling* for regulatory purposes and should not be used as a measure of the minimum price permissible in a competitive market. The justifiable fear of monopoly, and the basis of section 2 of the Sherman Act, is that a firm enjoying monopoly power will not be constrained by market forces; it will raise prices and decrease output in such a manner that its own profit will be maximized but that consumers will be subject to higher prices and a less efficient allocation of resources than would be the case in a competitive market. A standard making predatory pricing illegal and subject to treble damages must be carefully structured to fit the needs of the Sherman Act and its encouragement of competition on the merits. *See Janich*

*Bros. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). When a price floor is set substantially *above* marginal or incremental cost a price "umbrella" is created which allows less efficient rivals to remain in the market sheltered from full price competition. A fully distributed price floor may thus misallocate resources and force consumers to pay more for less production than competition would dictate.

The economic literature that has considered the problem of predatory pricing has rejected almost entirely the notion that fully distributed costs are a relevant measure of ATC.[51] To the contrary, long-run incremental cost has been approved as an economically relevant measure of average total cost for one product produced by a multiproduct firm. Professor Baumol has stated in reply to the sloppy use of the term "average total cost":

> By average total cost, [one] surely does not mean fully allocated cost, which is a mare's nest of arbitrary calculations parading as substantive information ... Consequently, I assume that when [one] requires the price of a good in the long-run to exceed its "average total cost," [one] defines the latter to mean the average incremental cost of the product including any fixed cost outlays required by the item.

Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1, 9 n. 26 (1979). Professors Joskow and Klevorick agree with this critique of fully distributed cost as a measure of average total cost:

---

**50.** This decision path illustrates that LRIC analysis is not, as the dissent suggests, a solely theoretical view of the question, but is, in fact, a meaningful representation of the implicit issues considered in the making of business decisions in the real world.

**51.** MCI has cited no economic authority beyond the testimony of its own expert, Dr. Melody, which supports fully distributed cost as a measure of average total cost. Similarly, MCI has cited no economic authority supporting the use of fully distributed cost in an *antitrust*

context. *But cf.* Noll & Rivlin, *Regulating Prices in Competitive Markets,* 82 Yale L.J. 1426 (1973) (use of incremental cost methods in setting regulated prices may invite predatory pricing). *See generally* Melody, *Comment,* in *New Dimensions in Public Utility Pricing* 205 (H. Trebing ed. 1976) (discussing the problems of marginal cost information in regulatory contexts); Melody, *The Marginal Utility of Marginal Analysis in Public Policy Formulation,* 8 J.Econ. Issues 287 (1974).

For a single-product firm, average total cost is easily defined. In the more likely multiproduct context, we are using "average total cost" to signify the average incremental cost of the commodity of concern and not any arbitrary "fully allocated cost measure."

Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213, 252 n. 79 (1979). Since all costs are variable in the long run it is long-run incremental costs (including return on investment) which most closely measure anticipated average total cost. 3 P. Areeda & D. Turner, *supra,* at ¶ 712 at 156. *Cf.* R. Posner, *supra,* at 190.[52]

A simplified example of some of these cost relationships can be found in Judge Wilkey's dissenting opinion in *Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221, 1236 (D.C.Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981) (Wilkey, J., dissenting).[53] In Judge Wilkey's example, a judge accepts an invitation to participate in a law school moot court, with the school paying for his hotel room costing $125 per night. He later decides to bring his wife along even though the school's moot court representative cannot assure him that his wife's expenses will also be paid. Judge and Mrs. X attend the moot court, and their hotel bill for two is $150 per night. Upon his return, Judge X sends the moot court board his itemized expenses, noting that if the board has decided to pay for his wife's trip, he should be reimbursed at $150 a day; if not, he should receive $125 a day, the amount it would have cost him had he attended the moot court alone. The moot court board sends back a check for $75, noting that it is unable to absorb the expenses of Mrs. X, and explaining that, using a fully distributed cost methodology, it has allocated one half of the couple's daily $150 hotel bill to Judge X and the other half to his wife. Judge X is understandably both annoyed and confused; he knows that if he had attended the moot court alone, he would have been reimbursed at $125 a day, because this is what his actual hotel charge would have been, and because the moot court board's original invitation had been extended on this basis. Judge X is also angry because, had he known that the moot court board was going to penalize him in this manner, he would not have asked Mrs. X to accompany him, but would have come by himself at the agreed all-expenses paid rate of $125 a day. Thus, both practical considerations and economic theory dictate that the relevant cost of Mrs. X's stay is $25 and that a marginal cost methodology should be used to analyze the judge's travel expenses and other real world problems.[54]

---

**52.** Unfortunately the terms "average total cost" or "average total costs" have been used ambiguously. As we use "average total cost" in this opinion, we mean average total *economic* cost, *i.e.* costs on a forward-looking basis. *See generally* 1 A. Kahn, *supra,* at 73–74, 130–33. For a particular product or service of a multiproduct business "average total cost" is defined differentially as the average long-run incremental cost of the product or service in question. The term "average total costs" has also been used in quite a different sense in a utility ratemaking setting to refer to the revenues required to meet all the *accounting, historical* or *embedded* costs of the entire utility enterprise. *See* Bonbright, *supra,* at 300. This latter usage of "average total costs" is not applicable here since we are concerned with the *economic* cost of a particular service of a multiservice business. Such a cost must be one which is *caused* by the particular service in question. *Cf.,* Brodley & Hay, *Predatory Pricing* at 780–86; Cudahy and Malko, *Electric*

*Peak-Load Pricing: Madison Gas and Beyond,* 1976 Wis.L.Rev. 47, 62.

**53.** In *Aeronautical Radio,* the District of Columbia Circuit held that the FCC did not act arbitrarily and capriciously in adopting a form of fully distributed cost methodology for purposes of evaluating proposed telephone rates. Judge Wilkey dissented, arguing that FDC was irrational, arbitrary and capricious even as applied to regulatory ratemaking.

**54.** Judge Wilkey goes on to draw the parallel between this example and AT & T's pricing decisions:

The parallel with the AT & T situation is obvious. The cost for monopoly services is fixed, and will be the same whether the competitive services are added by AT & T or not. The cost for the monopoly services is the equivalent of the $125 which would have been the hotel charge for Judge X; the cost for the competitive services would be the

### D. *The Proper Cost Standard*

This case, insofar as predatory pricing is concerned, is truly one of first impression for this circuit. The case law in this and most other circuits has thus far largely addressed the merits of short-run marginal cost (or its proxy, average variable cost) as compared with average total cost; the cases have not discussed the choice between long-run incremental cost and fully distributed cost as a way to measure average total cost. *See, e.g., Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir.1980); *Borden, Inc. v. FTC*, 674 F.2d 498, 515 (6th Cir.1982), *petition for cert. filed*, 51 U.S.L.W. 3271 (U.S. Aug. 25, 1982) (No. 82–328); *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340 (3d Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982); *Americana Industries v. Wometco de Puerto Rico, Inc.*, 556 F.2d 625 (1st Cir.1977); *International Air Industries v. American Excelsior Co.*, 517 F.2d

714 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). *Cf. Northeastern Telephone Co. v. AT & T*, 651 F.2d 76, 89–90 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (rejecting use of fully distributed cost standard). The Supreme Court has not spoken on the entire issue of predatory pricing except to note a firm's below cost pricing in a price discrimination case. *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 698–99, 87 S.Ct. 1326, 1333–1334, 18 L.Ed.2d 406 (1967).

Recently, several courts have questioned whether *short-run* marginal cost should be the exclusive standard for predatory pricing and have expressed a willingness to consider other factors. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir.1981), *cert. denied*, —— U.S. ——, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); *International Air Industries v.*

---

additional $25 which would be added if Mrs. X enjoyed the use of the same services. From the hotel's point of view, the additional cost for Mrs. X's presence is only the additional linens and food, and therefore the incremental cost for her presence is a relatively small amount compared to the basic cost of providing that one room and facilities for one person. (The hotel might calculate that the presence of Mrs. X would generate sales in the shops on the hotel premises and thus add a small amount to hotel revenues, and thus the hotel could encourage her presence by charging even less than the cost of the linens and food and still make a profit on the incremental services. Similar comparisons might be made to AT & T services.)

To apply fully distributed costs to the stay of the couple at the hotel is economic nonsense; it is unquestionably true that considered *ab initio* the cost of providing the room and food for the two persons can be divided equally, $75 apiece, but this bears no relation to the economic logic of the way to conduct a hotel business or to conduct a moot court board's business either. What the moot court board was faced with from the start was paying the total expenses of Judge X, which amounted to $125 at the price charged by the hotel. Similarly, the price charged by the hotel for Judge X individually was what it cost to put one person in the room and provide meals and all services, with a reasonable profit.

Both the hotel and the moot court board should logically and sensibly run their busi-

ness on an incremental cost basis, just as is advocated by AT & T and the Antitrust Division in our case. The basic cost of having Judge X come to the moot court is going to be $125 a day whether Mrs. X comes or not. The board is logically forced to pay this price. The advent of Mrs. X is something entirely within the control of Judge X; she can come or not, and if she does come, there is no moral or economic right of the moot court board to profit by the incremental service the hotel is providing for Mrs. X by reducing the cost allocated to Judge X's presence, which logically still remains at $125 a day and is not either economically or equitably reducible to $75.

Similarly, the charges which the monopoly customers of AT & T have been paying and which have been previously determined as fair, based on the costs of AT & T in providing these services, should not necessarily be reduced simply because AT & T can inaugurate other services in the competitive market. The costs properly allocated to the new competitive services of AT & T are incremental costs, not fully distributed costs, because the costs of the monopoly services should remain the same irrespective of whether AT & T enters competitive markets or not. (Actually, as shown by the detailed economic exposition above, there is hope that the competitive services of AT & T, with incremental cost pricing, will definitely contribute to a lowering of costs for the monopoly service customers.)

642 F.2d at 1245–47 n. 52.

*American Excelsior Co.*, 517 F.2d 714 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *see generally* Note, *Predatory Pricing: The Retreat from the AVC Rule and the Search for a Practical Alternative*, 22 B.C.L.Rev. 467 (1981) (hereinafter cited as Note, *Retreat from AVC*). Exclusive reliance on AVC (a proxy for short-run marginal cost) has been criticized primarily on the grounds that it focuses on short-run rather than long-run price cost comparisons, a criticism which, as noted earlier, is not fairly applicable to LRIC. *See* Note, *Retreat from AVC* at 484–85, 489–94.

This court in *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir.1980), affirmed the use of an incremental cost methodology as the starting point for predatory pricing analysis. In that case, the Areeda-Turner standard based upon *short-run* marginal cost was cited as "both a relevant and an extremely useful factor" in identifying predatory conduct. 615 F.2d at 432. We are now required to move away from the Areeda-Turner rule because we are faced with a choice between two different cost standards—LRIC or FDC—each of which may be argued to measure average total cost. If average total cost is the objective (and the principle of cost causation is to be honored), we think that LRIC *is* and FDC *is not* an appropriate method of getting at it.[55] We, of course, do not close the door on such other methods—as yet undeveloped and undisclosed—as may be firmly based on the relation of *cause* and *effect* between the product or service involved and the costs it produces.

It is not surprising that no court has ever adopted fully distributed cost as the appropriate cost standard in a predatory pricing case. Most recently, the Second Circuit rejected fully distributed cost and adopted marginal cost as the test for predation in a

case involving AT & T. In *Northeastern Telephone Co. v. AT & T*, 651 F.2d 76 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), the court considered allegations that a Bell System affiliate had engaged in predatory pricing in the equipment market. The Second Circuit, in reversing the portion of the judgment relating to predatory pricing, stated:

Adopting marginal costs as the proper test of predatory pricing is consistent with the pro-competitive thrust of the Sherman Act. When the price of a dominant firm's product equals the product's marginal costs, "only less efficient firms will suffer larger losses per unit of output; more efficient firms will be losing less or even operating profitably." . . . Marginal cost pricing thus fosters competition on the basis of relative efficiency. Establishing a pricing floor above marginal cost would encourage underutilization of productive resources and would provide a price "umbrella" under which less efficient firms could hide from the stresses and storms of competition.

*Id.* at 87 (citation omitted).

The Second Circuit explicitly rejected the trial court's reasoning that because AT & T was a multiservice regulated utility the use of fully distributed cost was appropriate. *Id.* at 89–90. The Second Circuit reiterated its conclusion that maintaining a price floor above marginal cost provided a haven for inefficient competitors. It then detailed the perverse effects of FDC pricing on consumer welfare and the competitive process itself. Finally, the court examined and rejected the argument that FDC was required to prevent cross-subsidization, explaining that if prices were above marginal cost no subsidies could exist and in fact contributions would be made to the overhead of the other Bell services. *Id.* at 90. *See also Southern Pacific Communications Co. v. AT & T*, 556 F.Supp. 825 (D.D.C. 1982).

55. We regard this case as being tried under a stipulation that a form of average total cost would be used to determine predation. Thus, we analyze whether LRIC or FDC is the most meaningful economic measure of average total cost. This analysis should not be construed as a rejection of the Areeda-Turner rule using average variable costs. We affirm our previous holding in *Chillicothe* that pricing below average variable cost is normally one of the most relevant indications of predatory pricing.

The Eighth Circuit has also rejected the use of fully allocated costs, although in a less definitive manner than the Second Circuit. In *Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275 (8th Cir.1981), the court held that pricing below fully allocated cost but above average variable cost was not predatory, particularly in the absence of predatory intent or other conduct sufficient to render the pricing unreasonable.

Nor has FDC gained any adherents among district courts in the Sixth Circuit, which has not decided the validity of the Areeda-Turner short-run marginal cost approach. *See Borden, Inc. v. FTC,* 674 F.2d at 515 (affirming violation of section 5 of the FTC Act where monopolist had engaged in selective price cutting and promotional allowances in competitive markets only); *cf.* Brodley and Hay, *Predatory Pricing* at 780–86. In *Hillside Dairy Co. v. Fairmont Foods Co.,* 1980–2 Trade Cas. ¶ 63,313 (N.D. Ohio 1980), the Northern District of Ohio considered a meeting competition defense to a price discrimination charge where the facts indicated that the defendant had inadvertently beaten rather than met its competitor's dairy prices. The court held that such a defense would still prevail if the defendant had made substantial efforts to verify the actual price offered by its competitor, and did not operate at a loss in supplying the product. *Id.* at p. 75,625. The court, in holding for the defendant, explicitly chose average variable cost over fully allocated cost as the proper standard. *Id.* at p. 75,626.

The other circuits have been virtually unanimous in their endorsement of a marginal cost standard for predatory pricing. The Third Circuit stated recently in *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340 (3d Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982), that although the record before it obviated the need to choose explicitly among competing economic theories of predation, it was "inclined to accept the basic premise of the Areeda and Turner thesis that predatory intent may not be inferred from sales at or above average variable cost." 659 F.2d at 352.[56] Similarly, in *International Air Industries v. American Excelsior Co.,* 517 F.2d 714 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976), the Fifth Circuit held that, except where barriers to entry are "extremely high," a plaintiff claiming predatory pricing must show that the defendant "is charging a price below his average variable cost in the competitive market." 517 F.2d at 724 & n. 31.[57]

**56.** The trial court in *Hommel,* relying on the Supreme Court's decision in *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), had allowed the jury to hear evidence of defendant's pricing below total cost. *See* 472 F.Supp. 793, 795–97 (W.D.Pa.1979). On this evidence the jury found for the plaintiff on a Robinson-Patman violation, but not on a section 2 Sherman Act violation. Hence, on appeal, the Third Circuit faced only the issue of the appropriate pricing standard in price discrimination cases. Without ruling on the question whether the standards for predatory pricing were the same for both price discrimination and monopolization, the Third Circuit reversed the district court and entered judgment for the defendant, in part because of the absence of any evidence that prices were below average variable cost. 659 F.2d at 350–53.

**57.** An important, but presently theoretical, issue not directly before this court is the propriety of using short-run marginal cost (as opposed to some measure of average total cost) in predatory pricing cases involving industries with high entry barriers. Several courts have suggested that exceptions to the Areeda-Turner rules may be appropriate where entry barriers are high—one of the circumstances in which true predatory pricing is more likely to occur. *See, e.g., International Air Industries v. American Excelsior Co.,* 517 F.2d at 724; *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358 n. 5 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *cf. Northeastern Telephone,* 651 F.2d at 89 (barriers to entry into business telephone equipment market "relatively low").

There is some evidence that barriers to entry may be high in the long distance telecommunications field. There is also evidence, however, that the development of microwave technology has significantly lowered those barriers. *See* Note, *Recent Federal Actions Affecting Long Distance Telecommunications: A Survey of Issues Affecting the Microwave Specialized Common Carriers Industry,* 43 Geo.Wash.L.Rev. 878, 894 (1975). Because both parties here have argued for measures of average total cost, we do not reach this question except to note that one of the principal barriers to entry in the telecommunications industry is the need for

The First, Tenth and District of Columbia Circuits have also expressed their approval of the Areeda-Turner marginal cost test. *See Americana Industries v. Wometco de Puerto Rico, Inc.*, 556 F.2d at 628; *Pacific Engineering & Production Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 797 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *AT & T v. FCC*, 602 F.2d 401, 410 n. 49 (D.C.Cir.1979); *National Association of Regulatory Utility Commissioners v. FCC*, 525 F.2d 630, 638 n. 34 (D.C.Cir.), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976); *Southern Pacific Communications Co. v. AT & T*, 556 F.Supp. 825 (D.D.C.1982).

Only one circuit has ever permitted a jury to hear evidence of predation based on pricing above average variable but below average total cost. In *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir.1981), *cert. denied*, —— U.S. ——, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982), the Ninth Circuit held that it was permissible for a jury to find predation based on evidence that demonstrated pricing above average variable cost, if accompanied by intent. In *Inglis* the trial court had entered judgment n.o.v. for the defendant as a result of plaintiff's failure to introduce evidence that prices were below marginal costs. *Id.* at 1026.

The Ninth Circuit reversed, noting its reluctance to adopt the Areeda-Turner rule as the exclusive test for predatory pricing. *Id.* at 1032. In place of Areeda-Turner, the court stated a new rule:

> [W]e hold that to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. If the defendant's prices were below average total cost but above average variable

cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.

*Id.* at 1035–36. *See also D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.*, 692 F.2d 1245 (9th Cir.1982).

Nothing in this statement supports the use of *fully distributed cost* in a predatory pricing case. The Ninth Circuit established a rule which allows a jury to hear evidence of pricing between ATC and AVC without any reference to FDC at all. The court in *Inglis* defined average total cost as the "portion of the firm's total cost—both fixed and variable—attributable on an average basis to each unit of output." *Id.* at 1035 n. 30. This definition is consistent with the use of long-run incremental cost as a measure of ATC, as advocated by Professors Baumol, Joskow and Klevorick; it does not support the use of non-economic cost measures such as FDC. Moreover, the *Inglis* rule must be read narrowly to avoid conflict with prior Ninth Circuit decisions endorsing a marginal cost standard and with the specific reason given by the Ninth Circuit in *Inglis* for reversing the district court. *See id.* at 1032–33, 1036.

It is important to understand that the "average total cost," to which some courts and commentators refer, should not be equated with FDC; it is, when properly understood, best measured in the multiproduct context by *average long-run incremental cost.* Essentially, this is the case because LRIC, unlike FDC, only measures costs which are causally related to the service or product in question.[58]

---

FCC permission to enter the field. Since the FCC has extensive powers to open up the telecommunications industry to new competition and to "fine tune" the permissible competitive prices by regulation, any such barriers to entry

may not be of overriding concern in an antitrust context.

**58.** How practically to compute LRIC (including the possible use of proxies, where appropriate, *cf.* Brodley & Hay, *Predatory Pricing* at 780–86)

This is not an economist's quibble or a theoretical musing; it is a matter of principled analysis and practical reality in the market place. Pricing at or above long-run incremental cost in a competitive market is a rational and profitable business practice. Because there are legitimate, and in fact compelling, business reasons for pricing products at or above their long-run incremental cost, no predatory intent should be presumed or inferred from such conduct.[59]

### E. Cross-subsidization

MCI makes one final argument to support the use of fully distributed cost. MCI argues at considerable length that an FDC methodology is required to prevent AT & T from subsidizing its competitive services with revenues derived from services in which it retains a monopoly. MCI claims that such "cross-subsidization" injures AT & T's competitors as well as AT & T's local monopoly customers, who must pay higher rates in order to "subsidize" the company's less profitable private line services. Nowhere does MCI define precisely what it means by a "cross-subsidy," although it presented evidence at trial that different AT & T services earned differing rates of return. In particular, MCI noted that AT & T's Telpak and other private line long distance services, although showing a posi-tive rate of return, earned on an allocated rate base a lower rate of return than did certain other AT & T long distance services.

Such differing rates of return, however, even if correctly and meaningfully derived, do not support the imposition of antitrust liability. The fact that different services may earn different rates of return largely reflects the realities of a competitive market.[60] Where a firm faces competition, demand is more elastic—that is, more sensitive to changes in prices—because of the presence of other firms producing substitute products to which buyers may turn. Lower returns on investment are to be expected in competitive markets because each firm, in accordance with classical competitive theory and practice, will be forced to lower prices toward marginal costs in order to maintain its market share.

MCI's argument presumes that customers of monopoly services will have to pay higher prices if AT & T prices below FDC in markets where competition is present. See *In Re American Telephone & Telegraph Co.*, 61 F.C.C.2d 587, 624, 652 (1976). Such arguments ignore the nature of costs and revenues in a multi-service enterprise. AT & T's unattributable overhead costs do not increase when AT & T offers a new service, nor do they decrease when such a service is

---

is a matter which we believe to be quite manageable and capable of development on an ongoing basis.

**59.** We do not intend to imply that in *all* cases and in *all* circumstances we would only examine the price-cost relationship of a product or service. Our test merely suggests that a judge or jury may not *infer* predatory intent unless price is below long-run incremental cost. Thus, we agree, at least in principle, with Judge Wood's advocacy of the use of non-economic (or less rigorous economic) evidence in some cases. Considering, however, among other things, the extent of regulatory control over entry and prices in the present case, and the highly ambiguous nature of the non-economic evidence which has been submitted, we think the price-cost relationship must be determinative. But, of course, some future case may admit more scope for "other factors." *Chillicothe*, 615 F.2d at 432. In any event a strong presumption of lawfulness must attach when price is shown in a case like this one to be above an appropriately derived measure of long-run incremental cost. MCI has offered no credible direct evidence of intent that, in our view, directly rebuts this presumption.

**60.** The implication of MCI's theory would be that a multiservice firm must earn a rate of return for *each* service at least equal to its overall cost of capital for the firm. Such a requirement is illogical since a firm's overall cost of capital is based on the level of risk in investing in the *firm* and not in an individual service faced with particularized risks and competitive conditions. Also, to the extent all the services face competition, a demand that in the aggregate they earn the overall cost of capital suggests that, to the degree some services exceed this figure, others will fall short and thus arbitrarily appear "predatory." In any event, rate of return calculations must be based on a host of arbitrary apportionments of plant and expenses.

discontinued. When a multiproduct firm prices a competitive service above its long-run incremental cost, no cross-subsidy can occur because the additional revenues produced exceed all additional costs associated with the competitive service and provide a contribution to the unallocable common costs otherwise borne by the firm's existing customers. For this very reason the Second Circuit in *Northeastern Telephone Co. v. AT & T* rejected a cross-subsidization argument identical to that advanced by MCI here:

> [The plaintiff's] argument in favor of the fully distributed cost test is based on a misunderstanding of the economic notion of subsidization. [The plaintiff] seems to believe that whenever a product's price fails to cover fully distributed costs, the enterprise must subsidize that product's revenues with revenues earned elsewhere. But when the price of an item exceeds the costs directly attributable to its production, that is, when price exceeds marginal or average variable cost, no subsidy is necessary. On the contrary, any surplus can be used to defray the firm's non-allocable expenses.

651 F.2d 76, 90 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). *See also Southern Pacific Communications Co. v. AT & T,* 556 F.Supp. 825 (D.D.C. 1982).

Judge Wilkey of the District of Columbia Circuit amplified this point in his dissent in *Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221, 1222 (D.C.Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981):

> AT & T's common or joint unattributable costs will exist whether or not it offers services in the competitive market. These costs existed and were borne by AT & T's monopoly service customers before AT & T entered the competitive market, and would again be borne fully by them if AT & T were forced out of the competitive market.

When AT & T considers whether to enter or to expand sales in a competitive market the old monopoly service customers stand to benefit so long as the new customers bear any part of the common or joint costs. To determine whether monopoly customers will benefit from the firm's operations in the competitive market, one need only calculate whether the revenues from the new competitive market operations pay fully for the incremental or additional costs the firm incurs for these operations. If revenues cover these costs (including cost of capital as measured by LRIC or any similar variant of marginal cost measurement) then ANY additional revenue earned above the LRIC level is a bonus for the monopoly customers.

642 F.2d at 1240 (Wilkey, J., dissenting). *See also* 2 P. Areeda & D. Turner, *supra,* at ¶ 719; 1 A. Kahn, *supra,* at 150–58.

If AT & T were forced to price at FDC levels in competitive markets, its monopoly customers would probably be worse rather than better off. Because of the elasticity of demand in competitive markets, any rate substantially above LRIC would cause AT & T to lose business against an equally efficient competitor and, hence, decrease AT & T's total revenue from competitive markets. There would thus be less revenue available from competitive services to contribute to the firm's joint or common costs, and monopoly customers would be required to provide a greater share of these costs.[61]

■ For a regulated utility such as AT & T, fully distributed cost methodology may be used to establish a regulatory rate ceiling, in order to provide no more than a "fair rate of return" for the enterprise as a whole. If FDC is adopted as a floor for predatory pricing purposes, as well as a ceiling for ratemaking purposes, the regulated utility will be effectively prohibited from materially raising or lowering prices to engage in competition. This result flies in the face of a major objective of the

---

**61.** We recognize, of course, that under the consent decree approved in *United States v. AT & T,* 552 F.Supp. 131 (1982), Bell's local operating companies will no longer be corporately linked to AT & T's long distance telephone service.

antitrust laws—the *promotion* of price competition. It is also inconsistent with the FCC's explicit endorsement of price competition in its *Specialized Common Carriers* decision. An antitrust rule requiring a dominant firm to price at or above FDC in competitive markets may effectively require the firm to forego price competition and gradually abandon its market share, *i.e.*, lose its business. Constraining AT & T to FDC pricing of its competitive services thus runs the risk of permitting actually or potentially less efficient competitors to serve a growing segment of the telecommunications market and thus deprive consumers of the benefits of price competition.[62]

## F. *Insufficiency of the Evidence*

■ In addition to reliance on an incorrect cost standard, the jury's finding that Hi-Lo was predatory is disapproved and must be set aside because MCI failed to produce sufficient evidence to create a jury question that Hi-Lo was priced below cost under *any* standard. The testimony of Dr. William Melody, a regulatory economist, accompanied by certain documents, constitutes the only evidence MCI presented on the issue of predatory pricing. Dr. Melody testified twice, first in the latter part of February 1980 and again on June 3 and 4, 1980. On neither occasion did his testimony produce evidence sufficient to sustain a

jury verdict that Hi-Lo was priced below cost under any standard.

Testifying the first time, Dr. Melody presented no evidence whatsoever that Hi-Lo was priced below any measure of cost. Dr. Melody introduced a chart, Plaintiff's Exhibit 933, which purported to prove that *Telpak* was predatory by comparing its price with the costs associated with *Hi-Lo* service. Dr. Melody argued that the costs attributable to both services were identical because each service was simply a different marketing plan for the same private lines. This chart shows the cost of the Hi Density (Hi-D) circuits to be *$.65 per circuit mile.* Thus, MCI's own proof on this issue establishes that AT & T's Hi-D circuits[63], which were sold for $.85 per circuit mile, were priced $.20 above even their fully distributed costs.

This admission was reinforced on cross-examination in an exchange between counsel for AT & T and Dr. Melody:

Q: Now turning back to Hi-Lo, you are not contending, are you, that the high density portion of the Hi-Lo tariff is below cost by any measure?

A: I have not contended that the high density rate is below cost. I have not assessed the high density rate in terms of costs.

Tr. 2593. Despite expressing misgiving about the costs reflected in PX 933, Dr.

---

**62.** Of course, quite apart from antitrust pricing standards in this regulated industry, the regulatory agencies can evaluate competitive prices by whatever standards they deem economically or socially desirable, including FDC. *See Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221, 1222 (D.C.Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981).

In this connection, although there may be some merit to the courts' fashioning an antitrust rule of liability addressing limit pricing (or other "strategic" practices) as discussed in the dissent, administration might be difficult. *See infra,* pp. 1181–1182. Further, Prof. Baumol's proposal of a quasi-permanent pricing approach (and other like proposals) may have promise if apparent problems of administration can be solved. *See* Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1 (1979). In any

event, no evidence was presented based on such theories in this case.

**63.** MCI belatedly argues that it was not required to prove that the Hi-D circuits were priced below cost but that Hi-Lo as a whole was priced below cost. This argument defies logic as well as MCI's proof. The Hi-D circuits were the only portion of the long distance market in which AT & T lowered its price. The Lo-D and short haul portions of the market were subject to substantial price *increases.* Further, Dr. Melody's testimony bolsters the notion that only the price cuts for the Hi-D circuits are relevant for purposes of determining predatory pricing. Dr. Melody stated that this decrease in the high density rates was AT & T's competitive response to MCI and, therefore, the only relevant price to be examined. Tr. 2617.

Melody repeatedly adopted these costs, including the $.65 figure, as the best evidence available. Tr. 2576, 10481. Dr. Melody also stated that, in examining Bell's cost data, he was unable to make the adjustments necessary to demonstrate that Hi-D costs were any greater than $.65. Tr. 2594.

On rebuttal, Dr. Melody purported, for the first time, to suggest that Hi-D was below cost. MCI introduced PX 3915, reproduced below, which is a table computed by Dr. Melody showing various alleged revenue deficiencies for AT & T's entire private line telephone service.

### AT&T PRIVATE LINE TELEPHONE SERVICE
#### (IN $ MILLIONS)

| | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|
| REVENUE NECESSARY TO COVER AT&T'S COST OF CAPITAL | $109 | $120 | $153 | $164 | $172 |
| REVENUE AVAILABLE | $ 37 | $ 47 | $ 65 | $ 68 | $ 73 |
| DEFICIENCY OF REVENUE BELOW COST | ($ 72) | ($ 73) | ($ 88) | ($ 96) | ($ 99) |

Dr. Melody explained the preparation of his chart as follows:

> On the basis of Mr. Johnson's [sic] [an AT & T witness's] study, what I did was I examined every revenue that would be available after deducting all of the normal operating expenses of business. . . .
>
> . . . .
>
> What I did was I calculated the revenue that would be available for paying the cost of capital on the basis of Mr. Johnson's [sic] studies. . . .
>
> . . . .
>
> I then calculated the revenue that would be necessary to cover AT & T's cost of capital as earned by the business as a whole. That is indicated by the first row. The revenues that would be necessary if private line telephone service were to provide sufficient revenue to pay the cost of capital.
>
> I then subtracted the revenue necessary from the revenue available and was able to calculate the deficiency of revenue below costs for private line telephone service.

Tr. 10474–76.

Neither Dr. Melody's testimony nor his private line telephone chart reflect the sort of analysis and presentation necessary to support a claim of predatory pricing. The summary nature of Dr. Melody's chart would make it very difficult for the jury to determine the basis of his calculations. Dr. Melody purports to be making adjustments to a series of fully distributed cost exhibits introduced by AT & T. Each of these exhibits consisted of voluminous cost studies (using several different methods of cost distribution), or summaries of such studies, which on their face stated that private line telephone service and Telpak earned positive rates of return[64] under each FDC method used in the studies. Dr. Melody provides us with no calculation (or even specification) of AT & T's overall cost of capital (including, presumably, embedded cost of debt), which establishes a deficiency in contribution by private line telephone to that cost.[65]

---

**64.** These were expressed in the studies as a ratio of net operating earnings to net investment.

**65.** Dr. Melody also testified that the "revenue deficiency" shown in his chart was "greater after Hi-Lo went into effect." Tr. 10477. Considered in the context of the other deficiencies in the evidence and the many variables involved, we do not consider this observation as evidence that Hi-Lo or Hi-D was "below cost."

Thus, Dr. Melody's testimony is deficient as to the reasons why he selected one of the FCC's at least seven cost methods or how he may have adjusted AT & T's cost studies to produce the revenue deficiencies derived on his chart. Dr. Melody does not state what percentage he used to calculate AT & T's cost of capital rate, nor what plant items he attributed to private line services for purposes of calculating these capital costs. Similarly, there is no definition or description of AT & T's "normal operating expenses of business." Thus, we do not know if, or how, Dr. Melody allocated capital costs and normal operating expenses.[66] More importantly, Dr. Melody's chart fails to isolate Hi-D circuits or even Hi-Lo service as a whole; instead it calculates alleged revenue deficiencies for AT & T's entire private line sector. As Dr. Melody acknowledged, this sector includes many services besides Hi-D, as well as several types of switching equipment.[67]

Dr. Melody's chart, together with his testimony, is therefore an insufficient basis for a jury verdict that the Hi-D portion of the Hi-Lo rate is "below cost." We assume that Dr. Melody's testimony was designed to demonstrate that, during the years in question, under some FDC method (presumably Method 1, *see supra,* note 65), "private line telephone" was returning less than AT & T's *overall* cost of capital. Whatever the merits of such a demonstration as a measure of predation, *see supra,* text and note at note 47, we think the attempted demonstra-tion is defective for lack of specificity and explanation of key elements and because "private line telephone" is inadequately related to the high density portion of the Hi-Lo rate.[68] This evidence falls below the legal standard of proof necessary to support a finding of predatory pricing. Indeed, the Second Circuit recently rejected summary evidence of this sort in a predatory pricing case. In *Broadway Delivery Corp. v. United Parcel Service of America,* 651 F.2d 122 (2d Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), plaintiffs had attempted to demonstrate predation using only lump summaries of defendants' costs, revenues, and profits, which purported to show below-cost operations. The district court granted defendants' motion to dismiss, after a jury trial. The Second Circuit affirmed the dismissal, noting that plaintiffs had offered no explanation of how they had adjusted the defendants' cost figures to show below-cost pricing:

> Whether or not one agrees that proof of pricing below marginal or average variable cost is essential to a predatory pricing claim, the plaintiffs could not demonstrate price predation by the defendants without proof permitting a careful assessment of the relationship between the defendants' prices and costs.... The plaintiffs' proof did not permit a reasonable fact-finder to make this assessment. The summaries of [one defendant's] operations lump all its traffic figures in one

**66.** It appears from our review of the record that Dr. Melody used the plant and expense allocations produced by AT & T's FDC "Method 1" as applied to the various years. *See supra,* note 47, for a discussion of FDC methodologies. Thus AT & T's "net operating earnings" under that method turns out for each of the years (with the possible exception of 1974) to be equal to the "revenue available" in Dr. Melody's chart. Dr. Melody did not testify that he in fact followed "Method 1" or why he selected that method if in fact he did. Of course, neither Method 1 nor any other method was espoused, or had its probative value attested to, by Mr. Johnston, who merely stated that these FDC studies were required by the FCC.

**67.** Dr. Melody attempted to address this problem by testifying that "Mr. Johnson (sic) [in his testimony] indicated that the other services were ... providing a profit." Tr. 10477. What Mr. Johnston actually said was that the other services "were making a significant contribution to the earnings of the Bell System." Tr. 6868. This statement might mean that the other services were contributing on an incremental cost basis or earning a positive rate of return on a fully distributed cost basis. The statement says nothing about whether the rate of return of the other services was greater or less than the overall cost of capital of the Bell System, which would seem to be the relevant consideration in terms of Dr. Melody's chart.

**68.** Referring to his exhibit (PX 3915) Dr. Melody said his "deficiency" calculations were not intended to be "exact or precise" and that he was looking for a "benchmark indicator." Tr. 10476. MCI's counsel referred to the numbers as "ballpark figures." Tr. 10477.

category, all its revenues in another, and all its profits in a third. It may be that an expert in cost accounting could have discerned in these gross figures a basis for the required analysis, but the plaintiffs presented no such testimony.

651 F.2d at 131 (citations omitted). *See Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427 (7th Cir.1980) (affirming district court's grant of directed verdict on ground that plaintiff's cost data and other evidence failed to present a prima facie case of predation).

Because MCI's evidence is similarly inadequate to establish that Hi-Lo was priced below cost *under any standard,* the jury's finding that AT & T engaged in predatory pricing of its Hi-Lo private line services cannot be sustained.

### G. *Pre-announcement*

Our conclusion that Hi-Lo was not shown to be predatory largely dictates our disapproval of the jury's finding that AT & T unlawfully pre-announced its Hi-Lo service. MCI argued that, if Hi-Lo was in fact predatory, AT & T would incur major losses in cutting its rates to stifle competition. At least part of these losses would result from AT & T customers shifting from more remunerative services such as WATS to private line. According to MCI, AT & T could maintain its monopoly without actually incurring any losses by simply announcing the proposed Hi-Lo tariff and then delaying its implementation for a significantly long period of time—thus discouraging AT & T customers from switching to MCI's more economical services during the fifteen month period between Hi-Lo's pre-announcement and its effective date. Insofar as this claim is predicated upon the alleged predatory nature of the announced Hi-Lo price, the jury verdict on this count is disapproved and must be set aside.

MCI also claims that by pre-announcing Hi-Lo, AT & T knowingly misled the public into believing that the new tariff would be implemented without "undue delay," when, in fact, AT & T's actions significantly contributed to the fifteen month lag period

between Hi-Lo's announcement and effective date. How to determine whether and under what circumstances the pre-announcement of a lawful price might constitute an act of monopolization is an extremely delicate task. Unnecessarily restrictive rules are likely to inhibit the flow of valuable information to the market; they also risk infringing upon protected commercial speech and first amendment rights. *See Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491–97, 95 S.Ct. 1029, 1044–1047, 43 L.Ed.2d 328 (1975). In commenting on liability for pre-announcement, Professors Areeda and Turner have stated that while a "knowingly false statement designed to deceive buyers" could qualify as an exclusionary practice,

> no liability should attach to statements that truly reflect the monopolist's expectations about future quality or availability where that expectation is both actually held in good faith and objectively reasonable. Such reasonable good faith statements about research, development, and forthcoming production serve the social interest in maximizing the relevant information available to buyers.

3 P. Areeda & D. Turner, *supra,* at ¶ 738 p. 284.

Such a standard comports with the policies of the antitrust laws and with existing case law. In *Americana Industries v. Wometco de Puerto Rico, Inc.,* 556 F.2d 625 (1st Cir.1977), the plaintiffs alleged that the defendant movie theaters had advertised in advance prices for the film "Godfather II" which maliciously undercut Americana. Plaintiffs also alleged that the pre-announcement was done with the intent of putting Americana out of business. The court held that, absent allegations of pricing below marginal cost, the announcement represented the sort of healthy competition which the antitrust laws were designed to foster. 556 F.2d at 628. The court stated:

> [The defendant] was not obliged to follow Americana's prices, nor to hide the fact

that it would, in three months time, show the same film in another city for less. Americana's complaint not only alleges facts that are completely consistent with perfectly lawful conduct, but falls short of alleging facts that, by themselves, constitute an antitrust violation.

*Id.*

It is certainly not unusual for competitors to announce a new product, service or price before its actual introduction in the market. The courts have upheld such "pre-announcements" in a variety of factual contexts. In *Ronson Patents Corp. v. Sparklets Devices,* 112 F.Supp. 676 (E.D.Mo.1953), the court considered an antitrust counterclaim to a patent infringement suit where the plaintiff was charged with advertising its new butane lighter in advance of even obtaining a patent. 112 F.Supp. at 688–89. The court declined to find liability even though the actual lighter advertised never appeared on the market. The court refused to infer predatory intent given the use of such an announcement to test demand in the market and production problems which subsequently led the company to decide not to put the product on the market. *Id.*

Similarly, in *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 287–88 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), the Second Circuit held that, absent actual deception, a monopolist's vigorous and even one-sided advertising of a new product or service does not constitute anticompetitive conduct violative of the Sherman Act. *See also ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423, 442 (N.D.Cal.1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981) (defendant's premature announcement of new product not actionable absent evidence of knowing falsehood); *Solargen Electric Motor Car Corp. v. American Motors Corp.,* 530 F.Supp. 22, 26 n. 3 (S.D.N.Y.1981), *aff'd,* 697 F.2d 297 (2d Cir. 1982) (competitor's allegations that dominant car company "knowingly exaggerated" success of its experimental battery do not support antitrust liability).

These cases suggest that AT & T's early announcement of Hi-Lo must be found to be knowingly false or misleading before it can amount to an exclusionary practice.[69] Applying this standard here, the issue of pre-announcement should never have been sent to the jury. Neither AT & T's application to the FCC for permission to file the Hi-Lo rate, nor the accompanying press release contains any false or misleading information about Hi-Lo or its availability. MCI claims that AT & T's statement in its FCC application that the Hi-Lo tariff "should be made effective without undue delay" is inconsistent with contemporaneous internal AT & T memoranda suggesting that AT & T had originally planned a voluntary extension of the effective date of the tariff until May 1974.[70] We, however, see no deliberate deception or misleading conduct here.[71]

At the time AT & T first sought permission to file its Hi-Lo tariff, in February 1973, it could not simply file the tariff and

---

**69.** AT & T is correct in arguing that the jury instructions in this case failed to reflect this standard. Judge Grady instructed the jury that it could find unlawful pre-announcement if AT & T's February 26, 1973 request for special permission constituted "the announcement of a price reduction by a firm with monopoly power a long time before it intends to put the reduction into effect," App. at 1205, and if the announcement "was done not for legitimate reasons, but for the purpose of maintaining a monopoly." *Id.* These instructions make no mention of deception or misleading conduct.

Because we conclude that there is insufficient evidence to support a finding of unlawful pre-announcement under the proper legal standard, we need not remand for a new trial on this issue.

**70.** At one time, according to these memoranda, AT & T considered requesting an extension of the effective date of the tariff from the FCC. AT & T, however, in fact made no such request and, therefore, the memoranda have little significance.

**71.** Judge Richey, in *Southern Pacific Communications Co. v. AT & T,* 556 F.Supp. 825 (D.D.C. 1982), analyzed the identical set of circumstances and attributed the *entire* delay to regulatory requirements. At 965–966.

automatically set the regulatory review in motion. Rather, because of an FCC "special permission" rule in effect at the time, AT & T was required to obtain FCC approval *before* it could file any new tariff. Thus, as of February 1973, AT & T was not permitted to file or effectuate its new tariff. It was not until October 1973, when, at the behest of AT & T, the Second Circuit invalidated the "special permission" rule, that AT & T was free to file its Hi-Lo tariff. *See AT & T v. FCC,* 487 F.2d 865 (2d Cir.1973).

AT & T actually filed its Hi-Lo tariff on November 15, 1973, and the tariff became effective on June 15, 1974. Once the tariff was filed, the provisions of Sections 203 and 204 of the Communications Act accounted for much of the remaining delay. This delay·included the two-month notice period prescribed by FCC regulations and a three-month suspension of the tariff ordered by the FCC. Hence, the only delay that MCI can fairly attribute to AT & T is AT & T's voluntary extension of the tariff for a period of about two months at the request of the FCC chairman. We believe that this rather minimal delay, considered in conjunction with the absence of deception or knowing falsehood in AT & T's filings and public statements regarding Hi-Lo, is insufficient to create a jury question on the issue of unlawful pre-announcement.[72] We therefore hold that the trial court erred in failing to direct a verdict on this count in favor of AT & T.

### H. *Telpak Marketing Plan*

MCI in its cross-appeal contends that even if Telpak was lawfully priced the jury should have been instructed to consider whether AT & T maintained its monopoly by marketing its Telpak service in a way that excluded competition. MCI alleges that two aspects of the Telpak marketing scheme were anticompetitive: the so-called "free" circuits, and "fictional" routing.

▇▇▇ MCI first argues that Telpak customers had free spare circuits available from AT & T because AT & T only offered Telpak in bundles of 60 or 240 circuits. Because AT & T's rates were quite low, this encouraged customers to order a bundle of Telpak circuits, even if the customer did not need all the circuits immediately. MCI argues that the remaining unused circuits of the Telpak bundle were "free spares" that could be used later at no additional charge, thus discouraging customers from purchasing MCI services.

This argument has no factual or legal merit. The unused capacity was in no sense free. Telpak customers had already paid for all their circuits in advance. The fact that the customer chose to use only a portion of the circuits at first does not render the remaining circuits free.[73] Indeed, in this regard Telpak is no different than any volume discount or package pricing plan. The mere existence of volume or package pricing does not support antitrust liability. *See Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 433 (7th Cir. 1980). Moreover, absent predatory pricing, the sale of bundles of Telpak circuits could have little exclusionary or anticompetitive significance since Bell offered many different marketing plans for long distance business telecommunications users. Since the jury found that Telpak was not predatorily priced, the fact that customers preferred this marketing plan because it was more responsive to their needs than MCI's alternate marketing plan is a matter of little concern to the enforcement of the antitrust laws.[74]

---

**72.** AT & T contends in its brief that the entire pre-announcement of Hi-Lo is immunized from antitrust scrutiny by the application of the *Noerr-Pennington* doctrine, discussed *infra* pp. 1153–1158. Inasmuch as we have concluded that the pre-announcement cannot be considered a *violation* of the antitrust laws we do not need to reach the question of *immunity.*

**73.** In addition to the fact that the circuits have already been paid for, a Telpak customer wishing to utilize a previously unused circuit must pay additional terminal charges.

**74.** In addition, the bulk marketing of Telpak made it comparable to the user-owned microwave systems against which it was designed to compete.

MCI also contends that Telpak's "fictional routing" feature tended to restrict MCI from serving large private line users. MCI argues that the routing was fictional in the sense that a Telpak customer who purchased a bundle of circuits, for example, from New York City to Columbus, Ohio and another bundle of circuits from Columbus to Toledo, Ohio could combine these circuits and make a call from New York to Toledo, which would be billed under Telpak. MCI contends that it has been injured because, although its Toledo to New York service is cheaper than AT & T's, it does not serve Columbus and a customer requiring communications to all three cities is penalized for choosing MCI.

 MCI's competitive disadvantage in this regard stems from the fact that it entered the market only on a limited geographic scale, and does not reflect unlawful predation by AT & T. What MCI calls "fictional routing" merely represents the customer's ability to tack one Telpak circuit onto another in such a way that a call can be placed between two distant cities connected by a string of circuits—or between intermediate cities. A customer building a private microwave system linking the same cities would be able to achieve precisely the same result. As AT & T points out, Telpak was designed—and upheld by the FCC—as an alternative to private microwave systems, and the "fictional routing" of which MCI complains involves no more than billing the Telpak customer as if service were provided over the same kind of facilities that the customer would have available from its own private microwave system.[75]

We hold, as in the case of the volume pricing of Telpak, that in the absence of predatory pricing such a billing system represents no violation of the antitrust laws.[76]

## IV. INTERCONNECTIONS

In the years following the 1971 *Specialized Common Carriers* decision, a major source of contention between MCI and AT & T was the extent to which AT & T was obliged to interconnect with MCI's facilities to accommodate MCI's needs. The interconnection issue arose in part because MCI had facilities in place to serve only a limited number of cities and in part because MCI was unable to provide the local circuits necessary to connect its long distance service to the telephone customer. MCI's telecommunications system consists of transmission towers that relay microwave impulses between terminals in the cities MCI serves. In each of those cities MCI must connect its terminals to telephones at its customers' locations. In order to provide full end-to-end transmission, MCI's equipment at some point must make contact with AT & T's equipment because AT & T, through its operating companies, controls the local service to MCI's customers. AT & T also provides long distance service to locations not covered by MCI. The dispute thus focuses on the local interconnections between MCI towers and its customers' premises and on "multipoint" interconnections (discussed *infra*, at pp. 1147–1150) between MCI towers and certain AT & T long distance circuits.

**75.** The only difference is that AT & T may physically transmit the signal over whatever circuits are available when the call is placed, a matter which is irrelevant to the customer and without competitive significance.

**76.** In this connection, it is somewhat unclear from MCI's brief exactly what "fictional" characteristics of Telpak routing MCI complains of. Our interpretation of MCI's argument differs slightly from that of Judge Richey of the District Court for the District of Columbia who considered a similar argument by a different specialized carrier in *Southern Pacific Communications Co. v. AT & T*, 556 F.Supp. 825 (D.D.C. 1982). Judge Richey characterized the

complaint before him as alleging a situation where a customer having a Telpak bundle between New York City and Washington, D.C. could have calls from New York suburban offices to Washington, D.C. suburban points billed under the same Telpak circuit. Judge Richey upheld such an arrangement, stating that AT & T had done no more than recreate the same communications system that the customer would have in its own hypothetical private microwave system. To the extent MCI complains of the same or an analogous problem, we think the answer is the same as that provided by Judge Richey.

When MCI sought interconnections that would give it access to AT & T's switched network,[77] AT & T balked. AT & T contended that the FCC's 1971 decision limited the new carriers to providing "point-to-point private lines," which require no switching because each line is dedicated to the exclusive use of a specific customer ·and runs between only two designated premises. MCI complained that AT & T unlawfully refused interconnections for FX and CCSA services, both of which use switching machines,[78] and for essentially local lines that led beyond a limited, defined geographical area. MCI also complained that AT & T unlawfully refused interconnections for multipoint service. Although AT & T supplied some interconnections when required by a 1973 district court injunction, it promptly terminated those connections when the injunction was vacated on appeal because the same issues were pending before the FCC. MCI alleged that these terminations were aimed at maintaining AT & T's monopoly by injuring MCI's reputation as a reliable firm and were improper since an FCC decision on the very matter of interconnections was imminent. MCI also maintained that AT & T illegally tied the provision of long distance service to local service.

The interconnections that were actually implemented between AT & T and MCI also gave rise to dispute. MCI asserted that the entire interconnection procedure required by AT & T was unreasonable because the physical interconnections utilized materials inadequate for the volume of business MCI was doing and because it involved unduly complex and ineffective installation and maintenance procedures.

All of these acts, MCI claimed, were committed deliberately by AT & T to damage MCI's conduct of its business and constituted an abuse of AT & T's monopoly power over facilities essential to MCI's success.

### A. FX–CCSA Interconnections

#### 1. The Essential Facilities Doctrine

■ The jury found that AT & T unlawfully refused to interconnect MCI with the local distribution facilities of Bell operating companies—an act which prevented MCI from offering FX and CCSA services to its customers. A monopolist's refusal to deal under these circumstances is governed by the so-called essential facilities doctrine. Such a refusal may be unlawful because a monopolist's control of an essential facility (sometimes called a "bottleneck") can extend monopoly power from one stage of production to another, and from one market into another. Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms. *United States v. Terminal Railroad Association*, 224 U.S. 383, 410–11, 32 S.Ct. 507, 515–516, 56 L.Ed. 810 (1912); *Byars v. Bluff City News Co.*, 609 F.2d 843, 856 (6th Cir. 1979).

■ The case law sets forth four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility;

---

**77.** A switched network is one in which a customer's telephone is linked to one of the many local AT & T central offices located in each exchange area. When the caller picks up his or her telephone receiver, a switching machine sends a dial tone that permits the caller access to switching machines in other central offices in the exchange area. Long distance service involves this same process, except that upon dialing the proper area code and telephone number, the caller is shifted from the local to a long distance toll switching machine, which forwards the call. *See supra,* at notes 8 and 9.

**78.** FX ("foreign exchange") service involves the connection of a subscriber's telephone to a switching machine in a distant, rather than a local, telephone company office. CCSA ("common control switching arrangement") service is used by large subscribers to link far-flung offices to each other by private lines connected through switches in the local telephone company's various offices. *See supra,* at note 10.

To provide both FX and CCSA, MCI would need "local loop" interconnections between an MCI terminal and the switch in a nearby AT & T central office. MCI would pick up the local switched call and send it long distance via MCI microwave relays to the customer called.

(3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 992–93 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Terminal Railroad Association,* 224 U.S. at 405, 409, 32 S.Ct. at 513, 515; *City of Mishawaka v. American Electric Power Co.,* 465 F.Supp. 1320, 1336 (N.D.Ind.1979), *aff'd in relevant part,* 616 F.2d 976 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

The Supreme Court in *Otter Tail,* considered the refusal of a regulated electric utility to sell power wholesale or to transmit power purchased from other sources to municipalities which had chosen to own their own retail distribution systems. This refusal to sell or transmit was held to violate section 2 of the Sherman Act. The Court noted the district court's determination that "Otter Tail had 'a strategic dominance in the transmission of power in most of its service area,'" *id.* 410 U.S. at 377, 93 S.Ct. at 1029, and, in effect, was concerned that market power in one market (transmission) was being used to further a monopoly in another market (retail distribution). *Id.* at 377–79, 93 S.Ct. at 1029–1030.

 *Otter Tail* provides an analogy to the instant problem. AT & T had complete control over the local distribution facilities that MCI required. The interconnections were essential for MCI to offer FX and CCSA service. The facilities in question met the criteria of "essential facilities" in that MCI could not duplicate Bell's local facilities. Given present technology, local telephone service is generally regarded as a natural monopoly and is regulated as such. It would not be economically feasible for MCI to duplicate Bell's local distribution facilities (involving millions of miles of cable and line to individual homes and businesses), and regulatory authorization could not be obtained for such an uneconomical duplication.

Finally, the evidence supports the jury's determination that AT & T denied the essential facilities, the interconnections for FX and CCSA service, when they could have been feasibly provided. No legitimate business or technical reason was shown for AT & T's denial of the requested interconnections. *Cf., Gamco, Inc. v. Providence Fruit & Produce Building, Inc.,* 194 F.2d 484, 487–88 & n. 3 (1st Cir.), *cert. denied,* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952) (defendants may deny access to their building because of limited space or the applicant's financial unsoundness). *See generally,* Comment, *Refusals to Deal by Vertically Integrated Monopolists,* 87 Harv.L.Rev. 1720, 1740 (1974). MCI was not requesting preferential access to the facilities that would justify a denial. *See Town of Massena v. Niagara Mohawk Power Corp.,* 1980–2 Trade Cas. (CCH) ¶ 63,526 (N.D.N.Y.1980). Nor was MCI asking that AT & T in any way abandon its facilities. *See American Football League v. National Football League,* 323 F.2d 124 (4th Cir.1963). MCI produced sufficient evidence at trial for the jury to conclude that it was technically and economically feasible for AT & T to have provided the requested interconnections, and that AT & T's refusal to do so constituted an act of monopolization.

2. *The Meaning of the Specialized Common Carriers Decision*

AT & T never challenged the assertion that it had denied MCI access to the local distribution network for FX and CCSA service. Instead, AT & T maintained that MCI had never been authorized to receive these interconnections. AT & T also argued that its own regulatory obligations prohibited it from interconnecting MCI with its local switched network for FX and CCSA.

The meaning of the FCC's 1971 *Specialized Common Carriers* decision lies at the heart of the dispute over interconnections. As indicated, the FCC's 1971 decision was extremely opaque. Following the *Specialized Common Carriers* decision, AT & T contended that it was required to provide local

interconnections only for point-to-point private line service, in accordance with service descriptions contained in documents submitted by the specialized carriers in the 1971 case. But MCI argued that the language of the *Specialized Common Carriers* decision also required AT & T to provide interconnection with its local switched network for FX and CCSA.

In November 1973, following more than a year of futile negotiations, MCI sought an injunction requiring AT & T to accede to MCI's demand for interconnections. A preliminary injunction was issued but was later vacated on appeal because of a pending FCC show-cause proceeding on the interconnection issue. *MCI Communications Corp. v. AT & T,* 369 F.Supp. 1004 (E.D.Pa. 1973), *injunction vacated on primary jurisdiction grounds,* 496 F.2d 214 (3d Cir.1974). AT & T immediately dismantled all the interconnections it had provided pursuant to the preliminary injunction. This action obviously adversely affected MCI's ability to serve its customers. AT & T claimed its filed tariffs required the disconnection.

Eight days after the Third Circuit decision vacating the injunction, the FCC issued its ruling on the show cause order. The FCC interpreted the *Specialized Common Carriers* decision, although conceding its lack of clarity, as requiring the interconnections MCI sought. *Bell System Tariff Offering of Local Distribution Facilities for Use by Other Common Carriers,* 46 F.C.C.2d 413, *aff'd sub nom. Bell Telephone Co. v. FCC,* 503 F.2d 1250 (3rd Cir.1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975).

The *Specialized Common Carriers* decision was interpreted three years later by the District of Columbia Circuit in the *Execunet* case. *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978). In *Execunet* the court held that the FCC had not conducted a sufficient hearing in *Specialized Common Carriers* to justify *any* limits on the services MCI could provide. MCI was then permitted to offer all forms of long distance service. Thus, *with the benefit of hindsight,* the FCC's 1974 order and *Execunet* established MCI's right to interconnections for FX and CCSA.

At trial, MCI contended that in denying interconnections, AT & T intended to prevent competition. AT & T argued that the *Specialized Common Carriers* decision was so vague that it gave no guidance on AT & T's obligation to interconnect or even on MCI's authority to provide FX and CCSA service. AT & T argued that it reasonably believed that MCI was not authorized to provide the services for which it sought interconnections, and that this good faith belief in the regulatory requirements was a complete defense to antitrust liability for the denial of interconnections.

The propriety of Judge Grady's instructions on the meaning of the *Specialized Common Carriers* decision became an extraordinary issue in this case. Although noting that "[o]rdinarily what a decision means is a question of law for the court," Judge Grady stated that under the circumstances of this case the jury must decide as a fact question whether the *Specialized Common Carriers* decision required AT & T to provide the requested FX and CCSA interconnections. Tr. 11463. He further told the jury that, even if it found that the *Specialized Common Carriers* decision ordered AT & T to make the connections, AT & T would not be liable unless it "knew or had good reason to believe that the decision constituted such an order." App. 1200. Judge Grady then explained the holding in *Execunet* and concluded by stating "I instruct you as a matter of law, therefore, that at the time MCI requested FX and CCSA interconnections it was authorized to render those services and AT & T was obligated under the Communications Act to provide the interconnections." App. 1201. The judge cautioned the jury that a violation of the Communications Act does not establish a violation of the antitrust laws. Finally, Judge Grady instructed that AT & T would not be liable for failure to provide the interconnections if "it believed that it had not been ordered to do so, that MCI was not autho-

rized to provide [FX and CCSA service], and that it would have violated established regulatory policies for MCI to receive the connections." *Id.*

■ AT & T asserts that the nature of obligations imposed by a regulatory statute or agency order is a question of law, not of fact, and thus that the jury should not have been permitted to decide whether the *Specialized Common Carriers* decision required the interconnections MCI sought. AT & T's argument at trial centered on the contention that it denied the interconnections in good faith.[79] That good faith, AT & T said, was based on its belief that neither the Communications Act nor the *Specialized Common Carriers* decision ordered the interconnections because that decision and the general regulatory policy relevant to the issue were so unclear that they offered little guidance.

■ By instructing on the *Specialized Common Carriers* decision, Judge Grady attempted to take AT & T's argument into account. The unusual dilemma facing the district court, however, was that in this case it concluded that antitrust liability turned not so much on what the *Specialized Common Carriers* decision ordered, but on what AT & T *believed* it ordered. Declining to take a legal position on the meaning of the decision, Judge Grady first permitted the jury to decide entirely as a fact question what the decision actually ordered. Although that approach improperly allowed the jury to decide what amounted to a question of law, the only party that could have been harmed by that error was MCI, whose case would have been cut short only by a legally *incorrect* finding that no interconnections were required. Judge Grady's approach could not have prejudiced AT & T, and only *that* possibility concerns us on appeal.

The remainder of the instruction on the *Specialized Common Carriers* decision took into account the thrust of AT & T's theory of defense: namely, that regardless of what the 1971 decision ordered as a matter of law, AT & T believed in good faith that MCI was not authorized to provide FX and CCSA and that AT & T was not required to provide the interconnections and could make an independent assessment of the public interest with respect to these interconnections. The jury could decide that AT & T was free to deny interconnections,

---

**79.** A related argument made by AT & T is that, since the Third Circuit concluded that there was room for "legitimate dispute" over the meaning of the *Specialized Common Carriers* decision, MCI was collaterally estopped from denying that such a legitimate dispute existed, and therefore the district court should have directed a verdict in favor of AT & T on the FX/CCSA issue. Both AT & T and MCI were parties to the suit that gave rise to the Third Circuit's decision which dealt with the interconnections at issue in the trial that spawned this appeal.

AT & T's estoppel argument cannot prevail. The Third Circuit concluded that there was legitimate room for dispute over whether or not certain kinds of interconnection were ordered. The court did not say that the interconnections were *not* ordered, *see Bell Tel. Co. v. FCC,* 503 F.2d 1250, 1262–63 (3d Cir.1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975), nor did it specifically find that AT & T believed or reasonably could have believed that denial of interconnection was justified under the Communications Act or the FCC decision. The court decided only that *Specialized Common Carriers* was sufficiently unclear to warrant deferral to the FCC under the doctrine of

primary jurisdiction. There is no identity of issues, and thus the court's "finding" does not bind MCI here. Of greater significance is the FCC's resolution of the interconnection question against AT & T.

AT & T alternatively contends that in light of the Third Circuit case, Judge Grady improperly refused to give a proposed instruction that MCI's interconnection denial charge arose out of a legitimate dispute. We note again that the Third Circuit stated that there was room for legitimate dispute, not that AT & T in fact relied on that interpretation as a basis for its interconnection denials. Judge Grady properly rejected the instruction, since it was for the jury to determine whether the dispute over the meaning of *Specialized Common Carriers* was legitimate. This is especially important here, where MCI's case included evidence from which it could be inferred that AT & T denied interconnections regardless of the meaning of the *Specialized Common Carriers* decision, and thus, even though the language in that decision could have given rise to a legitimate dispute, in this instance it did not. AT & T's tendered instruction was potentially misleading as to the significance of the Third Circuit decision.

based upon a good faith determination that interconnection was contrary to the public interest, by finding that AT & T believed no interconnections were required because (a) the 1971 decision by its terms did not explicitly order them or (b) the context in which the interconnections were ordered was so vague that AT & T did not know that they were ordered. In either case, AT & T's defense could be fully considered by the jury. As indicated, only MCI and not AT & T could have been injured by transforming into a fact question an issue decided against AT & T as a matter of law by the FCC in 1974 and by the District of Columbia Circuit in 1977.

### 3. "Retroactive" Application of Execunet

AT & T also contends that the court erred in instructing on the meaning of the *Execunet* decision. AT & T argues that the district court improperly gave retroactive application to the 1977 *Execunet* decision by instructing the jury that the case meant MCI had been authorized to provide FX and CCSA, and AT & T had been obligated under the Communications Act to provide the FX and CCSA interconnections since the date MCI's permits issued.

The Supreme Court has in part analyzed the retroactivity question as follows:

[T]he decision to be applied nonretroactively must establish a new principle of

law, either by overruling clear past precedent on which litigants may have relied, . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed. . . .

*Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) (citations omitted).

Although *Execunet* may have taken AT & T and the FCC by surprise, its holding did not establish a new principle of law, nor was the case one of first impression. While the FCC had concluded that *Specialized Common Carriers* did not authorize Execunet service, 60 F.C.C.2d at 38–40, the appeals court noted that this view represented "a substantial departure from prior administrative practice." 561 F.2d at 373. The court carefully set out FCC regulations and practices, and the case law from both the District of Columbia and Second Circuits to support its conclusion. *Id.* at 374–76.[80] In a later case dealing with FCC proceedings on the interconnection issue pursuant to the *Execunet* decision, the District of Columbia Circuit reaffirmed its earlier view. *MCI Telecommunications Corp. v. FCC,* 580 F.2d 590, 593 (D.C.Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978). The reasoning and holding of the District of Columbia Circuit in *Execunet,* while perhaps startling, did not create a "new principle of law."[81]

---

**80.** AT & T asserts that the FCC's pre-*Execunet* opinion in the matter is due special deference because it embodies the view of the administrative agency responsible for enforcing the relevant statute. To begin with, the *Execunet* decision holds that the FCC's view on this issue was inconsistent with the agency's past practice, a situation in which the agency's views are due no special deference. *See United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 84, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932). *See generally,* W. Hurst, *Statutes In Court* 161 (1970). Moreover, Judge Grady permitted AT & T to argue that the FCC's expressions of its incorrect views made AT & T's reliance on them proper. This gave AT & T ample opportunity to lay out for the jury the historical context and all the facts and circumstances known to the parties *at the time,* consistent with the district court's instructions.

**81.** This is so notwithstanding AT & T's argument that the court in *Execunet* recognized

that other cases had not foreshadowed its decision. 561 F.2d at 377–78 n. 59. What the D.C. Circuit meant in this respect was that different arguments had been put before the courts that had previously dealt with the interconnection controversy. That the result was not foreshadowed does not undermine the court's conclusion that the FCC departed from established doctrine when it limited MCI in the manner involved in that case. Indeed, as AT & T itself acknowledges, the *Execunet* court's premise is that there is no limitation on a grant of service without a ruling to that effect by the FCC. The court's holding that the FCC in *Specialized Common Carriers* did not make an affirmative determination that the public interest required such a limitation was clearly foreshadowed by earlier cases and is merely the latest application of established principles in this interconnection controversy.

█ Unlike the usual situation in which a question of retroactive application is raised, the *Execunet* decision was not determinative of the outcome in this case.[82] Even though Judge Grady correctly instructed the jury that by the reasoning of *Execunet* MCI was entitled to the interconnections, the instructions clearly stressed that entitlement under the Communications Act did not establish liability under the antitrust laws. More importantly, the careful instruction that the jury was to consider "the historical context and all of the facts and circumstances known to the parties at the time" of AT & T's allegedly improper acts [83] preserved AT & T's good faith defense (which was emphasized in the instruction immediately following the explanation of *Execunet*), and rendered Judge Grady's instruction on *Execunet* an accurate representation of the controversy between MCI and AT & T rather than a "retroactive" application of a new legal principle resulting in prejudice to AT & T.

Nor do we believe that the explanation of *Execunet* misled or confused the jury. AT & T argues that it "placed AT & T in the anomalous position of being required to prove that it was ignorant of the law." AT & T does not argue that Judge Grady misstated the law. His instruction placed in proper context AT & T's position that it believed at the time that MCI was not authorized to provide FX and CCSA service. It removed any misleading implication that MCI was not, as a matter of law, so authorized, leaving only the crucial question of AT & T's good faith belief, which was the focus of the remainder of the instruction. Moreover, as previously stated, the instructions, when read as a whole, did not mislead the jury as to the date *Execunet* was decided in relation to the date of the conduct under scrutiny here.

### 4. *Instructions on Regulatory Policy*

█ As we have already indicated the regulatory constraints governing the behavior of a public utility are an important factor to be weighed in assessing the potential antitrust liability of a regulated firm. *See supra*, at pp. 1105–1111. Ordinarily, antitrust liability should not be imposed when a firm acts in compliance with its regulatory obligations. *See* Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards*, 22 Antitrust Bull. 559 (1977).

AT & T contends that, since it asserted at trial that public interest considerations under Section 201(a) of the Communications Act prompted its refusal to provide interconnections, the district court should have instructed the jury on the details of the regulatory statute as they relate to the controversy involved here. Judge Grady instructed the jury that MCI had to prove that AT & T denied the FX and CCSA interconnections for anticompetitive reasons, and not because of its good faith belief "that it would have violated established regulatory policies for MCI to receive the connections."

AT & T argues that this instruction was nonetheless inadequate because it failed to explain in detail the regulatory provisions governing interconnection. In making this argument AT & T relies heavily on *Mid-Texas Communications Systems, Inc. v. AT & T*, 615 F.2d 1372 (5th Cir.), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). In *Mid-Texas*, the defendant Bell System had refused to make available to a local telephone company certain essential interconnections. The Fifth Circuit reversed a verdict for the plaintiff on the basis of erroneous instructions to the jury. The jury was instructed to assume the ex-

---

**82.** *See, e.g., Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (earlier holding on applicability of state statute of limitations would eliminate present plaintiff's right to institute suit, even though filed before earlier holding).

**83.** The jury was instructed that the period of liability for AT & T's acts extended between 1969 and mid-1975. The court told the jury at the outset of this portion of the instruction that the *Execunet* decision was rendered in 1977. Thus, AT & T's contention that the district court failed to instruct on the relevant time frame of the case is contradicted by the record.

istence of monopoly power, thus precluding it from consideration of state and federal regulation. On the issue of willful misuse of monopoly power, the instruction allowed for consideration of "legitimate telephone business reasons," but did not specifically direct the jury to take into account the effect regulation might have had on the conduct of the Bell System. The Fifth Circuit concluded that the jury must be instructed as to the relevant regulatory framework to determine whether Bell's conduct was reasonable. *Id.* at 1390–91.

AT & T argues that more is required than the charge that regulation is to be taken into account. In *Mid-Texas,* the court stated that "the district court should have instructed the jury on the applicable regulatory provision." *Id.* at 1387. From this, AT & T finds support for a rule requiring the court to describe and explain *in detail* all relevant regulations. But this fails to take into account the rule, cited with approval in *Mid-Texas,* that "the question on appeal is not whether an instruction was faultless in every respect, but whether the jury, considering the instruction as a whole, was misled. Thus, only in those cases where the reviewing court has substantial doubt whether the jury was fairly guided in its deliberations should the judgment be disturbed." *Id.* at 1390–91 n. 16 (citations omitted). *Accord, Alloy International Co. v. Hoover-NSK Bearing Co.,* 635 F.2d 1222, 1226 (7th Cir.1980); *Commercial Iron & Metal Co. v. Bache Halsey Stuart, Inc.,* 581 F.2d 246 (10th Cir.1978), *cert. denied,* 440 U.S. 914, 99 S.Ct. 1229, 59 L.Ed.2d 463 (1979); *Allers v. Bohmker,* 199 F.2d 790, 792 (7th Cir.1952).

▬▬▬ *Mid-Texas* does not state how detailed a regulatory framework instruction must be. All we know is that it was error to omit all reference to how evidence on regulation was to be used in the jury's deliberations. 615 F.2d at 1390–91 n. 16. An ideal instruction would very briefly explain, for example, that a carrier has an obligation under the Communications Act to interconnect, but may deny interconnections if it determines that the public interest is to the contrary; and that if the carrier at the time had a reasonable basis in regulatory policy to conclude, and in good faith concluded, that denial of interconnections is required by concrete, articulable concerns for the public interest, then there is no liability under the antitrust laws. AT & T's proposed instruction went well beyond this concise model. The court's instruction fell short to the extent that it did not explain the particular provision of the Act, but we do not consider this fatal. Unlike the jury in *Mid-Texas,* the jury here was clearly instructed to consider the impact of regulation and, where applicable, AT & T's defense of good faith. Both parties presented evidence on regulation and thoroughly argued the application of that evidence to the jury. The thrust of AT & T's position under the Communications Act was made plain, and nothing in the pertinent instructions misled or confused the jury in this regard.[84]

AT & T makes a second argument in favor of specific instructions on the meaning of its regulatory obligations. AT & T contends that the jury instructions omitted specific reference to and explanation of the Rule of Reason required to be applied in antitrust cases. AT & T argues that pursuant to the Rule of Reason the jury must consider all the facts and circumstances bearing on the reasonableness of the challenged conduct. Such consideration would require detailed instructions on the meaning of the Communications Act.

---

84. With respect to the interconnection controversy, AT & T specifically requested an instruction explaining in great detail the pertinent regulatory statutes, but the district court rejected it and instead simply instructed that liability could not be found if AT & T had acted pursuant to a good faith interpretation of regulatory policy. In the interconnection controversy, the inquiry focused on whether AT & T *in fact* had acted on the basis of a perceived regulatory policy. Whether AT & T's purported belief was correct was not at issue since the relevant policies actually required the interconnections. Particularly in that instance the district court's more general instruction was sufficient.

■■■■■ AT & T's argument misapprehends the proper role of the Rule of Reason in antitrust cases. The Rule of Reason is a rule of construction which applies to section 1 of the Sherman Act. The need for such a rule arose because a literal reading of section 1 would prohibit virtually every private contract. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). Thus, under the Rule of Reason only agreements which are unreasonably restrictive of competition violate section 1 of the Sherman Act, *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); the Rule of Reason does not directly apply as such to the offense of monopolization under section 2 of the Sherman Act.

■■■■■ Even if the Rule of Reason were construed to apply to analysis of section 2 of the Sherman Act, the Rule does not stand for the proposition that "all the facts and circumstances which bear on the reasonableness of the challenged conduct be considered." For example, a defendant cannot claim as a defense that a decision to fix prices was reasonable, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir.1898), *modified,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), or claim that it was reasonable to replace competition with monopolistic arrangements. *United States v. Joint Traffic Association,* 171 U.S. 505, 573–77, 19 S.Ct. 25, 33–34, 43 L.Ed. 259 (1898); *United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897).

■■■■ The Rule of Reason was analyzed comprehensively in *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Justice Stevens writing for the Court stated:

> Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions.

*Id.* at 688, 98 S.Ct. at 1363. The inquiry under the Rule of Reason is thus confined to a consideration of the impact of the challenged conduct on competitive conditions and does not inquire whether a policy favoring competition is in the public interest. *Id.* at 690, 692, 98 S.Ct. at 1364–1365.

The district court properly instructed the jury on the applicable provisions of the Sherman Act and how the facts fit within that legal framework. As part of the instruction, the jury was cautioned that violation of the Communications Act did not prove that antitrust laws also were breached. If the jury has been adequately instructed how to apply the pertinent law to the evidence, there is no reversible error. *Alloy International,* 635 F.2d at 1226–27. The instructions given comport with AT & T's view that the impact of regulation must be considered. We further find no reversible error in the refusal to instruct on the specific details of the Communications Act, or on the Rule of Reason.

### 5. Insufficient Evidence

■■■ AT & T asserted that the evidence was insufficient to sustain the jury's finding that the FX and CCSA interconnection denials were made in bad faith. The first contention is that MCI never proved AT & T knew in 1973 and 1974 that the court would rule as it did in the 1977 *Execunet* decision. Therefore, says AT & T, its denial of interconnections was made in good faith. MCI argued, however, that AT & T made its interconnection decisions without reference to its understanding of the state of the law. For support, MCI introduced internal AT & T documents showing AT & T's expectation that a less limited interconnection policy would be propounded in the near future (one AT & T official anticipated "demands for unrestricted interconnections"), and suggesting that AT & T's approach be one of "buying time" through

"delaying tactics."[85] One AT & T document noted Bell's adoption of policies designed to "limit flexibility of [the specialized carriers] and [their] ability to sell services utilizing our central office switching capacity." From this evidence, the jury could reasonably infer that AT & T's delays in permitting FX and CCSA interconnections were evidence of AT & T's improper intent "to limit competitive encroachments through devices such as restricting the use other carriers may make of our facilities." AT & T's denial of interconnections must also be judged in context with its other actions. *See City of Mishawaka v. American Electric Power Co.,* 616 F.2d 976, 986 (7th Cir.1980). The evidence supports the inference that, regardless of whether it anticipated *Execunet,* AT & T intended to obstruct MCI's entry into the market and used the public interest standard in bad faith.[86]

AT & T also urges that the evidence was insufficient to support the jury's rejection of AT & T's defense that it had in good faith interpreted the *Specialized Common Carriers* decision as limiting its duty to provide interconnections. The jury was entitled to credit the evidence showing that generally AT & T officials intended to impede competition regardless of the meaning of the 1971 decision. AT & T presented testimony of its officials and others familiar with the telecommunications industry.

That evidence indicated that some persons familiar with the telecommunications industry viewed the FCC's use of the term "private line" service in the *Specialized Common Carriers* opinion as vague enough to be read as limiting MCI to "point-to-point" private line service (an AT & T interpretation that would exclude FX and CCSA interconnections and limit required interconnections only to "tie lines" through local wire "links" that would not provide access to the public switched network).[87] In response, however, MCI introduced evidence that AT & T always classified FX and CCSA as "private line service," which was the principal descriptive term used in the 1971 order to describe the scope of service authorized; that the limiting term "point-to-point private line service" did not appear in the 1971 decision; and that "tie lines" could afford access to a switched network. The "tie line" point, which raised a fact issue, would sustain a jury conclusion that, even if MCI was limited to receiving tie line interconnections, there still was no basis for AT & T to conclude that access to the switched network was forbidden to MCI by the 1971 order. Moreover, the *Specialized Common Carriers* decision discusses options for the provision of "local loop" interconnections, an approach which assumes that such interconnections would be freely available.[88] MCI demonstrated on cross-exami-

---

**85.** AT & T challenges the admissibility of one document containing such statements. That question is dealt with *infra,* at 1143.

**86.** A similar inference of intent could be drawn from tariffs AT & T filed, which by their terms required AT & T to refuse FX and CCSA interconnections. When considered in the context of the comments noted above, the tariffs could well give rise to a legitimate inference by the jury that AT & T sought every avenue of obstruction to competition, while anticipating that its general denial of interconnections would prove unsupportable in the long-run. *See infra,* at pp. 1153–1158, the discussion of those tariffs.

**87.** MCI undercut some of this testimony on cross-examination. One AT & T witness admitted that his view of the interconnection requirements of the *Specialized Common Carriers* decision was formed without his having read the opinion. Another witness could not

articulate precisely what aspects of the decision gave rise to his view that the decision limited MCI to "point-to-point" service. Other AT & T witnesses were closely examined to expose their biases or lack of knowledge about the specifics of the decision. The jury was entitled to consider all this in according weight to the testimony of these witnesses and those whom MCI called to testify to their opposite conclusions about the meaning of the case.

**88.** That portion of the opinion describes the options approved "with respect to local loop service," 29 F.C.C.2d at 938, as including (a) provision of interconnection arrangements on "reasonable terms and conditions," or (b) new carriers' construction of "their own independent local facilities to provide end-to-end service" without the need for interconnection. *Id.* at 940. There is no limiting language about interconnections aside from the reference to "reasonable terms and conditions."

nation of an AT & T technical witness that the term "local loop" encompassed any local interconnection (including connections to switching equipment used in an FX termination) between an AT & T central office and an MCI terminal. This demonstration of AT & T's awareness that its own interpretation of *Specialized Common Carriers* was on highly questionable technical ground is sufficient to sustain a finding of improper intent,[89] especially when viewed in light of the arguably anticompetitive comments of AT & T management.

In any event, regardless of whether AT & T reasonably believed that *Specialized Common Carriers* did not require interconnections, the jury was entitled to conclude, based on the evidence, that AT & T did not act in good faith when it purportedly determined that the public interest justified its denial of interconnections.

### 6. *Evidentiary Rulings*

AT & T asserts that the district court erred in admitting into evidence the FCC's 1974 cease and desist order and accompanying decision, 46 F.C.C.2d 413, which required AT & T to provide FX and CCSA interconnections. That decision noted that the scope of the FCC's 1971 order may have been unclear (prompting the agency to proceed under a section of the Act different from that usually employed for cease and desist orders), but concluded that AT & T unlawfully denied the interconnections in contravention of the *Specialized Common Carriers* decision. Although Judge Grady refused to admit the decision and order for the truth of the matters asserted, he admitted the document for non-hearsay use as revealing the FCC's "state of mind" about

the scope of its *Specialized Common Carriers* decision which AT & T brought into question. AT & T's good faith defense, based as it was on an asserted ambiguity in the *Specialized Common Carriers* decision, necessitated that MCI be allowed to show what the FCC believed its own order meant. AT & T recognized, when questioning a witness, the risk of providing a basis of admissibility for the 1971 order. Judge Grady warned AT & T's counsel that his questions were opening the door for MCI's use of the 1971 decision. AT & T's counsel responded, "I don't think there is any doubt about that," and continued to pursue his line of questioning.

■ How the FCC viewed its 1971 decision was relevant to the reasonableness of AT & T's professed good faith interpretation of that decision. This limited, non-hearsay use was not erroneous. Further, the use of the decision comports with our recognition of the relevance of showing the full regulatory environment within which AT & T operated.

■ Judge Grady did not, as AT & T claims, reverse his evidentiary rulings on the *hearsay* use of the opinion; it was not admitted for the truth of the statements it contained.[90] *Cf. United States v. AT & T,* 498 F.Supp. 353 (D.D.C.1980) (finding that same FCC decision inadmissible if offered for the truth of the matters asserted in it). Nor was the admission of the 1974 decision unduly prejudicial under Federal Rule of Evidence 403. To the contrary, it provided highly probative evidence of how the FCC viewed one of its own decisions, a subject discussed by AT & T witnesses who explained their views of the "clear meaning"

---

**89.** This is so even acknowledging the Third Circuit's comment that the FCC's 1971 opinion was not a model of clarity. The evidence was sufficient for the jury to infer that AT & T seized on whatever ambiguity existed in the opinion to mask the true anticompetitive animus that guided its decisions.

**90.** Indeed, AT & T never objected on hearsay grounds to the use of the opinion, but rather on the basis that the order was irrelevant or else unreliable because it was purportedly obtained by MCI's fraudulent representations to the

FCC. In its Reply Brief, AT & T directs our attention to a portion of the transcript where it says it made an objection on hearsay grounds to the admission of the 1974 decision. We see nothing remotely resembling such an objection in that or any other relevant section of the transcript. Rather, the cited portion of the transcript contains an objection on relevancy grounds that "[t]he document has nothing to do with the interpretation of" the *Specialized Common Carriers* decision.

of the 1971 opinion.[91] The entire opinion was admitted, including the portion that characterized the *Specialized Common Carriers* case as "unclear," and AT & T was permitted to draw the jury's attention to that fact.[92] Judge Grady carefully instructed the jury on the limited purposes for which it could use the decision, clearly stating that it was not conclusive of the illegality of AT & T's actions but was merely one piece of evidence relevant to whether AT & T should have known that interconnections were required. In his final instructions, Judge Grady also reminded the jurors that the FCC's expression of intent is relevant only to the extent that it was based on the language of the 1971 decision or other facts known to the parties at the time. Potential prejudice is not a reason to keep out evidence where probative value outweighs prejudice. Fed.R.Evid. 403. *See generally* 10 J. Moore & H. Bendix, *Moore's Federal Practice* ¶ 403.10[1] (2d ed. 1982). Judge Grady did not abuse his discretion in admitting the opinion for limited purposes. *See Forro Precision, Inc. v. IBM*, 673 F.2d 1045, 1057 (9th Cir.1982).[93]

■ AT & T contends that the district court improperly refused admission of two documents, one of which emanated from Bechtel Corp., MCI's construction firm, and one of which came from Collins Radio, Inc., one of MCI's radio equipment suppliers. The documents contained the writers' impressions of the meaning of the *Specialized Common Carriers* opinion. Judge Grady properly refused the admission of the Bechtel letter under the business records rule, Fed.R.Evid. 803(6), because it did not reveal how the author drew his conclusions. Judge Grady correctly ruled that the author's vague statement that "in the beginning" FX and CCSA interconnections were not required "as I understood it" was insufficient to meet the foundation requirement of Rule 803(6). Because no adequate foundation could be established for admission of the Bechtel letter, the district court properly exercised its discretion in refusing to admit it.

■ The district court also refused to admit a memorandum prepared by the chief legal officer of Collins Radio, which was circulated to certain managers of that firm. That memorandum concerned the attorney's belief about the scope of interconnection required under the *Specialized Common Carriers* decision and discussed in part the injunction MCI recently had obtained from the federal district court in Pennsylvania. In a deposition, the attorney stated that he regularly prepared such memoranda on similar topics relevant to Collins Radio's business. AT & T sought to introduce the memorandum under the business records exception to the hearsay rule to support its claim that it denied the interconnections in

---

**91.** AT & T claims that the opinion is not probative of the FCC's state of mind, saying that only two of the five Commissioners sitting at the time joined in the opinion's full reasoning. Actually three of the five formed the majority as to the relevant portions of the opinion. One of those three dissented from a single paragraph concerning an issue not raised here. AT & T's citation of *Assure Competitive Transp., Inc. v. United States*, 629 F.2d 467 (7th Cir.1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981), is inapposite, since that case involved the validity of agency actions in the absence of a quorum. Here, by contrast, a majority of the FCC Commissioners sitting approved the decision in relevant part, and AT & T raises no issue about the validity of that action on the basis that a quorum was lacking. *Cf. Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (where no majority, plurality opinion states the holding of a case).

**92.** AT & T notes that the 1974 decision was submitted to the jury with the prejudicial portions highlighted. Since AT & T did not object to the highlighting after having an opportunity to inspect the exhibit prior to its submission, and itself highlighted portions of its own exhibits, we see no impropriety in the jury's receiving the marked document.

**93.** Similarly, the district court properly exercised its discretion in admitting the 1973 injunction issued by the United States District Court for the Eastern District of Pennsylvania, the Third Circuit's decision upholding the FCC's 1974 cease and desist order and the Supreme Court's denial of certiorari to review that decision. All three were probative of the reasonableness of AT & T's assertions of innocent motive.

good faith because the scope of the *Specialized Common Carriers* opinion was unclear. Judge Grady refused admission of the memorandum because he believed that it was not a business record and that it would be unduly prejudicial. Although Judge Grady may have erred in refusing to admit the document on those grounds, the error was harmless. The evidence was merely cumulative of the opinions of six other people who expressed the same view of the *Specialized Common Carriers* decision as that contained in the Collins Radio memorandum. AT & T even introduced a similar statement by the president of one of MCI's companies. AT & T does not draw our attention to anything particularly novel or significant about the comments in the Collins Radio document.

 AT & T objects to the admission of portions of documents comprising an AT & T internal study, called the Interbusiness Relations Report. The report contains statements attributed to AT & T management. The statements express management's attitude that AT & T's tactics in regard to interconnection were or should have been designed to obstruct commercial rivals' legitimate competitive progress by denying interconnections. AT & T asserts that the documents are not admissions of the corporation because they were written by "low level" employees. While AT & T is correct that opinions of such employees without management responsibility are not properly considered to be admissions of the corporation, see, e.g., *United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir.1980), the employees whose opinions were admitted were not "low level." Rather, the opinions admitted were those of high level management compiled in the course of the study. Precise identification of the persons who made the statements was not possible because AT & T had misplaced the interview sheets. The proposal for the format of the study, however, makes clear that the source of the report's information was to be "the highest possible management level." The study indicates that key managers (such as those who were "interfacing" on AT & T's behalf with firms such as MCI) were involved in the report. Moreover, materials made available to MCI list numerous high-ranking managers as having participated at various stages in the report's preparation. *Cf. Siemens Corp.*, 621 F.2d at 508 (viewing documents as corporate admissions is proper when there is some indication that senior management has seriously considered and endorsed views stated in them). At any rate, AT & T agreed that the identity of the interviewees was appropriate for argument to the jury.

 If the report is viewed as the work of agents of the corporation, it is admissible as an admission, since, at least as shown by circumstantial evidence, it was made while the managers were agents of the corporation; and it concerns matters within the scope of their agency, namely relations with competitors. Fed.R.Evid. 801(d)(2)(D); *Mahlandt v. Wild Canid Survival & Research Center, Inc.*, 588 F.2d 626, 630 (8th Cir.1978); *McCormick On Evidence* § 267 at 642 (E. Cleary, ed., 2d ed. 1972). The report was the basis for corporate action since it evaluated alternative methods of dealing with competitors and involved a vast expenditure of corporate time. *Pekelis v. Transcontinental & Western Air, Inc.*, 187 F.2d 122, 128–29 (2d Cir.) (A. Hand, J.), cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951). The fact that the report is based on hearsay or reflects opinion goes to its weight and credibility, not its admissibility.[94] *Pekelis*, 187 F.2d at 129. The district court did not abuse its discretion in admitting the report.

### 7. Substantial Impact

AT & T contends that the evidence fails to sustain the jury's finding that its FX and CCSA interconnection denials caused MCI substantial harm. AT & T argues that MCI had a significant backlog of uninstalled or-

---

**94.** The federal case AT & T cites for a contrary rule is based on local rules of Texas courts, as applied in that diversity action. *Lasiter v.* *Washington National Insurance Co.*, 412 F.2d 594 (5th Cir.1969).

ders and had only been in operation for seven months. AT & T's arguments lack merit.

■ From its inception, MCI was uncertain whether it could obtain the necessary interconnections. Consequently, MCI decided to defer its construction activities since it was unsure whether it could generate needed working capital, the anticipated source of which was cash flow from service revenues. The deferral decision in turn limited MCI's scope of operations once interconnections became available. The jury was entitled to find that the time consumed by the denial of interconnection and MCI's consequent entry into the market on a reduced scale were sufficient to substantially harm MCI, coming as they did during MCI's start-up period.[95]

MCI's backlog of circuit installations, the jury reasonably could believe, was caused in significant part by low morale resulting from layoffs that were made necessary by AT & T's anticompetitive denial of interconnections. This was reflected by the comments in three internal MCI memoranda. Other possible causes for the installation backlog (some of which concerned MCI mismanagement) were noted in those memoranda, and the jury was asked to consider those reasons as well as the ones that reflected adversely on AT & T. Contrary to AT & T's contentions, there is nothing inconsistent between these jury determinations and the jury's finding that AT & T did not harass MCI through its process of handling installations, and did not provide late or faulty installations. If there were other reasons for the backlog, such as low MCI employee morale brought on by AT & T's anticompetitive actions, it hardly mattered how expeditiously AT & T responded with the installations that were effected. It was reasonable for the jury to find that, based on all the evidence, the refusals to interconnect had a substantial adverse impact on MCI.

The evidence was sufficient to sustain the jury's conclusions that MCI suffered substantial harm from AT & T's denial of FX and CCSA interconnections.

## B. Tying

The jury found AT & T guilty of tying local to intercity telecommunications. AT & T contends that the jury's findings are unsupported by substantial evidence and vitiated by erroneous instructions. MCI's tying theory was based upon AT & T's monopoly control over local interconnections. MCI argued that AT & T had sold these interconnections as a separate product to local customers, independent telephone companies and others for years. MCI claims that where FX and CCSA services were involved AT & T took the position that the local services could not be purchased separately, but could be used only in conjunction with AT & T's long distance services.

MCI's tying claim is, in reality, simply an alternate legal characterization of its claim relating to the FX–CCSA controversy. The only specific act allegedly involving tying that MCI can point to is AT & T's unconditional refusal to interconnect specialized common carriers with its local distribution system. The facts underlying MCI's theory are identical to those underlying the entire interconnection dispute. These claims have already been dealt with under the rubric of the essential facilities doctrine. Whether we label AT & T's violation of the antitrust laws as tying or the denial of an essential facility, our prime concern is that AT & T used its monopoly power in local telephone service as a lever to impede or destroy competition in other markets. Nothing in this case hinges on which theory one uses to condemn AT & T's conduct. We therefore need not reach the issue of tying given our disposition of the claims on other grounds.[96]

95. Thus, AT & T's argument that MCI could not have been harmed because it did not have facilities in service during part of the time these obstructive events occurred is not convincing. The harm was one that would have effect once MCI actually went into service, as well as at the time of AT & T's actions.

96. We express no opinion on the overall relationship between the doctrines of essential facilities and tying and do not mean to imply that

### C. Disconnections

AT & T contends that erroneous instructions account for the jury's finding that AT & T improperly disconnected MCI customers after the Third Circuit's decision overturning the district court injunction which ordered interconnection. AT & T specifically asserts that Judge Grady erred in failing to instruct the jury that Bell system tariffs precluded the interconnections, because Bell was obliged to follow the terms of those tariffs once the injunction was vacated.

■ The instruction given precluded liability unless the jury found that AT & T "did not believe it was acting lawfully in disconnecting these lines." The instruction also conditioned liability on a finding that the purpose of the disconnections was to keep "MCI out of the market or unfairly [to limit] its ability to compete with AT & T." AT & T contends that the instruction effectively directed a verdict against it, because even innocent disconnections obviously could keep MCI out of the FX and CCSA market. This argument ignores the portion of the instruction that required the jury to find that, before AT & T could be liable, AT & T must have believed it was disconnecting MCI's customers unlawfully.

■ In any event, the tariffs filed by AT & T do not insulate it from the disconnection claim. The tariffs were issued by AT & T and took effect automatically unless the FCC rejected or suspended them—no special approval being required. 47 U.S.C. § 203(a), (b)(1) (1976). If the terms of the tariffs were themselves simply another device, designed and used by AT & T to inflict antitrust injury on MCI, then it does not matter that AT & T merely adhered to those terms. The jury was entitled to infer that AT & T failed to propose changes in the tariff terms. The existing terms were not instituted or required by the FCC, and AT & T could presumably modify them upon due notice, *see Ambassador, Inc. v. United States,* 325 U.S. 317, 323,

65 S.Ct. 1151, 1154, 89 L.Ed. 1637 (1945). The tariffs could not thus provide an excuse for AT & T's knowingly anticompetitive conduct. *See Cantor v. Detroit Edison Co.,* 428 U.S. 579, 592–96, 96 S.Ct. 3110, 3118–3120, 49 L.Ed.2d 1141 (1976) (even where utility could neither maintain nor alter allegedly anticompetitive tariff without state regulatory agency's permission, antitrust laws still apply if "the option to have, or not to have, such a program [in the first instance] is primarily" the utility's). Since AT & T presented to the jury its theory that its actions, purportedly based on its legal obligations arising under the tariffs, were lawful, and the substance of that defense was communicated to the jury in the instructions, no further elaboration of the specifics of AT & T's position was necessary. *See Beard v. Mitchell,* 604 F.2d 485 (7th Cir.1979).

■ AT & T also argues that there was no evidence to support the jury's conclusion that MCI sustained significant injury from the disconnections. Consumer and investor confidence in MCI was surely shaken by the abrupt interruption in its provision of service. This reaction was evidenced by testimony about the many telephone calls received from confused and distressed MCI customers. Even if MCI gave its customers advance notice that the Third Circuit might rule as it did, such a warning would not necessarily render the impact of AT & T's unlawful conduct *de minimis.* AT & T's anticompetitive actions created the impression that AT & T would continue to disrupt MCI's efforts to serve its customers and consequently may have influenced MCI customers who feared that prospect. We approve the jury's finding on the disconnection charge.

### D. Denial of Interconnections for Service Outside of Local Distribution Areas

■ In the *Specialized Common Carriers* decision the FCC ordered AT & T to

---

a tying violation will always flow from any denial of an essential facility by a dominant firm.

provide local distribution facilities to the new carriers, and authorized the new carriers to construct inter-city communications facilities. AT & T developed geographic boundary maps for the cities MCI served. The territory within the boundaries was known as a local distribution area ("LDA"), and AT & T refused to provide MCI interconnections to reach its customers outside those boundaries.

MCI adduced evidence that AT & T insisted on boundaries for the LDA's that bore no relation to those AT & T normally used to define service limits. For example, AT & T's explanatory letters to its local operating companies concerning LDA maps note the existence of "base rate boundaries" and "exchanges," terms which refer to common or normal demarcations for provision of service. Yet the LDAs in virtually all the maps, as the letters point out, bear no apparent relationship to those demarcations.[97] This is important because MCI asked for a reasonable definition of the LDAs. As one of AT & T's witnesses acknowledged on cross-examination, MCI was dissatisfied with the various boundaries drawn up even after it participated in negotiations over the establishment of those

boundaries. The boundaries were not what MCI wanted, but it was forced to accept them given the time constraints under which it operated. As an AT & T memorandum detailing the history of the new carriers describes, the carriers' efforts to expand the number of customers they could serve were stymied by AT & T's insistence on narrowly drawn boundaries. It was for the jury to determine in light of those and other circumstances whether AT & T's methods of establishing LDAs were anticompetitively arbitrary and unduly limiting, or on the other hand, whether the boundaries were drawn with a proper motive to conform to the reasonable limits mandated by the FCC.

 AT & T also argues that there was no evidence to show that the facilities denied were essential, as required under Judge Grady's instructions. There was, however, testimony that MCI needed the facilities beyond the local distribution areas proposed by AT & T to reach the populations in reasonably delimited metropolitan areas surrounding the major cities MCI served and that MCI could not duplicate these facilities.[98] The fact that MCI was

**97.** Neither party questions the correctness of Judge Grady's instruction that MCI was not entitled to interconnections for geographically unlimited local facilities. MCI contended only that the boundaries as drawn unreasonably restricted MCI's ability to serve its customers. For example, MCI claimed it was unreasonable for AT & T to restrict the Washington, D.C. LDA in such a way as to preclude necessary interconnections extending to Rockville, Maryland, a densely populated and commercial suburb only 13 miles from the city. AT & T argues that there is no evidence that the LDA designations were unduly restrictive or constituted an improper attempt to keep MCI at a competitive disadvantage and to exclude it from the market. There was conflicting evidence as to whether the LDA's were unreasonably restrictive. This question thus became appropriate for resolution by the jury, and in light of the testimony and arguments concerning the restrictiveness of the LDAs, Judge Grady adequately instructed the jury to determine the reasonableness of the LDAs.

The MCI witness whose testimony AT & T says supports the view that MCI sought geographically unlimited interconnections was referring only to his desire for MCI to receive

reasonable interconnections for *local* areas. His statement that "[t]here should have been no restriction on MCI's ability to serve its customers" was linked directly to his expressions of concern over unreasonable limits on the LDAs. The witness went on carefully to distinguish between MCI's requests for broader limits on local interconnections, and its desire for national "interexchange" facilities. On appeal, AT & T ignores the effective distinction made by the witness to its counsel—and the jury—at trial.

**98.** AT & T's argument that the district court failed to provide guidance to the jury on what constituted an "essential facility" is meritless. Judge Grady carefully instructed the jury on the elements of the essential facilities doctrine (including the need for the jury to find that MCI could not reasonably duplicate the facility) and specifically stated that MCI contended the facilities of AT & T's local operating companies were "essential", since without them, MCI could not provide service to its customers. Moreover, the district court instructed the jury that the essential facilities doctrine is applicable where "a business holds a monopoly of some essential facility that other businesses

building its own facilities in at least one of the contested areas[99] may properly have been taken by the jury as evidence that MCI was exercising its option under the 1971 *Specialized Common Carriers* decision to build its own facilities for end-to-end service, *see* 29 F.C.C.2d at 940, not that it could duplicate AT & T's local service facilities at every point. Also, the FCC itself characterized service within the LDAs as "essential" even though the new carriers had an option to duplicate them. *Id.* We find no fault with the instruction as given.[100]

### E. *Multipoint Service*

The jury found that AT & T denied interconnections for multipoint service to MCI with the intent to retain its monopoly. AT & T asserts that the instructions on this claim were incorrect because they were inconsistent with the instruction given under the LDA interconnection charge that MCI was not entitled to geographically unlimited interconnections. AT & T also asserts that it was incorrect to allow the jury to find the denial of multipoint interconnections unlawful under the essential facilities doctrine.

Multipoint service described the situation where AT & T provided a private line to a customer between city A and city B, and MCI provided a private line between city B and city C. MCI sought an interconnection in city B between its own line and AT & T's line so that MCI's customer in city C could have uninterrupted service between city C and city A. MCI claimed that its ability to compete in the market for city B to city C communications was substantially impaired if it was not able to offer its customers through service over AT & T's lines to other cities which MCI did not serve itself. AT & T contended that multipoint interconnections effectively allowed MCI to provide its customers service to cities MCI could not reach with its existing equipment although

---

need in order to compete ...." Since the word "essential" is a term of ordinary meaning, and since the instruction explained that the facilities involved must be those that a firm needs in order to compete, the jury was given adequate guidance. *Cf. Kocher v. Creston Transfer Co.,* 166 F.2d 680 (3d Cir.1948) (where enigmatic term used, jury may not be left to speculate on its meaning).

**99.** AT & T's Reply Brief on this issue cites an MCI memorandum detailing the construction of MCI facilities in South Chicago and Hammond, Indiana. The memorandum appears to refer to these facilities as part of the long distance portion of MCI's planned service between Chicago and Cleveland, making them different in character from the local interconnections MCI sought in the LDA controversy.

**100.** AT & T argues that the essential facilities concept is not applicable here because there has been no *joint* refusal to deal. Where a monopolist controls essential services, however, its refusal to allow potential competitors to use those services gives rise to antitrust liability where the purpose of the denial is to restrain competition, even if the monopolist is the only one that controls the facility. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Official Airline Guides, Inc. v. Federal Trade Commission,* 630 F.2d 920, 927–28 (2d Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d

343 (1981). Otherwise, a monopolist would be able unreasonably to choke off all competition, yet escape sanctions simply because it was the only one in a position to do so. The thrust of *Official Airline Guides* and *Almeda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343 (5th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980), is not, as AT & T contends, that a *joint* refusal to deal is necessary in order to establish the applicability of the essential facilities concept. Rather, the point made in those cases is that in the absence of competition between a potential seller and a putative buyer, there is no room to apply the essential facilities doctrine. Here, in contrast, AT & T and MCI are in direct competition as providers of long distance service. The interconnections that MCI seeks from AT & T in the area beyond the restrictive LDAs are by definition a necessary component for MCI to reach its customers. The jury was entitled to find that absent a greater geographical range than AT & T was willing to concede, MCI would be placed at a severe competitive disadvantage. Since MCI showed that it had potential customers outside the restrictive LDAs, the jury had an ample basis to conclude that AT & T intended to undercut MCI's competitive potential. Indeed, when AT & T provided the temporary interconnections pursuant to the 1973 injunction, several went to MCI customers beyond at least one LDA.

MCI was itself authorized to build the facilities that would provide the service.[101]

■ We find that, as a matter of law, the evidence was not sufficient to support a jury finding that AT & T denied multipoint interconnections with the intent to monopolize. We also agree with AT & T that the jury instruction was insufficient, although on grounds different from the one advanced by AT & T.

There are two independent theories upon which the denial of multipoint interconnections could have violated the antitrust laws. First, as we have discussed in terms of interconnections for FX–CCSA service and service beyond a local distribution area, the denial of multipoint interconnections could have been a violation of the antitrust laws if sufficient evidence had been presented that these were "essential services." In general, a business has no legal obligation to deal with its competitors. There are situations, however, in which the federal courts have found a duty under section 2 of the Sherman Act for a monopolist to trade with all on nondiscriminatory terms. One of these instances is where the monopolist controls an "essential service" or "bottleneck." *Supra* at pp. 1132–1133. We hold, however, that, as a matter of law, there was not sufficient evidence presented at trial to permit a finding that interconnection for multipoint service involved "essential services."

MCI's principal testimony on interconnections came from its president, William McGowan. While Mr. McGowan testified that interconnections were essential to connect MCI's metropolitan terminal with the local Bell distribution system (the basis for the FX, CCSA, and LDA counts), none of this testimony addressed the need for interconnection to Bell's intercity circuits. Tr.

372–80. Similarly, Mr. McGowan testified that it would be "physically impossible" to duplicate Bell's local telephone system, but did not address the practicability of duplicating the private long distance circuits with which it had requested to be interconnected for multipoint service. Tr. 379. The evidence presented did not demonstrate either that the duplication of Bell's intercity lines was economically infeasible or that the denial of access inflicted a severe handicap on market entrants. MCI's primary business was to build precisely the type of facilities to which it sought access from the Bell System. There was no sufficient explanation as to why MCI, on the one hand, was building its own network, and, on the other, was entitled to access in the interim to AT & T's facilities. Thus, the jury lacked sufficient evidence to conclude that these interconnections were essential.[102]

■ A second possible basis for imposing antitrust liability upon AT & T for the denial of multipoint interconnection would be a determination that AT & T's actions in this respect were sufficient evidence of an intent to monopolize. In addition to the cases finding liability for a refusal to deal when an essential service is involved, there are cases which find liability when a monopolist's refusal to deal with a competitor is shown to be evidence of an illegal intent to destroy competition. *See Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). These cases focus on the intent and competitive effect of the refusal to deal; not on whether the facility itself is "essential." It is settled law that actions which might be lawful in another context can constitute a

---

101. It should be made clear that multipoint service, as requested by MCI, contemplated that AT & T would be entitled to all revenue generated by the use of AT & T lines.

102. On appeal, MCI argues that the interconnections it sought for multipoint service were "purely local and do not involve provision of interstate facilities by AT & T to MCI." Appel-

lee's Brief at 83. We find this argument to be somewhat disingenuous. While the interconnections in question involved, in a technical sense, physical facilities that were "local," the purpose of these interconnections was to allow MCI to sell a long distance service package which included access to cities to which MCI had, as yet, not built its own facilities.

violation of section 2 of the Sherman Act if they are done with the purpose of benefiting a monopolist as against its competitors, and have the effect of smothering competitors, either in the market where the monopoly power exists or in adjacent markets. *See United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Official Airline Guides, Inc. v. F.T.C.,* 630 F.2d 920 (2d Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701 (7th Cir.1977), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Town of Massena v. Niagara Power Corp.,* 1980–2 Trade Cas. ¶ 63,526 (N.D.N.Y.1980).

■ We do not think that, given the unsettled regulatory status of the telecommunications industry at the time of these events, sufficient evidence was presented to the jury to permit a finding that AT & T's denial of interconnection for multipoint service was primarily motivated by an illegal intent to monopolize. Contrary to MCI's assertion, multipoint interconnection was substantially different in character from the other types of interconnections sought by MCI. Multipoint interconnection was the device through which MCI sought access to the full scope of AT & T's nationwide long distance network. Granting MCI multipoint interconnections would have enabled MCI to compete with AT & T for long distance traffic into areas where MCI may have made no significant capital investment. At the time in question, the FCC may or may not have intended (or indeed may or may not now or in the future intend) to effect such a significant change in the structure of the national telecommunications industry, and to impose upon AT &

T the extraordinary obligation to fill in the gaps in its competitor's network.

As a matter of antitrust liability only, however, can an entrant which actually builds its own facilities between Chicago and Milwaukee, for example, thereby gain entitlement to use all the far-flung facilities of the Bell System? Is its entitlement based on its expressed intention to duplicate major portions of the Bell System on a national basis? Could it claim entitlement before (or without) building any facilities of its own? We think the ramifications of the demand for multipoint service are troubling and complex, and that under the circumstances of this case and without reliance on a regulatory determination, the denial of interconnections for multipoint service cannot form a basis of liability. Therefore, as a pure matter of antitrust law (without any regulatory component), we decline to hold AT & T liable for a refusal to make available its full nationwide network to a competitor. Instead we find that AT & T could only have been liable for denying multipoint interconnections under a theory that this denial was sufficient evidence of monopolistic intent, *if the FCC had authorized or mandated multipoint interconnections.* Because we find no such order or authorization to have been clearly made, we decline to inject the complications of a generally amorphous antitrust doctrine into what is, at heart, a regulatory matter.

■ We also find that the instructions which the jury received were insufficient to allow liability for the denial of multipoint interconnection to be premised on the proposition that the FCC's *Specialized Common Carriers* decision actually ordered AT & T to provide such interconnections.[103] The district court's instruction on multipoint interconnection essentially stated that, in order to prevail, MCI had to "prove that AT & T unreasonably denied those interconnections with the intent of

103. AT & T's theory on appeal is that the jury instruction for the multipoint claim conflicted with the instruction under the LDA claim. We find no conflict in these two instructions. The instruction on the LDA claim, when read in context, tracks the application of the essential facilities doctrine to the LDA controversy. The district court's reference to "geographically unlimited local facilities" in that instruction applied only to the LDA claim.

maintaining a monopoly." [104] Instruction No. 32, App. 1203. This instruction, unlike the instructions given under the FX, CCSA, and LDA interconnection claims, entirely failed to instruct the jury as to the relevance or applicability of the FCC's determinations, if any, on the subject. No mention was made either of any guidance which may have been afforded to AT & T by the FCC's decision or of AT & T's beliefs as to its obligations (or lack thereof) under the *Specialized Common Carriers* decision. We thus hold that the jury could not have reasonably found, based upon the instructions it received, that AT & T's refusal to provide multipoint interconnections was in violation of the FCC's decision and thus evidence of the intent necessary for a violation of the antitrust laws.[105]

F. *Inappropriate or Inefficient Interconnections*

AT & T contends that there was no support for the jury's finding that AT & T provided MCI with "inappropriate or inefficient equipment or procedures for interconnection." Specifically, AT & T charges that the jury based its findings on generalized complaints, impermissible references to a 1975 agreement arising from an FCC proceeding,[106] and vague instructions that allowed the jury to consider an impermissible theory. Because of these errors, AT & T claims that the jury imposed liability despite adequate technical arrangements. We find, however, that the jury was properly instructed and that there was sufficient documentary and testimonial support for the finding of technically inadequate interconnections.[107]

The evidence indicates that AT & T's insistence on a "clean interface" [108] between MCI and AT & T equipment was at the heart of many of MCI's technical complaints. To facilitate that requirement, AT & T insisted that all interconnection with MCI be made at the customer's premises. The customer premises restriction precluded the central office terminations needed to provide FX and CCSA service. E & M signaling [109] was provided because it facilitated the "clean interface" concept. Unlike the other available forms of signaling, E & M could be separated and tested independently at the point of conversion, and was

---

**104.** Instruction 32 reads, in full:

MCI claims that AT & T denied it interconnection for multipoint service. According to the evidence, multipoint interconnection involved a situation where a customer ordered an AT & T private line between City A and City B, and an MCI private line between City B and City C, and MCI sought an interconnection between its terminal and the AT & T terminal so that the customer could obtain service between City A and City C. To prevail upon its claim of denials of multipoint service interconnections, MCI must prove that AT & T unreasonably denied those interconnections with the intent of maintaining a monopoly in the relevant market rather than for legitimate business reasons.

App. 1203.

**105.** Because MCI failed to request a jury instruction which would have allowed a finding of liability based upon this theory, MCI may not now claim as error or be entitled to a remand upon this inadequacy in the instruction actually given. *See* Fed.R.Civ.P. 51.

**106.** *AT & T, Offer of Facilities for Use by Other Common Carriers,* 52 F.C.C.2d 727 (1975). Neither the agreement itself nor any of its terms was in evidence.

**107.** We also reject AT & T's argument that MCI's injury from the inappropriate or inefficient interconnections was never specified at trial and so must be *de minimis.* For the reasons stated in our discussion of MCI's damages, *infra,* p. 1168, MCI must be allowed to present its proof of damage without having to tightly compartmentalize its proof and without having to specify an exact dollar amount for each *unlawful* act of AT & T.

**108.** According to the definition stipulated to by the parties, "clean interface" is a demarcation or method of connecting Bell services or facilities with non-Bell services or facilities in a manner which clearly delineates the end-to-end responsibilities of the carrier providing the services, obviating the necessity for joint installation, maintenance or testing.

**109.** As the parties stipulated, signaling is the method of telling the telephone equipment that communication is being made or has stopped, such as making the telephone ring or stop ringing. E & M is one of three possible signaling systems.

best suited for short distance transmission on the customer's premises. The evidence indicated that E & M signaling caused increased cost to MCI and decreased reliability of service. As a result, MCI provided slow response time in repairing customer equipment.

■ An internal AT & T report demonstrated that AT & T itself recognized that interconnection at the customer's premises would cause problems. The report stated:

Our study shows that an interface at an intermediate customer's premises results in redundant local facilities; degraded service, higher costs to the customer, and a more difficult maintenance arrangement for both Bell and the [other common carriers].

PX 323 at p. 275.

Despite AT & T's knowledge and despite testimony that MCI requested DX, a different signaling method, AT & T would only provide E & M signaling and insisted on connections at the customer's premises. The jury was entitled to conclude that AT & T's actions were deliberately taken to impede MCI's progress.

AT & T also argues that MCI approved of the equipment and procedures employed by AT & T. In support, AT & T points out that an MCI vice-president initially agreed in an internal memorandum that E & M signaling was "the best long term solution." The MCI vice-president, however, recognized even in the early memorandum that E & M signaling was not appropriate for MCI's needs as it started business:

Bell ... want[s] to interface on an E & M basis with MCI. We agree, this *is* the best long term solution. However, this usually involves Western Electric and for example, in Ohio MCI has been told that it will take 15 weeks to complete and accept the work, and cost $300 to $400 which will be passed on directly to the

customer by Bell. This, of course, is not acceptable to MCI in a start up situation. DX 768. (Emphasis in original).

The trial testimony also indicates that the MCI vice-president qualified his opinion as to the long-run viability of E & M after discussing the alternative forms of signaling.

As to physical equipment, MCI asserted that the 66-type connecting blocks, which were used to connect MCI's wires to those of AT & T, were inadequate. MCI's technical witness testified that the 66-type connecting block was designed to be used at a customer's premises where the customer had more than one line, or in conjunction with the customer's switchboard unit. The witness testified that the 66-type block was not designed to be used in an area of high activity. MCI sought the 300-type blocks because they were more appropriate for high volume areas and could be centralized at MCI's own terminals. MCI contended that the 300-type block was needed because MCI was a communications carrier and not merely an AT & T customer seeking connections at separate points of service, as AT & T preferred to think. There was conflicting testimony about whether the 300-type connecting block differed from the 66-type connecting block.[110] There was sufficient evidence, however, from which the jury could find that the 66-type block was inappropriate for MCI's needs and was provided as a means to harm MCI.

MCI also complained that AT & T did not maintain sufficient trouble reporting procedures. There was evidence that AT & T only provided MCI with essentially the same procedures AT & T provided for *individual* customers. MCI claimed that these procedures were inadequate to handle the special problems occurring in the network MCI provided its customers. AT & T contends that MCI was satisfied with the procedures because the chairman of MCI's board, in a 1973 letter to the FCC, expressed his approval of "the fair price of

---

**110.** A connection in a 66-type block is formed by pushing wires down between small pins. There are two points of connection. In comparison, a 300-type connector is mounted on a frame, has a square pin and provides 32 points of connection.

service [and] the technical details of accomplishing interconnection to date." The letter, however, did not specifically address trouble reporting procedures. Rather, it simply enumerated five requests for interconnection between MCI and either customer premises or AT & T's facilities. In addition, there was testimony that MCI's dissatisfaction with the trouble reporting procedures continued after 1973.[111] The jury was entitled to take this into account in evaluating AT & T's argument.

■ AT & T asserts that the trial court erred by allowing the jury to hear references to a 1975 agreement in an FCC proceeding initiated to consider MCI's complaints and resolved through negotiation. AT & T relies on Federal Rules of Evidence 407 and 408, which limit the evidentiary use of subsequent remedial repairs and settlement negotiations, respectively. On direct examination, an MCI vice-president mentioned the settlement agreement. Instead of objecting on the basis of Rule 407 or 408, however, AT & T's counsel moved for a mistrial on the ground that the reference violated a provision in the agreement that stated, "[N]othing contained in this settlement agreement . . . shall constitute an admission by any party. . . ." The district court denied the mistrial motion, finding that AT & T had not been prejudiced. AT & T cannot argue other grounds for reversal on appeal, because "if a specific objection is overruled, only the ground stated in the objection [can] be raised on review." 21 C. Wright & K. Graham, *Federal Practice and Procedure* § 5036 at 183 (1977).

Later in the trial, an MCI technical witness characterized the post-1975 technical arrangements MCI had with AT & T as superior to those before 1975, but did not mention the settlement. The court then informed the jury of the agreement in order to explain why services had changed so suddenly in 1975. Judge Grady explained how the jury should view the agreement:

> The reason that I allowed in the evidence about [the agreement] is . . . that I just don't see any way you can try the case without knowing what happened. It would be an artificial situation for you not to understand the course of the events. But it is very important for you to understand that the defendant doesn't admit anything and its having made those changes and having agreed to those changes does not constitute an admission.

■ Prior to this testimony, AT & T objected, arguing that the settlement provision and the doctrine of subsequent remedial repairs precluded the testimony. On appeal, AT & T argues that the testimony was inadmissible because a court may not admit evidence of a settlement agreement for the purpose of proving fault or liability. Settlement negotiations, however, are admissible to explain another dispute and to assist the trier of fact in understanding the case. Subsequent repairs are also admissible to demonstrate technical feasibility, which was at issue here (a point AT & T does not contest on appeal), and which was a basis for Judge Grady's decision to admit the testimony. At the time the evidence was introduced, the district court properly instructed the jury on the limited use of the testimony.

■ Finally, AT & T contends that the district court's instruction failed to establish any meaningful standard to guide the jury in its deliberations.[112] The submis-

---

**111.** MCI's witness on this issue, who testified from personal experience with the reporting procedures, did not join the company until 1973.

**112.** The instruction reads as follows:

> For plaintiffs to prevail on their claim that they were provided with inefficient or otherwise inappropriate equipment and procedures for interconnections, plaintiffs must establish that defendant knowingly furnished inefficient or inappropriate services or equip-

ment with the intent of maintaining a monopoly in the relevant market. The basic controversy here concerns the equipment used by the Bell operating companies to interconnect with plaintiffs, including such things as connector blocks and equipment interfaces, the various kinds of signaling used by the Bell operating companies, the configuration of certain interconnections, such as those for Central Office Centrex Service, the provision of engineering information, and the proce-

sion and form of instructions, however, are matters within the discretion of the trial court. Instructions must be viewed in their entirety and verdicts will not be overturned by picking and choosing words from an instruction without regard to the whole trial. *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1270 (8th Cir.1980). The instruction gave sufficient guidance to the jury by setting forth the technical areas in contention. It also stated that in order to find liability, the jury must determine that AT & T *knowingly* provided inefficient or inappropriate equipment or services with improper intent. This covered AT & T's claim that it believed even MCI was satisfied that the equipment was adequate. The district court did not abuse its discretion in so charging the jury.[113]

## V. BAD FAITH NEGOTIATIONS AND NOERR–PENNINGTON

### A. *The State Tariff Filings*

The jury found that AT & T filed tariffs in bad faith with state utility commissions as an act in willful maintenance of its monopoly position. AT & T contends that this activity merely constitutes the petitioning of the government protected under the First Amendment and is therefore immune from antitrust scrutiny.

 Under the so-called *Noerr-Pennington* doctrine, activities such as state tariff filings are immune from antitrust liability where their purpose is to influence government action. The doctrine arose from the need to construe the antitrust laws in such a way as to avoid a conflict with the right to petition the government protected under the First Amendment. This immunity doctrine was first enunciated by the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). While in *Noerr* the Court held that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws," *Id.* at 135, 81 S.Ct. at 528, it explicitly excluded from immunity activities which it labeled "mere sham" and defined as "nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id.* at 144, 81 S.Ct. at 533. As the Court restated in *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), *Noerr* immunity obtains so long as the attempt to influence government action is made in good faith.

The Court in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), extended *Noerr-Pennington* to administrative and adjudicatory proceedings. The Court also applied the "sham litigation" exception for the first time, holding that a common plan to oppose every application for a trucking permit, regardless of the merits, stated a cause of action under the antitrust laws. The Court stated that, "One claim, which a court or agency may think baseless, may go unnoticed, but a pattern of baseless, repeti-

---

dures for coordination, installation, testing, and repairs.
App. 1203.

**113.** AT & T also asserts that the instruction permitted the jury to find against AT & T on the theory that it was under an obligation to make its best and most up-to-date equipment and procedures available to MCI. Quoting from *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), AT & T notes that "if a firm that has engaged in the risks and expense of research and development was required in all circumstances to share with its rival the benefits of these endeavors, this incentive on which the proper functioning of our competitive economy rests would very likely be vitiated." *Id.* at 281. We find no hint of the theory to which AT & T objects in the instruction that mentioned only efficient and appropriate equipment and procedures, not the "most" efficient or appropriate ones. The only theory contained in the instruction is that MCI was entitled to equipment and procedures that did not act as a hindrance. The cases AT & T relies on for the contrary conclusion are inapposite. MCI did not ask AT & T for advance knowledge of its new products, unlike the plaintiffs in *Berkey Photo*; nor did MCI suggest that AT & T abandon a technical innovation in favor of an already existing alternative as in *Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir.1980), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981).

tive claims may emerge which lead the fact-finder to conclude that the administrative and judicial processes have been abused." *Id.* at 513, 92 S.Ct. at 613. AT & T seizes upon this language to define the scope of the sham exception, arguing that since no pattern of baseless, repetitive claims was shown, *Noerr-Pennington* applied as a matter of law to immunize the state tariff filings.

Although the Court in *California Motor Transport* specifically mentioned repetitive, baseless claims by way of example, we believe its rationale is not so limited. In *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977), the defendant had filed a single state suit, allegedly for the purpose of harassment and the elimination of competition. Four Justices in a strong dissent held fast to the view that *California Motor Transport* did not limit the sham exception to "a pattern of baseless, repetitive claims," but indicated that it may include a single use of the adjudicatory process to violate the antitrust laws. *Id.* at 661–62, 97 S.Ct. at 2902–2903. A plurality of three other Justices reversed the district court's injunction against enforcement of the state judgment on the basis of the anti-injunction statute, 28 U.S.C. § 2283, but noted that:

> Any "disadvantage" to which the federal plaintiff is put in the [state court] proceeding is diminished by his ability to set up the federal antitrust claim as an affirmative defense ... and his ability to sue for treble damages resulting from the vexatious prosecution of that state-court litigation.

433 U.S. at 636 n. 6, 97 S.Ct. at 2890 n. 6.

Thus the Court has left open the question whether a pattern of several claims is required to constitute a "sham." A close reading of the plurality and dissent in *Lektro-Vend* suggests that a majority of the Court believes that a *single* claim, lawsuit or petition can be "sham litigation" actionable under the antitrust laws.

The recent Ninth Circuit case of *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1254–57 (9th Cir.1982), provides the most thorough examination of the rationale for permitting antitrust liability to rest on the prosecution of a single claim before an administrative agency. In *Clipper Exxpress* the defendant opposed the filing of a single tariff before the ICC. The district court granted summary judgment for the defendants holding that the defendants' conduct was immunized by the *Noerr-Pennington* doctrine. The Ninth Circuit reversed the summary judgment and held that a single baseless claim could constitute sham litigation. The court analyzed the issue as follows:

> The sham exception ... reflects a judicial recognition that not all activity that appears as an effort to influence government is actually an exercise of the first amendment right to petition. At times this activity, disguised as petitioning, is simply an effort to interfere directly with a competitor. In that case, the "sham" petitioning activity is not entitled to first amendment protection, *because it is not an exercise of first amendment rights.*
>
> If the activity is not genuine petitioning activity, the antitrust laws are not suspended and continue to prohibit the violating activities. Because application of the antitrust laws is not suspended, it will prohibit sham activity, whether that activity consists of single or multiple sham suits. This analytical framework does not permit a conclusion that single sham suits are protected under *Noerr.*

690 F.2d at 1255 (emphasis in original).

*Clipper Exxpress* joins a growing list of federal cases which have held that a single lawsuit or claim may constitute sham litigation. *Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 543 n. 6 (5th Cir.1978), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); *First National Bank of Omaha v. Marquette National Bank*, 482 F.Supp. 514, 519–21 (D.Minn. 1979); *Technicon Medical Information Systems Corp. v. Green Bay Packaging, Inc.*, 480 F.Supp. 124 (E.D.Wis.1979); *Colorado Petroleum Marketers Association v. Southland Corp.*, 476 F.Supp. 373, 377–78 (D.Colo. 1979); *Cyborg Systems v. Management Sci-*

*ence America, Inc.,* 1978–1 Trade Cas. ¶ 61,927 (N.D.Ill.1978); *Associated Radio Service Co. v. Page Airways, Inc.,* 414 F.Supp. 1088 (N.D.Tex.1976). *Cf. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) (a single instance of enforcing a fraudulently procured patent can violate Section 2 of the Sherman Act). *See generally* Balmer, *Sham Litigation and the Antitrust Laws,* 29 Buff.L.Rev. 39, 55–56 (1980); Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80 (1977). *But see Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171 (10th Cir.1982). We therefore find that the bringing of baseless claims—even the undertaking of a single sham state court lawsuit—is devoid of the constitutional significance that warrants immunity from the antitrust laws.[114]

■ AT & T also challenges the jury instructions on this issue. In its instructions the court told the jury that the claim based on the state tariff filings "involves a resort by AT & T to a regulatory process, and involves certain First Amendment questions, that is, freedom of expression and freedom to seek redress from the appropriate regulatory body." Tr. 11483. The court went on to explain that consequently the filings would have to be found to be "an actual use of the regulatory process in a way that is really a sham and not a legitimate effort to present an arguable question, or legitimate question to a regulatory body." Tr. 11484. The court stressed

that MCI's burden on this claim is higher (clear and convincing evidence) because of these First Amendment concerns. While the instruction did not mention the *Noerr-Pennington* doctrine by name, the essentials of the doctrine and the exception from it for sham litigation were clearly and correctly explained. We find the instruction adequate.

■ MCI still bears the burden of proof that AT & T's tariff filings were, in fact, "sham." The *Noerr* and *Pennington* cases themselves provide little definition of what a "sham" may be other than to indicate immunity for "genuine efforts" and "good faith" attempts to influence governmental bodies. In *California Motor Transport* the Court held that the allegation that the defendants "instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the case" falls within the meaning of sham litigation. 404 U.S. at 512, 92 S.Ct. at 612. The Court also defined sham litigation as the filing of baseless claims. *Id.* at 513, 92 S.Ct. at 613. In concurring in the judgment, Justice Stewart indicated a willingness to allow an antitrust cause of action if the defendant "had made misrepresentations of fact or law to [the] tribunals, or had engaged in perjury, or fraud, or bribery." *Id.* at 517, 92 S.Ct. at 615 (Stewart, J., concurring in the judgment).

The lower courts have tended to read *California Motor Transport* narrowly so as not to tread on the First Amendment freedoms underlying the *Noerr-Pennington* doctrine. *Mid-Texas Communications Systems*

---

**114.** This discussion of the soundness of the theoretical underpinning for allowing antitrust claims based upon a single sham claim or lawsuit may be unnecessary under the facts of this case. AT & T filed the same tariff for interconnection charges with 49 individual state commissions. This may be regarded as a pattern of baseless claims within the language of *California Motor Transport.* Judge Grady in denying AT & T's motion to dismiss regarded AT & T's filings as constituting just such a series of "baseless, repetitive claims." *MCI Communications Corp. v. AT & T,* 462 F.Supp. 1072, 1103 (N.D.Ill.1978).

We also note what is at least a theoretical question: whether *Noerr-Pennington* would ap-

ply to each and every filing with state regulators. Since *Noerr-Pennington* is designed to protect the right to petition the government to take some action, *Noerr-Pennington* might not apply if a tariff filing is only a *pro forma* publication perhaps required by law and not an exercise of the right to *petition* the government. The record does not indicate whether each state regarded the filing of the tariff as an application for approval or merely as a notification (formal or otherwise). We do not reach this issue given our conclusion that these filings, even if "petitions" to which *Noerr-Pennington* applied, were, in any event, "sham."

*v. AT & T,* 615 F.2d 1372, 1384 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). The Ninth Circuit has stated that, "The sham exception permits the imposition of antitrust liability on those seeking action from government agencies only when the activity in question can serve no useful purpose, and is undertaken for purely anticompetitive reasons." *Forro Precision, Inc. v. IBM Corp.,* 673 F.2d 1045, 1060 (9th Cir.1982). The Tenth Circuit apparently has taken the most restrictive view among the Circuits, holding that sham denotes "misuse or corruption of the judicial process." *Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171, 1176–77 (10th Cir. 1982) (citing *Semke v. Enid Automobile Dealers Association,* 456 F.2d 1361, 1366–67 (10th Cir.1972)). The Tenth Circuit in *Hydro-Tech* applied its restrictive rule to hold that the mere absence of probable cause in the initiation of a lawsuit is not enough to invoke the sham exception to *Noerr-Pennington,* 673 F.2d at 1176.

One of the more cogent definitions of sham litigation may be found in *Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258 (S.D.Fla.1980):

> Without a doubt, the intention to harm a competitor is *not* sufficient to make litigation or administrative proceedings a sham. That anticompetitive motive is the very matter protected under *Noerr-Pennington.* Rather, the requisite motive for the sham exception is the intent to harm one's competitors not by the *result* of the litigation but by the simple fact of the *institution* of litigation.

488 F.Supp. at 1265–66 (emphasis in original).

This Circuit has had several opportunities to construe *California Motor Transport* but has not set forth any general definition of "sham" litigation. Most recently this court has analogized sham litigation to the common law torts of malicious prosecution and abuse of process. *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466 (7th Cir. 1982). In *City of Mishawaka v. American Electric Power Co.,* this court held that the utility's rate filings with the Federal Power Commission were not protected by *Noerr-Pennington* because they were "an abuse of the administrative process" and denied the plaintiff municipalities "fair and effective access to the regulatory process." 616 F.2d 976, 982–83 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981). *See also Kurek v. Pleasure Driveway and Park District,* 557 F.2d 580, 594 (7th Cir.1977) (proof that economically unrealistic proposal was submitted to the Park District might support an inference that the proposal was not a genuine effort to persuade public officials).

■ In the present case MCI alleges that AT & T filed tariffs with state regulatory commissions in bad faith as part of a continuing effort to deny MCI interconnections for local facilities. Complaint Paragraph 23(c)(5) and (1). AT & T argues that there was no basis upon which the jury could have found the state tariff filings a sham or an abuse of agency process. MCI contends that these tariffs were sham proceedings in the sense that AT & T filed the tariffs knowing that the state commissions lacked jurisdiction over long distance interconnection matters. Deliberately bringing administrative actions with the knowledge that the agencies involved lacked jurisdiction would seem to be a strong indication that AT & T did not engage in a genuine effort to influence public officials. There can be no genuine attempt to petition the government when the petitioners know in advance that the governmental body lacks the authority to take the action desired. The sham activity, as alleged by MCI and as found by the jury, is analogous to the institution of numerous appeals when the defendants know that they lack standing. The Second Circuit recently held that this sort of baseless and frivolous activity falls within the sham litigation doctrine. *Landmarks Holding Corp. v. Bermant,* 664 F.2d 891 (2d Cir.1981).

■ Although the question of FCC jurisdiction over interconnection tariffs had not been judicially determined at the time

AT & T filed the tariffs,[115] MCI did present substantial evidence to support the jury's finding that, at the time the tariffs were filed, AT & T believed that the state commissions lacked jurisdiction to approve them. This evidence includes the testimony of Mr. Strassburg, the FCC's Common Carrier Bureau Chief, AT & T's own expectations expressed in internal memoranda, and AT & T's previous position in FCC proceedings that state commissions did not have jurisdiction over tariffs applicable to MCI. These factors, together with testimony that MCI remained uninformed of the filings despite ongoing interconnection negotiations with AT & T, allowed the jury reasonably to infer that AT & T filed these tariffs solely as a means of undermining the negotiations.

While the filings of tariffs with state commissions are not "immune" under *Noerr-Pennington,* on the other hand, their filing by AT & T was not necessarily unlawful. Any number of actions are not immune from Sherman Act scrutiny but are entirely lawful because they have no anticompetitive effect or purpose. AT & T has many thousands of tariffs on file with various state utility commissions around the country. Even if these filings are for some reason not immune under *Noerr-Pennington,* the vast majority of them cannot possibly constitute the basis of an antitrust violation merely because the agency with which they are filed may be found to "lack jurisdiction." Some tariffs are filed with commissions for purely informational purposes. *See supra,* note 114. Other tariffs relate to rates and services which have no *competitive* effect whatsoever and are therefore not illegal even if they are not immune.

The tariffs filed with the state commissions which are at issue in this case relate to the charges for interconnection to Bell's local distribution facilities. AT & T claims that the tariffs were filed to supplant a long-standing contractual arrangement with Western Union in order to set uniform terms and conditions for nationwide interconnections with other common carriers like MCI. MCI, on the other hand, claims that the filings were part and parcel of AT & T's continuing efforts to unlawfully deny all interconnections related to FX and CCSA.

MCI alleged in its complaint that:

AT & T, acting in bad faith, caused to be filed with various state regulatory commissions sham tariffs which purportedly regulated the provision by the Bell System Companies of interconnection to plaintiffs for use in interstate commerce. Defendant AT & T thereby imposed upon plaintiffs a substantial financial burden for the purpose of exhausting plaintiffs' resources and destroying plaintiffs as potential competitors.

Complaint 23(1).

These allegations were supported by the testimony of William McGowan and Laurence Harris. Mr. McGowan testified that after twelve months of negotiations, during which time MCI was not receiving any interconnections besides Chicago-St. Louis, AT & T broke off talks completely and insisted that MCI would now have to take up the subject of interconnections with each of the state commissions. Tr. 414. MCI was then forced to undertake lengthy proceedings before the FCC and in the courts to vindicate its rights to interconnections for FX and CCSA service.

115. At the time Bell filed its interconnection tariffs with the state utility commissions, no court had determined that the FCC had exclusive jurisdiction over the tariffs. The tariffs, of course, covered interconnections between interstate long distance carriers (regulated by the FCC) and local telephone operating companies (regulated by state agencies). Filings, such as those involved here, could presumably have been made with state commissions for informational purposes, or merely on request of a commission, whether or not the FCC had exclusive jurisdiction.

It was not until 1977 that a court directly addressed the question: what agency had jurisdiction over FX and CCSA interconnection. At that time the District of Columbia Circuit held that the FCC had exclusive jurisdiction over such interconnections. *California v. FCC,* 567 F.2d 84 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978).

This testimony was corroborated by that of Laurence Harris, who was MCI's chief negotiator on interconnections with AT & T. Mr. Harris described the filings of the state tariffs as the culmination of over twelve months of bad faith negotiations. Early in the discussions, in September 1972, he had informed AT & T of the urgency of working out interconnections to permit MCI to begin its expanded service in the summer of 1973. Tr. 893–94. Harris was subjected to months of fruitless negotiations involving the purchase rather than the lease of facilities, the creation of local distribution areas, pricing and technical disputes. During the entire period MCI received no new interconnections whatsoever.

Then on September 1, 1973, Mr. Harris learned that AT & T was not going to resume negotiations but instead had filed tariffs *which did not include FX service, CCSA service or service outside narrowly circumscribed local distribution areas,* Tr. 1015, 1049, with forty-nine state utility commissions. Prior to the filing of the state tariffs MCI was negotiating with AT & T for a single contract with a single set of terms and conditions that would be used by all of the AT & T operating companies. Tr. 1013. Because of the filings in state commissions, MCI faced the prospect of negotiations and litigation before forty-nine separate state regulatory agencies.

■ As one commentator has noted, lawsuits and administrative actions by powerful firms "can tie up smaller businesses in uncertain and expensive proceedings, thereby increasing the cost of doing business and preventing or delaying new entries into a particular market." Balmer, *Sham Litigation and the Antitrust Laws,* 29 Buff.L.Rev. 39 (1980). *See generally* R. Bork, *The Antitrust Paradox,* 347–64 (1978). Based on the record in this case, the anticompetitive aspects of AT & T's course of conduct are apparent. AT & T's bad faith negotiations culminating in the tariff filings harmed MCI in a number of significant ways. First, MCI had to face the prospect of litigation in forty-nine different forums to establish its right to offer its private line

services. Any changes in its own charges or services might also then have to be brought before these forty-nine state commissions. This requirement alone would greatly increase litigation costs by requiring MCI to spread its resources across the country and would necessitate the retention of numerous local legal counsel. Perhaps the most harmful aspect of this strategy is the possibility that at least one commission would refuse to allow the proposed service, which might undermine the creation of a nationwide communication system. AT & T's strategy also forced MCI to bear additional costs and expenses in connection with litigation before the courts and the FCC to establish its right to interconnections.

Finally, and most importantly, the filings with the state commissions (as a culmination of the negotiations) added additional months of delay before MCI could enter the market. The combined effect of the bad faith negotiations and the filing of the state tariffs may have cost MCI one and a half years of time and revenue while it fought for interconnections, first with AT & T at the bargaining table and later in the FCC and the courts. In October 1973, MCI had its terminals in place and had expended substantial amounts of capital only to have its revenue flow obstructed because of its inability to operate while AT & T denied interconnection. Tr. 1067. On this basis the jury properly found that the bad faith negotiations culminating in the filing of state tariffs were unlawful acts committed in order to maintain AT & T's monopoly position.

### B. *Bad Faith Negotiations*

■ AT & T also challenges other aspects of the jury's finding that bad faith contractual negotiations culminated in sham filings before state regulatory commissions. On the issue of bad faith negotiations AT & T argues that the court erroneously instructed the jury that MCI need only "establish that defendant negotiated in bad faith for purposes of delaying plaintiff's entry ... and with the intent of maintaining a monopoly." Appellant's

Brief at 128. AT & T argues that this instruction allowed the jury to hold the entire course of negotiations unlawful without considering the First Amendment implications of filing tariffs with the states. The finding of bad faith negotiations is, however, an entirely separate count from the state tariff filings.

The negotiations themselves were a business transaction carried on by two private parties, AT & T and MCI, and involved no resort to any governmental processes. The jury had ample evidence to hold that these negotiations were conducted in bad faith based on the record of delay, the bargaining position of AT & T, and the ultimate futility of the negotiations. These findings did not depend on the state tariff filings. The lack of candor with respect to the decision to file the tariffs was at most additional circumstantial evidence of bad faith. And, for whatever it may be worth, our conclusion that the state tariff filings were not protected by the *Noerr-Pennington* doctrine would apply with equal force here, were we somehow to conclude that *Noerr-Pennington* applied to the bad faith negotiations.

■ AT & T also contends that the verdict on this charge cannot stand because the court failed to define "bad faith" in its instruction. It is only error to fail to define "enigmatic terms" that leave the jury to speculate on their meaning. *See Kocher v. Creston Transfer Co.,* 166 F.2d 680 (3d Cir. 1948). Here, however, the use of the term "bad faith" comports with its ordinary meaning [116] and needs no further explanation.

■ AT & T also claims that there was no evidence that injury resulted from the alleged bad faith negotiations since the facilities eventually were provided. As we have previously indicated MCI introduced sufficient evidence to show that AT & T's course of conduct delayed its entry into the market and affected MCI's ability to attain financial viability. Therefore, there was sufficient evidence to sustain the jury's finding of injury as a result of bad faith negotiations.

■ Finally, AT & T attacks the jury's finding of bad faith negotiations as inconsistent with other related findings. But the fact that AT & T was exonerated of charges of discrimination against MCI in favor of Western Union and of charging excessive prices for local interconnections does not foreclose the possibility that bad faith negotiations were found on the basis of other acts. Evidence such as the filing of "sham tariffs," the failure to disclose this action and other delaying tactics could have contributed to the jury's conclusion. Given the fair inferences that the jury could have drawn from the other evidence, we cannot engage in the type of speculation AT & T urges to construe the jury's special findings as irreconcilable. *See Stockton v. Altman,* 432 F.2d 946, 951 (5th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971).

## C. *Other Conduct*

AT & T additionally argues that a general *Noerr-Pennington* instruction was necessary because "virtually every liability issue found adversely to AT & T by the jury involved conduct subject to regulation and the Bell System's participation in the regulatory process." Appellant's Brief at 142–43. AT & T notes that MCI pointed to many instances of AT & T's participation in the administrative process as evidence of bad faith and anticompetitive intent. The court's failure to give such an instruction, AT & T insists, is reversible error.

■ The *Noerr-Pennington* doctrine is concerned solely with the right to attempt to influence government action. It thus immunizes only those actions directed toward governmental agencies or officials.

---

**116.** Bad faith is defined as:

The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

Black's Law Dictionary (4th ed. 1968).

The fact that a common carrier's decision may eventually provoke agency action or review does not alone call the *Noerr-Pennington* doctrine into play. Except for the claim based on state tariff filings (and perhaps the pre-announcement of Hi-Lo), none of the claims sought to impose liability for resort to agencies or courts. In *Mid-Texas Communications Systems v. AT & T*, 615 F.2d 1372 (5th Cir.1980), the Fifth Circuit, considering a somewhat similar refusal to interconnect, held that Bell's action "was not an attempt to influence governmental action so as to warrant protection under *Noerr-Pennington*." *Id.* at 1383; *see Cantor v. Detroit Edison Co.*, 428 U.S. 579, 601–02, 96 S.Ct. 3110, 3122–3123, 49 L.Ed.2d 1141 (1976).

Rather, MCI referred to AT & T's actions before the FCC only as evidence of the purpose and character of business decisions which had already been made and which were relevant to charges other than the filings of state tariffs. "Evidence of activity that is protected by the *Noerr* doctrine may be admitted to show the purpose and character of other activities if doing so is not overly prejudicial to the defendants." *Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 543 n. 7 (5th Cir. 1978), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); *see also United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 1593 n. 3, 14 L.Ed.2d 626 (1965). We find no error in the district court's refusal to give a general *Noerr-Pennington* instruction.

## VI. DAMAGES

We come at last to the substantial award of damages in this case. The jury, after deliberation, found for MCI on ten of the fifteen counts it considered. After completing the special verdict the jury awarded MCI $600 million in general damages which were trebled in accordance with the antitrust laws to total $1.8 billion in damages. Because this determination awards damages for both *lawful* and *unlawful* conduct, the damage award must be set aside and the case remanded for a proper determination of damages.

### A. *MCI's Proof of Damages*

At trial, MCI's proof of the amount of damages centered on the introduction of a lost profits study. The study sought to calculate the difference between the revenues received by MCI as damaged by the alleged exclusionary acts of AT & T, and those revenues which could have been expected for an undamaged MCI. The data for the "damaged" MCI came from the actual operating figures of the company, plus projections into the future. The data for the "undamaged" MCI purportedly came from the original business plans for the corporation,[117] modified for certain events unattributable to AT & T.

After the differences between anticipated and realized revenues were derived, the differentials in income over a twenty year period were reduced to present value using MCI's estimated cost of capital. The study showed losses for MCI totalling $452,215,-000. This figure was then adjusted to $900,000,000 to produce an after-tax result to MCI equal to the alleged financial losses. The jury, upon finding liability on ten of the fifteen alleged acts of monopolization brought by MCI, returned a general verdict for MCI in the amount of $600,000,000, which was trebled to produce a damage award of $1,800,000,000. AT & T challenges the jury award on the grounds that the lost profits study failed to separate injury caused by lawful competition from that caused by unlawful conduct and that the study was based upon unsupportable assumptions not found in the record. AT & T specifically challenges the study's assumptions that MCI could have achieved revenues of $.85 a circuit mile per month; that MCI could have attained a market share of thirty-seven million circuit miles by 1975; and that MCI could have financed the communications systems envisioned in the study. MCI relies on case law to the effect that a successful antitrust plaintiff need

---

**117.** The business plan itself was not introduced at trial.

not "disaggregate" or "tightly compartmentalize" its damages once the fact of injury has been established. MCI also defends the specific assumptions relied on by the authors of the lost profits study.

## B. Causation of Damages

■ If a plaintiff has suffered financial loss from the *lawful* activities of a competitor, then no damages may be recovered under the antitrust laws. It is a requirement that an antitrust plaintiff must prove that his damages were caused by the *unlawful* acts of the defendant. *See* 15 U.S.C. § 15 (1980). This is the essence of "antitrust injury" as set forth by the Supreme Court:

Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original).

■ Once *causation* of damages has been established, the *amount* of damages may be determined by a just and reasonable estimate as long as the jury verdict is not the product of speculation or guess work. *J. Truett Payne Co. v. Chrysler Motor Corp.*, 451 U.S. 557, 566–67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981); *Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–1577, 23 L.Ed.2d 129 (1969). Since the Supreme Court has been willing to accept a degree of uncertainty in the calculation of damages, strict proof of what damages have been caused by which acts has not been required. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873 (7th Cir.1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 584, 27 L.Ed.2d 632 (1971). Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a

defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946); *City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

It is essential, however, that damages reflect only the losses directly attributable to *unlawful* competition. The Supreme Court in *Bigelow* emphasized this point by allowing a more lenient standard for calculating the *amount* of damages only upon "proof of defendant's wrongful acts and their tending to injure plaintiffs' business, and from evidence in the decline of prices, profits and values, not shown to be attributable to other causes." 327 U.S. at 264, 66 S.Ct. at 579.

The courts have always distinguished between proof of *causation* of damages and proof of the *amount* of damages. Thus, the courts have been consistent in requiring plaintiffs to prove in a reasonable manner the link between the injury suffered and the *illegal* practices of the defendant. The First Circuit affirmed a directed verdict for the defendant on this ground in *Momand v. Universal Film Exchanges, Inc.*, 172 F.2d 37 (1st Cir.1948), *cert. denied*, 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949). The plaintiff in *Momand* had lost on summary judgment in a previous suit on eighteen of the twenty counts in his complaint. Once the court determined that this prior action was *res judicata* it held that the plaintiff was required to prove that the two remaining acts were the cause of injury. *Id.* at 43.

The Third Circuit has also overturned a jury verdict and ordered a new trial when the evidence showed that the damage calculations were based in part on lawful competition by the defendant. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir.1975). In *Coleman Motor,* a former independent automobile dealer brought suit against Chrysler and its wholly-owned dealers alleging that Chrysler subsidized its

wholly-owned factory dealers at the expense of its independent dealers and otherwise discriminated against the independents. To establish damages the plaintiff offered expert testimony which purported to project annual net earnings based upon the volume of sales which could have been expected if no factory dealerships had been established. To arrive at a measure of lost profits the experts, as in the case before us, subtracted from this projected figure the plaintiff's actual net earnings before taxes. *Id.* at 1351–52.

The Court held that the failure of the sales projection to account for *lawful* competition from the factory dealers required reversal and a new trial. The Court stated:

> The damage figures advanced by plaintiff's experts may be substantially attributable to lawful competition. In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition.

*Id.* at 1353. *See also Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256 (9th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); *Van Dyk Research Corp. v. Xerox Corp.,* 631 F.2d 251, 255 (3d Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981).

*Coleman Motor* was followed in a well-reasoned district court opinion in *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954 (M.D.Pa.1981). The district court granted judgment n.o.v. for the defendants based on plaintiff's failure to present sufficient damage evidence. The defendants argued that the plaintiff's proof failed to distinguish between their lawful and unlawful acts. The plaintiff responded, in a manner almost identical to MCI's position, that it need not disaggregate their damage nor prove exact losses. The court rejected the lesser standard of proof urged by the plaintiff holding:

> [I]t is apparent that the arguments made by the defendants ... attack the causation of damages, not amount of damages,

and therefore require a higher measure of proof.

*Id.* at 964.

The court in deciding the issue of *causation* of damages stated:

> Plaintiff did not address the effect lawful competition may have had upon its damage model, choosing instead to throw the ball back in defendant's court by citing *Story Parchment* for the proposition that damage estimates need not be perfect.

*Id.* at 965. A lost profit study was then rejected because of its "failure to account for any lawful competition." *Id.* at 966.

In a case very similar to the case before us, a California district court ordered summary judgment for the defendant in *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423 (N.D.Cal.1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981), because of the nature of the plaintiff's proof of damages. After holding that IBM was not guilty of predatory pricing, the district court considered the plaintiff's damage study which was structured in such a way that one could not separate injury caused by the pricing practices of IBM from injury from other practices. In ordering summary judgment for IBM the court stated:

> The way Memorex structured its damage claim there was no basis in the record for the jury to determine what the effect on damages would be if it found one or none of the challenged acts lawful. Thus, if one of IBM's acts was not a violation of the antitrust laws, much of the damage claim would become invalid.

458 F.Supp. at 434.

When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of "speculation or guesswork" not permitted for antitrust jury verdicts. *Bigelow,* 327 U.S. at 264, 66 S.Ct. at 579. To allow otherwise would force a de-

fendant to pay treble damages for conduct that was determined to be entirely lawful. *Momand,* 172 F.2d at 43; *ILC Peripherals Leasing Corp. v. IBM Corp.*

There is nothing inconsistent between requiring *proof that damages were caused by illegal acts* and the rule that a plaintiff need not disaggregate damages among those acts found to be unlawful. In this case, the trial court granted summary judgment for AT & T on seven of the twenty-two counts in the complaint. In addition, the jury found for AT & T on five of the fifteen counts it considered. The jury found for MCI on two counts relating to Hi-Lo tariffs, two counts relating to tariffs filed with state agencies, and six counts relating to interconnection. In addition, this court has now determined that the jury's findings for MCI on the pricing and pre-announcement of Hi-Lo as well as the finding related to denial of multipoint interconnections must be set aside.

MCI assumed in the preparation of its damage study that all twenty-two of AT & T's acts charged were illegal. In fact, liability has now been established with respect to only seven of the twenty-two counts of alleged monopolization. MCI's lost profits study does not establish any variation in the outcome depending on which acts of AT & T were held to be legal and which illegal. On the contrary, the study was prepared well in advance of trial on the assumption that all of AT & T's actions constituted the willful maintenance of a monopoly. MCI's brief states:

> Section I of the lost profits study allowed a computation *for each year* between 1973 and 1984, of the difference in financial results between the MCI company *subjected to AT & T's exclusionary acts,* and the company as it would have been if allowed to pursue its original business plan subject only to the normal business risks of a competitive marketplace.

Appellee's Brief at 141 (emphasis supplied).

██ Even assuming that the instructions, as a whole, were sufficient, the jury was left with no way to adjust the amount of damages to reflect lawful competition from AT & T. This is contrary to MCI's assertion on appeal that the jury had ample evidence from the lost profits study itself to make such an adjustment. The study provides detailed *cost* data on specific components of MCI's operations but does not set forth any information that would permit the jury to adjust the damages in the event that AT & T were successful on any of the counts in the complaint. In particular, the study does not contain any information indicating how to adjust MCI's projected revenues and profits to reflect a possible finding that Telpak and Hi-Lo were lawfully priced.

Pursuant to Rule 11 of this court and Rule 28(j) of the Federal Rules of Appellate Procedure, *MCI* has further cited to us this court's recent decision in *Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226 (7th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983), as support for the proposition that it may recover damages for the lawful and unlawful acts of a defendant if disaggregation is impracticable. In *Spray-Rite* this court faced a factually peculiar situation in which the special interrogatory sent to the jury was phrased in the alternative so that it was unclear whether the jury had found liability on one act or all three of the acts which were alleged to have been part of the conspiracy which resulted in the termination of the plaintiff as a dealer. *Id.* at 1233. This court affirmed the jury verdict and damage award because it was able to conclude that there was substantial evidence to support the verdict on all three acts. *Id.* at 1242 n. 11. This situation is clearly distinguishable from the case at bar for several reasons. First, there is insufficient evidence to support the jury verdict on Hi-Lo predatory pricing. Second, *Spray-Rite* is also distinguishable since the jury in the present case expressly found Telpak to be lawful. Finally, unlike *Spray-Rite,* where the extent of the lawful conduct was insubstantial in relation to the damages and the burden of requiring strict proof of causation was relatively great, in the instant case

Telpak alone was apparently a major element of the injury giving rise to the damage award.

Thus, in *Spray-Rite,* the shipping policies, compensation policies and territorial restrictions, which were complained of, were of secondary importance to the major injury— the termination of dealers. In contrast, the lawful conduct in this case, the establishment of AT & T's pricing policies, represents a central competitive reality of the telecommunications industry and became an important focus of this case. Thus, it would be unjust and contrary to the policies of the treble damage remedy to award MCI damages which may compensate it for the effects of such quantitatively significant *lawful* competition.

The predatory pricing allegations play such a significant role in MCI's case that failure to establish either the Telpak or the Hi-Lo allegations mandates re-examination of any damages which may have been predicated on what has been held to be *lawful* pricing. Throughout MCI's case-in-chief the alleged predatory pricing of both Telpak and Hi-Lo were emphasized as key anticompetitive practices used by AT & T to injure MCI's business. Telpak's pricing structure and supposed "free" circuits were alleged to be the major stumbling blocks to MCI in attracting and holding large volume customers. Hi-Lo was alleged to be the specific response adopted by AT & T to unlawfully compete against MCI along the long distance telephone routes MCI had initially chosen to enter.

Mr. Uhl, the principal author of the lost profit study, testified that the study's purpose was to calculate the net profits MCI could have earned if "it had not been interfered with by AT & T." Tr. 3199. When asked specifically what types of interference he meant, Mr. Uhl stated:

Well, there were a number of things that occurred . . .

MCI was forced to compete against certain services offered by AT & T that it didn't anticipate it would have to compete against. Two that came to my mind are Telpak service offered by AT & T

which was priced at a rate which was too low. In fact, we had proven it to be not cost justified.

Secondly, further on the second point, it was caused to compete against other services such as Hi-Lo service, which I believe was priced in a manner to preclude MCI from serving small customers, where Telpak made it difficult for MCI to serve large customers. And even though Hi-Lo didn't come into effect, I believe it was 1975, it was early 1973 when AT & T announced the Hi-Lo rates and at that moment in time, of course, MCI had some difficulty trying to market against an AT & T announced rate.

Tr. 3199–3200.

The assumptions concerning Telpak alone are so critical to MCI's proof of damages that the damage award must be overturned. Telpak and the interconnection controversy were always the twin prongs of MCI's case. *See* MCI's opening statement, Tr. 178–80. Telpak was the single largest component of the private line telephone industry, comprising over half the market. Tr. 426. In discussing the effect of Telpak on MCI, Mr. McGowan, the chief executive of MCI, stated:

[I] certainly always was aware that it had a major impact, significant impact, on MCI because without it being in existence, there would be a significant benefit and with it, there was harm.

Tr. 705. Telpak had all the more significant impact on MCI because it was aimed at the very largest customers, whom MCI hoped to attract.

Since a major premise of the study, illegality of Telpak and Hi-Lo, was incorrect, the study must be rejected. This defect might have been cured if MCI had offered evidence on the adjustment of the damage award to reflect findings of non-predation, but no such evidence was offered.

C. *The Flawed Assumptions of the Lost Profits Study*

In addition to failing to prove that MCI's damages were caused by the unlawful con-

duct of AT & T, MCI's lost profits study also fails to substantiate adequately the assumptions which provide the foundation for the study. The lost profits study is based on the assumptions that MCI would receive average revenues of $.85 a circuit mile per month; that MCI would only have to pay local distribution charges at the same rate as Western Union; that MCI would have in place a capacity of thirty-seven million circuit miles; and that MCI could have raised the $500 million necessary to finance this system. While the validity of all of these assumptions may be questioned, the basis for the average revenue assumption is so lacking in substance that the lost profits study must be rejected as inherently untrustworthy and lacking in foundation.[118]

Our conclusion that AT & T maintained *lawful* pricing policies casts grave doubt on MCI's ability to earn $.85 per circuit mile in the face of legitimate price competition by AT & T and additional specialized common carriers. Mr. Uhl confirmed this point on cross-examination when he stated that "when viewing the 85 cents, there was an assumption that Telpak would not be in existence." Tr. 3336. Once the assumption that Telpak was unlawful was eliminated the jury was left with no way to adjust the amount of damages to reflect this lawful price competition by AT & T. Similarly, the study provides no guidance to this court in adjusting the award to reflect a finding that Hi-Lo was also lawfully priced.

 The main assumption that falls as a result of Telpak and Hi-Lo's being determined to be lawful is the $.85 revenue assumption. The ability of MCI to earn $.85 per circuit mile over an extended time period is undermined by price competition by AT & T which, contrary to MCI's assumption, may maintain or conceivably even lower its long distance rates for large volume business users. In addition to failing to address lawful competition from AT & T, the lost profits study does not analyze price

competition from other specialized common carriers but merely assumes that this does not pose a problem to MCI in achieving the $.85 revenue target.

The most damaging piece of evidence concerning MCI's $.85 revenue assumption is the fact that Telpak is priced considerably lower than $.85, at a Telpak price which the jury found to be lawful. If MCI had wanted to compete with Telpak it would presumably have had to lower its prices well below the assumed $.85 rate. MCI argues that this price comparison is inaccurate because it prices its services on a different basis than AT & T. MCI contends that the price stated for Telpak does not include service terminal charges which are already included in MCI's $.85 assumed revenue. MCI further contends that Telpak is billed by AT & T in such a manner that the mileage for billing purposes is nineteen percent greater than would be the case for the identical circuit owned by MCI. Finally, MCI points to the fact that Telpak customers only use seventy-five percent of their circuits thus producing a seventy-five percent "fill factor" and thereby raising the pro rata cost of the circuits used. MCI adjusts the cost of Telpak for the different billing systems, the "fill factor" and the addition of a *pro rata* service terminal charge to produce a calculation showing that the "true cost" of Telpak as a whole is $.93. MCI relies on this calculation to show that its projected $.85 service would, using comparable numbers, be priced lower than the competing Telpak, costing $.93. Thus MCI says that its $.85 revenue assumption is competitive and, hence, reasonable.

MCI's argument fails for a number of reasons. MCI's claim that the average Telpak user utilizes only seventy-five percent of its circuits is seriously misleading because seventy-five percent is not a weighted average reflecting the high percentage of the Telpak business represented by the

---

**118.** Because of the deficiency of MCI's revenue assumption we do not consider the validity of the assumptions concerning the size or financing of MCI's system. With regard to MCI's assumption that it had a right to receive local

interconnections from AT & T at the same rate as Western Union, it must be noted that the jury rejected this claim and that, in fact, MCI has paid a higher charge than it assumed in its lost profits study.

United States government and the very largest private corporations. For example, the fill factor for the United States government, the largest Telpak customer which alone accounts for over half the Telpak circuit miles, has always been at least ninety-five percent. The evidence also shows that the fill factor for Telpak D as a whole increased to ninety percent by 1977. Hence, we think MCI has not demonstrated that the total price of Telpak exceeds $.85 per circuit mile, or that MCI's original revenue assumption of $.85 was reasonable.[119]

Further, MCI's damage witness, Mr. Uhl, conceded on cross-examination that the $.85 revenue assumption included revenue from Execunet as well as FX, CCSA and other private line services. Execunet is a fully switched MCI service which was not approved until 1977, when the District of Columbia Circuit reversed the FCC and legitimated MCI's offering of Execunet to its customers. *See MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978). Execunet has ostensibly been a profitable business for MCI while FX, CCSA and other private line services might not have been. At least, the evidence before the jury was (in the face of Telpak) insufficient to establish the profitability of these latter services. The jury thus had no rational basis for concluding that, without Execunet, MCI could have earned $.85 per circuit mile during the period up to 1977.[120]

In addition MCI failed to explain how it derived its $.85 revenue assumption. Purportedly, the $.85 figure came from adjustments made to the original business plan for MCI by Mr. Uhl. The other source for the $.85 figure was an MCI consultant, Dr. Norman Lerner, but he did not testify at the trial. MCI's business plan was never introduced at trial. Mr. Uhl, who did testify at trial, had expertise solely in the financial and accounting techniques necessary to prepare a lost profits study once the basic assumptions on the revenue side had been made. Mr. Uhl did not attempt to offer any fundamental justification for the original assumptions contained in the business plan. Thus, the $.85 figure represents nothing more than an adjustment made to essentially unsupported data. MCI did not produce at trial any other witnesses or documentary evidence which sufficiently demonstrated how the revenue assumption in the original business plan was derived. Thus while not necessarily hearsay, the lost profits study and the assumptions it contains lack a foundation from which a jury could reasonably have determined the damages which were found in the instant case. *Cf. Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 879 (7th Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 582, 584, 27 L.Ed.2d 632 (1971) (assumptions in damage evidence must rest upon an adequate base).

### D. Remand for a Partial New Trial

These defects in the proof of damages require that the jury verdict be set aside. This does not, however, necessarily mandate a new trial on all issues. Rule 42(b) of the Federal Rules of Civil Procedure permits the separate trial of any issue when separation would be "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed.R.Civ.P. 42(b). Only one of these conditions need be met for the court to order a Rule 42(b) separate trial. *United States v. IBM Corp.,* 60 F.R.D. 654 (S.D.N.Y.1973). A new trial

---

**119.** We also note that since the service terminal charge is a flat fee, the *pro rata* service charge depends on the length of the circuit. MCI makes its pricing calculation on the basis of a 306 mile circuit. When a 500 mile circuit is chosen for comparison the *pro rata* service termination charge is reduced and, according to MCI's own figures, Telpak's price drops to $.82, which is *below* MCI's assumed average revenue rate.

**120.** Although we recognize that MCI was the victim of certain unlawful acts of AT & T it should be noted that MCI never in fact earned anything close to $.85 per circuit mile prior to the introduction of Execunet. In 1975 MCI had never earned more than $.63 per circuit mile. While AT & T's unlawful actions undoubtedly had some effect on MCI, it appears unlikely that the impact accounts for realized revenues so far below the projected revenue figure.

on liability is unwarranted since this court has affirmed liability for monopolization on the basis of most of AT & T's actions involving interconnection with MCI.[121] No new trial is required on those issues where we have set aside the findings at trial because our conclusion in these areas was based on a lack of evidence or other legal deficiency and not mere trial error. *See Woods Exploration & Producing Co. v. Aluminum Co. of America*, 509 F.2d 784 (5th Cir.), *cert. denied*, 423 U.S. 833, 96 S.Ct. 59, 46 L.Ed.2d 52 (1975). A new trial on *damages* is required to reflect the determinations by the jury, and by this court, that AT & T's pricing policies were not predatory. The fact that evidence of damage frequently changes depending upon the findings of liability is one reason that split trials are permitted by the Federal Rules and endorsed by the Manual for Complex Litigation and the rules of the Northern District of Illinois. *Manual for Complex Litigation* § 4.12 (1981); Rule 21 of the United States District Court for the Northern District of Illinois. *See generally* 5 J. Moore, J. Lucas, & J. Wicker, *Moore's Federal Practice* ¶ 42.03 (2d ed. 1982). The bifurcation of trials has been approved as an effective method of simplifying factual presentation, reducing costs, and saving time. Schwartz, *Severance—A Means of Minimizing the Role of Burden and Expense in Determin-*

*ing the Outcome of Litigation*, 20 Vand.L. Rev. 1197 (1967); Zeisel and Callahan, *Split Trials and Time Saving: A Statistical Analysis*, 76 Harv.L.Rev. 1606 (1963); Miner, *Court Congestion: A New Approach*, 45 A.B.A.J. 1265 (1959); Note, *Original Separate Trials on Issues of Damages and Liability*, 48 Va.L.Rev. 99 (1962); Note, *Separate Trial of a Claim or Issue in Modern Pleading: Rule 42(b) of the Federal Rules of Civil Procedure*, 39 Minn.L.Rev. 743 (1955).[122]

MCI's proof of damages was quite distinct from its proof on the question of liability. In attempting to prove damages during trial MCI used different witnesses and proof of a somewhat different nature from its evidence on the question of liability. MCI's principal damage witnesses, Mr. Laros and Mr. Uhl, testified at the close of the case-in-chief. The testimony of Mr. Laros concerned the business forecast of MCI, which was incorporated into the lost profits study. Mr. Uhl's testimony concerned only the data and the preparation of the lost profits study. MCI's two other damage witnesses, Dr. Hamada and Dr. Lorie, presented evidence only on MCI's cost of capital and the adjustment of MCI's damages to present value, while accounting for taxes. This proof of damages is sufficiently distinct from MCI's proof of monopolization

**121.** In its petition for rehearing, AT & T raised an argument that the intent evidence presented on the predatory pricing claims, which we reject, was inextricably interrelated with the intent evidence applicable to the findings on the interconnection claims which we approve. And, as a result, AT & T contends that the jury's finding on predatory pricing "necessarily tainted" its findings on the interconnection claims; hence those claims should be remanded for a new trial on liability. But we think this argument relies on unfounded speculation about the jury's mental processes. On the face of things, because reductions in price, unlike the denial of interconnections, may be pro-competitive as well as anticompetitive, we think the "intent" relevant to pricing is not necessarily closely linked to the "intent" relevant to refusals of interconnection. Further, the jury itself exonerated AT & T on the important Telpak pricing claim while finding monopolistic intent in the denials of interconnection. Particularly in the context of this unusual case, we believe we should balance the possibility of spillover

among claims against the prejudice to the prevailing party in the overturning of the jury's findings. The jury's determination that Hi-Lo was predatory did not so clearly taint its ability to decide the interconnection claims that justice would be served by overturning the jury verdicts on these interconnection claims.

**122.** Some have argued that the bifurcation of trials in civil antitrust cases must be approached with trepidation. *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307 (5th Cir.1976). In a private treble damage action impact or "fact of damage" is a necessary element of proving liability. However, "fact of damage" and "amount of damage" are distinct concepts. As such, separate trial of these issues is beyond constitutional challenge even when the partial new trial is to be heard by a separate jury. *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931).

to permit a separate and fair trial on remand to determine damages without prejudice to either party.[123] *Franklin Music Co. v. American Broadcasting Co.,* 616 F.2d 528 (3d Cir.1979); *In Re Master Key Antitrust Litigation,* 528 F.2d 5 (2d Cir.1975); *In re Ampicillin Antitrust Litigation,* 88 F.R.D. 174 (D.D.C.1980); *LoCicero v. Humble Oil & Refining Co.,* 52 F.R.D. 28 (E.D.La.1971); *Fischer & Porter Co. v. Sheffield Corp.,* 31 F.R.D. 534 (D.Del.1962).

In order to be effective, separate trials of liability and damages in antitrust cases must be grounded upon a clear understanding between the court and the parties of the issues and proof involved in each phase of the trial. The most difficult part of the decision to remand for a partial new trial on damages is the formulation of rules to guide such a proceeding. It is critical to realize what issues have not been remanded. The issues relating to jurisdiction, liability and immunity have been conclusively decided by this opinion and are not subject to further proceedings on remand. To the extent it is necessary to educate the fact finder on these issues, evidence which might normally be associated with a determination of liability may have to be introduced or reintroduced. We suggest, however, that stipulations be heavily relied upon by the parties in accordance with the sound discretion of the trial judge.

The issue to be re-tried on remand is solely the amount of damages that MCI is entitled to receive for those acts by AT & T which have been found to be unlawful. Any new lost profits study introduced on remand must be supported by an adequate foundation for all assumptions critical to the calculation of damages. MCI damage evidence must also make provision for impairments or losses stemming from competition that has been found to be lawful—Telpak pricing, Hi-Lo pricing, the pre-announcement of Hi-Lo, the denial of multipoint interconnections and other acts or practices held to be lawful in the district court. The level at which the competition may price its product or service would appear to be an important determinant of profitability. It seems difficult to determine how much MCI lost from the alleged slow-down of its growth without knowing something about the lawful price environment in which it and its competition could reasonably expect to operate. As we have already indicated MCI need not disaggregate its proof of damages among individual unlawful acts which have caused financial loss, but MCI must be able to rationally separate these damages from those losses (or reductions in profit) which are caused by the purely lawful competitive actions of AT & T.[124]

**123.** AT & T argued in its petition for rehearing that the jury's answers to special verdict questions numbered 5(a), (c), (f), (h), (j), and (k) do not define the conduct found unlawful by the first jury with sufficient clarity to separate the issue of damages from the issue of liability so as to permit a new trial limited to the question of damages alone. *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500 (1931). As indicated, we believe that the district court and counsel can, on the basis of the record and in accordance with the procedures prescribed in this opinion, sufficiently identify the conduct found unlawful by the first jury to separate the issues relevant to damages for trial.

**124.** We briefly note an additional issue which relates to the calculation of damages. At trial, MCI argued that the damages it suffered must be adjusted upward to reflect the taxes which the company would pay on the award. In its original presentation to the jury MCI asked for

over $900 million so that, after taxes, it would receive approximately $452 million, its projected lost profits.

Tax issues received very scant attention in the district court, yet result in an approximate doubling of the recoverable damages if MCI is correct in its treatment of tax effects. It is not possible for this court to review the tax aspects of this case on the record before us. Rather than require additional briefs on an issue not fully dealt with below, we simply note the existence of the issue and leave its resolution to the proceeding on remand. In directing the district court's attention to these issues, we particularly note MCI's contention that the relevant tax rate was 49.78% as well as the provisions of 26 U.S.C. § 186 (1980), which suggest that a portion of antitrust damages may be subject to an offsetting deduction if they have not been previously deducted as unrecovered losses.

Given the massive discovery which has already been taken in this case little further discovery should be necessary on remand, but this is a matter for the trial court's discretion. A presumption should also exist that previous rulings on documents and evidence offered at the last trial are not rearguable, but the trial judge, of course, has broad discretion to determine, or redetermine, these issues.[125]

## VII. THE CONDUCT OF THE TRIAL

AT & T argues that the manner in which the district court presided over the case amounted to a denial of due process. AT & T complains of the court's failure to set forth the issues for trial in its pretrial order, its imposition of a time limit upon the parties' presentations and its reversal of several evidentiary rulings during trial. AT & T in addition contends that the jury instructions erroneously excluded certain theories of its defense.

### A. Fair Trial

We find that the district court could properly have refused to enter a pretrial order in this case. Federal Rule of Civil Procedure 16 gives the trial court discretion to hold pretrial conferences. Fed.R. Civ.P. 16.[126] Although the rule is phrased in mandatory language ("the court shall

---

**125.** With these guidelines in mind, we note that the district court might wish to appoint a special master under the terms of Rule 53 of the Federal Rules of Civil Procedure to aid the district court in the resolution of this case. We leave this entirely to the discretion of the district court, with the further knowledge that references to a special master are to be the exception rather than the rule, and that the problem here may argue as much for as against such a master. However, the language of Rule 53 permits reference to a master in a jury trial where "the issues are complicated" or in a non-jury case involving "difficult computation of damages." Fed.R.Civ.P. 53(b). Reference is particularly appropriate to resolve issues "so technical or esoteric as to be outside ordinary judicial competence." Comment, *Masters and Magistrates in the Federal Courts*, 88 Harv.L. Rev. 779, 795 (1975). Reference on the limited issue of the computation of lost profits seems to be within the standards announced for the use of special masters. *See La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). *See generally* Kaufman, *Masters in Federal Court: Rule 53*, 58 Colum.L. Rev. 452 (1958); Note, *Reference of the Big Case Under Federal Rule 53(B): A New Meaning for the "Exceptional Condition" Standard*, 65 Yale L.J. 1057, 1065 (1956). The question of appointing a special master is, of course, wholly within the district court's discretion.

If the district court chooses to use a master, the reference to the master should be strictly limited to the calculation of lost profits. The use of an impartial and knowledgeable master might be helpful in determining the validity of assumptions used in lost profits studies as well as the accuracy and reliability of the costs and revenues used in the calculation of damages. Any evidence of actual damages can be presented directly to the fact finder at trial since such evidence does not present the sort of extraordinary complexity suggesting reference.

The computation of damages in an antitrust case where liability has already been established is the type of issue that has often been referred to a master. District courts within this circuit have utilized this procedure in previous antitrust suits where liability has been established. *See, e.g., Locklin v. Day-Glo Color Corp.*, 429 F.2d 873 (7th Cir.1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 584, 27 L.Ed.2d 632 (1971). In *Locklin* a special master was used to calculate lost profits following the district court's judgment on the issue of liability in an antitrust suit. *See also Arthur Murray, Inc. v. Oliver*, 364 F.2d 28 (8th Cir.1966) (affirming reference for analysis of books and records in connection with antitrust award); *Connecticut Importing Co. v. Frankfort Distilleries, Inc.*, 42 F.Supp. 225 (D.Conn.1940) (special master appointed to calculate lost profits relating to an unlawful boycott of plaintiff's business); *Eastern Fireproofing Co. v. United States Gypsum Co.*, 50 F.R.D. 140 (D.Mass.1970). Again, we emphasize that any reference is within the discretion of the district court.

**126.** Federal Rule of Civil Procedure 16 provides in relevant part:

In any action, the court may in its discretion direct the attorneys for the parties to appear before it for a conference to consider (1) The simplification of the issues;

. . . .

The court shall make an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered and which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and such order when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice.

make an order") the unique facts of each case should determine the necessity for a pretrial order. *United States v. IBM Corp.,* 68 F.R.D. 358 (S.D.N.Y.1975). As one commentator has stated: "The failure of the court to enter an order after a pretrial conference does not render the ensuing trial a nullity if, at the pretrial conference, the opposing attorneys were in such disagreement that the conference was completely unproductive, and it would be an undue burden on the court if it were forced to forge a pretrial order." 3 J. Moore, *Moore's Federal Practice* ¶ 16.18 (1982).

■ Under such circumstances, a requirement that a court catalogue all points of dispute and agreement would create an unnecessary burden and cause undue delay. *See, e.g., Video Components, Inc. v. Laird Telemedia, Inc.,* 574 F.2d 1061, 1062 (10th Cir.1978). In the instant case the district court would have been forced to conduct a trial within a trial as the parties argued over how the court should frame each issue. Thus, a pretrial order is not mandatory under Rule 16 when it is clear that the pretrial conference, as in this case, failed to produce an agreed statement and definition of issues. *See IBM,* 68 F.R.D. at 359.

The district court here encouraged the parties to narrow the issues whenever possible.[127] Judge Grady acknowledged the failure of the parties to do so when AT & T pressed for a pretrial order.[128] There was

no absolute requirement for, and in fact, apparently little benefit in, such an order in this situation. Nonetheless, we stress the important potential benefits of such a document and the need to fully explore its feasibility before rejecting it. In the instant case, the court urged the parties to stipulate and agree to the authenticity and admissibility of evidence. Compliance with the district court's directions would have obviated the need for any formal statement of the issues.[129]

We also reject AT & T's argument that the district court did not allow AT & T sufficient time to present its case in an intelligible manner. Originally, AT & T predicted that it would take approximately eighteen months to try the case. Understandably chagrined, the district court directed the parties to submit lists of their witnesses and a summary of the testimony of each, together with a more precise estimate of the time required for trial. MCI's list named seventeen witnesses and predicted that it would require twenty-six days to present its case-in-chief. AT & T's list, by contrast, named 162 witnesses and described a minimum of twenty-one more by category. At that time, AT & T predicted that trial of the entire case would take eight to nine months. The district court reviewed those materials and only then imposed a twenty-six day time limit on the presenta-

---

**127.** THE COURT: What I have tried to do here by asking you to stipulate and agree is to accomplish the substance of a pretrial order. Those pretrial orders, where you list the things you disagree about—well, that is nonsense. I have seen those things that go on for pages.

MR. HANLEY: You try the case on paper once and then you have to come back and try again.

THE COURT: If there is anything in there that we have not covered that could be covered, we ought to do it. But right offhand, I cannot think of it, and I am reluctant to impose upon anybody unnecessary paper work at this point.

MR. SAUNDERS: I agree with that.

THE COURT: We do not need it either. Let's forget the pretrial order but go over it—I have not seen one in a long time. I have forgotten some of the parts of it, but if

you see something in there that you think would be helpful, you can get together with each other.

Tr. 29–30.

**128.** The following exchange took place:

MR. SAUNDERS: Judge are we going to do anything with that pretrial order that I gave to you?

THE COURT: I really think there is enough in it that would be controversial that it is not worth trying to reach an agreement on. The answer I think is no.

**129.** We emphasize the value of a pretrial order, in a proper case, in facilitating the orderly conduct of a lengthy and complex trial. We suggest, subject of course to Judge Grady's exercise of discretion, that the full procedures of Fed.R.Civ.P. 16 be utilized on remand.

tion of each side's case-in-chief.[130] The district court did not place a limit on the time allotted for rebuttal or surrebuttal. *MCI Communications Corp. v. AT & T,* 85 F.R.D. 28, 32 (N.D.Ill.1979). On appeal, AT & T argues that the limits which were imposed were wholly arbitrary and amounted to a denial of due process. We cannot agree.

 Litigants are not entitled to burden the court with an unending stream of cumulative evidence. *United States v. Article of Drug Consisting of 572 Boxes, More or Less,* 415 F.2d 390, 392 (5th Cir.1969); *Manbeck v. Ostrowski,* 384 F.2d 970, 973 (D.C.Cir.1967), *cert. denied,* 390 U.S. 966, 88 S.Ct. 1077, 19 L.Ed.2d 1170 (1968). As Wigmore remarked, "it has never been supposed that a party has an absolute right to force upon an unwilling tribunal an unending and superfluous mass of testimony limited only by his own judgment and whim. . . . The rule should merely declare the trial court empowered to enforce a limit when in its discretion the situation justifies this." 6 Wigmore, *Evidence* § 1907 (Chadbourne Rev.1976). Accordingly, Federal Rule of Evidence 403 provides that evidence, although relevant, may be excluded when its probative value is outweighed by such factors as its cumulative nature, or the "undue delay" and "waste of time" it may cause. Whether the evidence will be excluded is a matter within the district court's sound discretion and will not be reversed absent a clear showing of abuse. *Hamling v. United States,* 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974); *Chapman v. Kleindienst,* 507 F.2d 1246, 1251 n. 7 (7th Cir. 1974).

 The time limits ordered by Judge Grady had the effect of excluding cumulative testimony, although in setting those limits the district court apparently fixed a period of time for the trial as a whole. This approach is not, *per se,* an abuse of discretion. This exercise of discretion may be appropriate in protracted litigation provided that witnesses are not excluded on the basis of mere numbers. *See Padovani v. Bruchhausen,* 293 F.2d 546, 549–50 (2d Cir. 1961).[131] Moreover, where the proffered testimony is presented to the court in the form of a general summary, the time limits should be sufficiently flexible to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive.[132]

**130.** Referring to the list submitted by AT & T, the district court noted:

It is almost an understatement to say that defendants' approach to this case is grandiose. Without intending to pass upon any evidence questions at this time, and recognizing that I asked the parties to be very brief in describing the proposed subject matter of the testimony, it does appear to me that much of defendants' proposed testimony would be cumulative and that some of it would be irrelevant.

*MCI Communications Corp. v. AT & T,* 85 F.R.D. 28, 30 (N.D.Ill.1979). The record indicates that much of AT & T's proposed testimony would in fact have been repetitive. AT & T's list submitted November 14, 1979, for example, names no fewer than a dozen witnesses selected to present testimony on the installation of interconnection services for MCI, seven more who were to testify on the subject of repair services for MCI, and at least six more who were to testify concerning provision of other services to MCI. AT & T also predicted that it would require between twenty-two and forty-six days to cross-examine MCI's witnesses who, by MCI's estimate, could be directly examined in twenty-six days.

**131.** AT & T cites *Padovani* as authority for reversal. There, the district court issued a preclusion order forbidding the plaintiff to introduce evidence of lay witnesses other than the plaintiff and his wife, any expert witnesses, any medical exhibits except three named, any evidence of damages with four exceptions and any evidence on the issue of liability either in negligence or based on breach of warranty. Finding that the order could only result in a judgment for the defendant, the Second Circuit granted plaintiff's petition for a writ of mandamus. The court held that "[i]n no event at this pretrial stage should witnesses be excluded because of mere numbers, *without reference to the relevancy of their testimony.*" 293 F.2d at 550 (emphasis added). In the case before us, the lists and summaries submitted by the parties referred to the relevancy of the testimony, and the district court found that some of AT & T's testimony would be irrelevant as well as needlessly cumulative.

**132.** The National Commission for Review of Antitrust Laws and Procedures recommended in its report the imposition of time limits on the length of trial in extraordinarily complex antitrust litigation. The Commission wrote:

The limits set by the district court were not absolute. As Judge Grady stated in his order, "[t]hese limits are subject to change if events at the trial satisfy the court that any limit is unduly restrictive. It is my intention to allow each party sufficient time to present its case; I have no interest in speed for the sake of speed." 85 F.R.D. at 31–32. Similarly, at a pretrial hearing the court told the parties that there was "nothing absolutely hard and fast" about the limits. After MCI completed presentation of its case in fifteen and one-half days, the court expressed an unwillingness to permit AT & T to exceed its twenty-six day limit, yet it later tempered this by reminding the parties, "I want to make it very clear that nobody is being pushed to do anything that is inconsistent with what he perceives to be the best interest of his client." [133] We cannot say that the district court was prepared to adhere strictly to its preliminary time limits without regard to possible prejudice to either party.

Insisting that the twenty-six day limit was too restrictive, AT & T cites *SCM Corp. v. Xerox Corp.*, 77 F.R.D. 10 (D.Conn.1977), where the court imposed a six-month limit on the plaintiff's presentation when the plaintiff had failed to make a *prima facie* showing of liability after fourteen weeks of trial. AT & T in effect suggests that whenever time limits are imposed in a complex case, the limits should involve months, not days. Although there may be some validity to this suggestion in most complex cases,

we cannot say that it should necessarily control in the case before us. Obviously, there must be specific attention to the substance of the testimony and the complexity of the issues, but it does not follow that several weeks for each side will never suffice. The circumstances of each individual case must be weighed by the trial judge, who is in the best position to determine how long it may reasonably take to try the case. MCI was confident that it could establish liability in twenty-six days, and in fact finished eleven days ahead of schedule. We recognize, as did the district court, that presentation of a competent defense may require more time than presentation of a plaintiff's case-in-chief. In light of the substance of AT & T's proffered testimony, however, and the district court's considered view that an efficient, yet effective, presentation of AT & T's defense would take no longer than the time MCI used to present its case, we conclude that the district court did not manifestly abuse its discretion in limiting the time for AT & T's case-in-chief.

█ AT & T also asserts that it was prejudiced when the district court reversed an earlier ruling and allowed AT & T to present evidence concerning the public interest, because that decision came too late for AT & T to include that evidence in its case-in-chief. Instead, AT & T had to present this evidence on surrebuttal. It is unclear precisely what harm AT & T believes it suffered. To the extent that the

---

It is desirable to establish time limits for each major phase of a complex case, so that within each fixed period the litigants are motivated to exercise self-discipline and creative choices between alternatives.

. . . .

Time limits for length of trial, as imposed recently in a large antitrust case, have been rarely used. The power of judges to cut off cumulative, redundant presentations of proof may provide authority for the use of overall limits on trial presentations. As long as the limitations established are realistic and fair, and the judge prevents delaying tactics by hostile witnesses, we believe that trial time limits would also be an appropriate means of expediting litigation.

National Commission for Review of Antitrust Laws and Procedures, *Report to the President and the Attorney General,* 80 F.R.D. 509, 535–

36 (1979) (footnotes omitted). *See* Lacey, *Proposed Techniques for Streamlining Trial of Complex Antitrust Cases: Pro and Con,* 48 Antitrust L.J. 487, 492 (1979); 1 J. Moore, *Moore's Federal Practice,* Pt. II. (Manual For Complex Litigation) § 4.57 (1982).

**133.** In this regard the following comment of AT & T's counsel to the district court is of interest, but not determinative of the issue:

We are very pleased with the amount of time we have been given to deal with this kind of defense. We have no problems about that at all, and I am not trying to say that we are cutting it down [on the presentation of the defense] because you are leaning on us. You are not leaning on us.

Tr. 6554–55.

harm it perceives derives from the jury's hearing the testimony out of context, the district court offered to "make any concession to the defendant" in order to assure that AT & T's evidence would be accorded its full impact. Moreover, as Judge Grady pointed out, "most of this evidence ha[d] been presented already" in one form or another during the testimony of AT & T witnesses. To the extent that AT & T believes it was harmed by the jury's becoming disconcerted by being held for an even longer trial, we note that AT & T refused Judge Grady's offer to allow AT & T's evidence in before MCI finished its rebuttal case, and to explain the situation to the jury, including the fact that AT & T had wanted to put its evidence in earlier. Particularly since Judge Grady reversed his ruling on "public interest" evidence as soon as AT & T brought the only fully apposite authority for its position—the *Mid-Texas* case—to his attention, the circumstances surrounding the late reversal of the district court's position, considered as a whole, do not demonstrate prejudice to AT & T's substantial rights. The district court did not abuse its discretion. *See Nanda v. Ford Motor Co.,* 509 F.2d 213, 223 (7th Cir.1974). *See also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Ditter v. Yellow Cab Co.,* 221 F.2d 894, 899 (7th Cir. 1955); *Patton v. Roane-Anderson Co.,* 192 F.2d 965, 966 (6th Cir.1951).

AT & T suggests that the district court's actions in managing the trial combined to deny AT & T a fair trial. The proper inquiry is whether it affirmatively appears from the record that some prejudice to the substantial rights of a party has resulted. *McCandless v. United States,* 298 U.S. 342, 347–48, 56 S.Ct. 764, 766, 80 L.Ed. 1205 (1936); *Citron v. Aro Corp.,* 377 F.2d 750, 753 (3d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 473, 19 L.Ed.2d 466 (1967); *United States v. Dressler,* 112 F.2d 972, 978 (7th Cir.1940). We conclude that AT & T suffered no substantial prejudice from any of the instances of alleged error. "It is axiomatic that litigation parties are entitled only to a fair trial, not to a perfect one."

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 843 (7th Cir.1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979). Considering the complexities of this case and the near impossibility of coping with them adequately with traditional procedures, AT & T received a fair trial.

### B. Theories of Defense

In its instructions to the jury, the district court refused to articulate AT & T's position on each charge. Reasoning that since the plaintiff had the burden of proof and that AT & T's basic theory was that "it did not do these things," the district court concluded that the jury would be adequately instructed without "explaining in detail what the defendant's position is."

AT & T nevertheless argues that the refusal was prejudicial because it, in effect, deprived AT & T of an opportunity to present its defense theories to the jury. Citing *Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Association,* 371 F.2d 263 (7th Cir.), *cert. denied,* 387 U.S. 909, 87 S.Ct. 1691, 18 L.Ed.2d 627 (1967) ("*FTD*"), AT & T argues that it was entitled to a specific instruction on each theory for which there was record evidence. The court in *FTD* found error in the trial court's refusal to instruct on each defense theory, and AT & T points to that case as controlling. In *FTD,* however, it is clear that the reversal was prompted by an overall inadequacy in the instructions. If the instructions are too general to encompass the theory which a party espouses, reversal is mandated. This court in *Beard v. Mitchell,* 604 F.2d 485 (7th Cir.1979), recognized, on the other hand, that if the instructions were given "in substance," there is no error. *Id.* at 497. Further, "even if the jury is only given a general instruction without being given the specific theory of the case, the refusal will not be reversible if the party's theory of the case was apparent throughout the course of the trial." *Id.*

In addition, our inquiry must focus on whether as a whole the jury was adequately instructed, and not on whether every specif-

ic aspect of AT & T's defense was covered in detail. *Id.* at 498. So long as the instructions, "when viewed in the light of the evidence, show no tendency to confuse or mislead the jury," there is no error. *Allers v. Bohmker,* 199 F.2d 790, 792 (7th Cir. 1952). *FTD* does not mandate reversal where the instructions as a whole encompass the theories of defense that are clearly incorporated in testimony and argument at trial.

 Thus, a review of the record leads us to conclude that the instructions meet both these tests of adequacy. AT & T cannot be said to have so failed in making its position known during trial that the refusal to instruct left the jury with no understanding of AT & T's defense. In these circumstances a general instruction would be acceptable. The district court also communicated the substance of AT & T's theories. We agree that much of AT & T's defense amounts merely to negating MCI's contentions. AT & T, for example, asserts that it was entitled to an instruction that it believed the relevant geographic market was not nationwide but limited to the areas where MCI was authorized to do business. The court in fact charged, "The geographic scope of the relevant market is the area in which the firms involved do business and the area from which they draw customers.... MCI claims that ... the geographic scope of the market was nationwide." App. 1198. The court further instructed the jury on what factors to consider in determining whether the market was, in fact, nationwide. These instructions in context lead us to believe that the jury understood AT & T's view. Considering the trial evidence and argument as well as the instructions tendered, the jury's obvious choice was between a nationwide market (espoused by MCI) or a more limited market (advocated by AT & T). Similar examples may be found

throughout the instructions. Essentially we find no error in the instructions since by eliminating redundancies and excess verbiage, the district court avoided potential confusion while preserving the substance of the theories of defense offered by AT & T.[134] *See Southern Railway v. Shealey,* 382 F.2d 752, 755 (5th Cir.1967).

## VIII. CONCLUSION

As indicated in this opinion, we conclude that the jury's award of damages and certain jury findings on the merits lack evidentiary support or are otherwise improper as a matter of law, so that they must be set aside. In addition, we approve the other jury findings on the merits. Accordingly, the judgment is reversed insofar as it is based on the award of damages and disapproved findings. In all other respects it is affirmed, and the cause is remanded for a new trial on the issue of damages only, in accordance with this opinion. Circuit Rule 18 shall not apply on remand. Each party shall bear its own costs on appeal. All arguments raised in this appeal which are not expressly addressed herein have been considered and determined to be without merit.

HARLINGTON WOOD, Jr., Circuit Judge, concurring in part and dissenting in part.

While I agree with the majority's opinion in a number of areas, including its view of regulatory immunity, the general conduct and fairness of the trial, the illegality of AT & T's conduct in regard to local interconnections, the tariff filings, negotiations and disconnections, and the legality of the denial of multipoint interconnections, there are certain other areas in which I respectfully offer other views. Even the recognized experts in this field upon whom the courts look for guidance constantly quarrel among

---

**134.** In affirming the adequacy of the instructions, we note Judge Grady's remarks during the instructions conference:

> I hope, incidentally, that anyone who, at a later time, is critical of these instructions, will take a look at what I had to work with

by way of the original submissions made by the parties a couple of weeks ago, by way of the plaintiffs' submissions and the defendants' submissions, and at least I may win somebody's sympathy, if not their approval.

themselves about some of these matters. The impression is left, at least as of now, that we cannot select and apply one view or another with unequivocal confidence. This case will not in the least settle the academic controversies. It should not be surprising, therefore, that, among the judges who have had to struggle with this case, there is not complete unanimity. This expression of my own views is not intended to be critical of the views of my colleagues.

Before considering those issues, I add only a preliminary comment. Some shock in the legal community was evident from the record breaking $1.8 billion verdict. This panel, however, has not approached this case intimidated by the size of the verdict, or with the attitude that necessarily because of its size there must be reversible error in the process somewhere. The issues have been approached as they would have been in a less expensive case. In my view the attorneys on both sides, Judge Grady, and the jury performed, not perfectly, but remarkably well considering that this is an extraordinarily complex and multifaceted case.[1] My initial impression was that certain reversible errors were readily apparent, but upon closer examination some of the novel events turned out to be not so disturbing in the particular circumstances. If there is any inclination, however, to generally find fault with the impressive verdict, I would shift a good share of the blame on to the law itself. There is necessarily permitted in antitrust cases some laxity in the computation of damages as we shall discuss. A just and reasonable "estimate," based upon relevant data, will suffice although it must be short of speculation or guess work. After a jury, with that practical computation leeway, has conscientiously rendered a verdict which presumably the jury believes will fully compensate the plaintiff for its damages, the statute then takes over and multiplies that verdict by three. There must be some surprised jurors who later come to realize what they have wrought. It is even conceivable that a struggling competitor securing a trebled judgment could not have been more fortunate than to have suffered the damage at the hands of the losing competitor. In my judgment the trebling requirement deserves Congressional review. Discretionary punitive damages, for example, might be an alternative for extreme cases in place of statutory multiplication. But, in any event, we have to try to resolve this case as we now find the law and the evidence.

## I. HI–LO AND PREDATORY PRICING

### A. The Inappropriateness of Exclusively Cost-Based Standards

My first point of difference with the majority concerns the elusive question of predatory pricing. In setting aside the jury's determination that AT & T was guilty of predatory pricing in connection with its Hi-Lo tariff, the majority has given indications of its philosophy concerning antitrust. Its belief appears to be that the antitrust laws should be concerned only with advancing consumer welfare and should thus focus exclusively on issues of efficiency. To implement that concern the majority would find that, in most cases, no price above Long-Run Incremental Cost could be held predatory.[2]

1. This appeal has generated a record of monstrous proportions. There are 11,500 pages of transcript, pleadings, motions and other record entries, more than 1,000 exhibits, and 45 boxes of sealed evidence and deposition. The appellate briefs total nearly 600 pages, the appendices reach more than a foot in height, and in addition, there is considerable correspondence to this court from the parties. Not only do we note the diverse issues upon which the parties focus, but also obscured in the small print of over 600 footnotes in the briefs we find countless additional issues.

2. For the convenience of the reader, we reiterate here brief definitions of the various cost terms used in the majority opinion and this dissent. Each term is more fully elaborated in the majority opinion, *supra*, at pp. 1114–1118:

Marginal cost—the additional cost of supplying a single, infinitesimally small additional unit.

Average Total Cost—the sum of all costs (fixed and variable) divided by all units of output.

Long-Run Incremental Cost—the average cost (including fixed costs) per unit of adding

While efficiency and consumer welfare are laudable goals, they should not be permitted to entirely eclipse a major aim of the antitrust laws: the promotion of *competition*. To advance efficiency ahead of competition in the hierarchy of antitrust values is to slight the *non-economic* dimension of the Sherman Act's concern with competition. In any event good healthy competition itself fosters efficiency and results in public benefits. I am not sure that the majority's LRIC rule should be the almost exclusive method of advancing consumer welfare.

In addition to focusing on the promotion of price competition, the antitrust laws have shown an equal concern for the abuse of monopoly power. Judicial condemnation of predatory pricing by a monopolist bent on destroying or deterring new competition is an appropriate and frequent target of antitrust doctrine. As the majority states, "Predatory pricing is prohibited because of the fear that a monopoly or dominant firm will deliberately sacrifice present revenues for the purpose of driving rivals from the market and thus recoup its losses through higher profits earned in the absence of competition." *Supra,* at p. 1112. Perhaps in the market place it does not always work that way, although I believe that it may, but in any event a lot of undue damage and disruption can be caused by those monopolists who believe that it is effective economic behavior.

This circuit has previously expressed its intention to consider a wide range of factors in determining whether such conduct may be predatory in particular circumstances. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 430 (7th Cir. 1980). The majority's willingness to retreat to a more mechanical test clashes with the holdings of *Chillicothe* and other cases which have refused to attach a conclusive presumption to any one form of evidence. *Borden, Inc. v. FTC,* 674 F.2d 498, 515 (6th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 2115, 77 L.Ed.2d 1298 (1983); *Pacific Engineering & Production Co. v. Kerr-McGee Corp.,* 551 F.2d 790 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977). Most recently the Ninth Circuit adopted a broad approach to analyzing predatory pricing. In *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982), the court stated that, in order to establish the existence of predatory pricing, a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. 668 F.2d at 1035. In place of economic formulae, the court created a test employing both economic and non-economic criteria. 668 F.2d at 1035–36.

It was just such a broad-ranging inquiry that was undertaken by the trial court in this case. The jury was permitted to find AT & T liable under Section 2 of the Sherman Act upon evidence that the anticipated effect of its Hi-Lo tariff was to eliminate MCI and thus restore AT & T's full market power. The jury was foreclosed from doing so, however, if Hi-Lo prices were found to exceed fully distributed cost, the "safe harbor" selected in this case.[3] MCI argued

---

an entire new product or service rather than merely the last unit of output.

Fully Distributed Cost—in the case of a multiproduct firm, the average additional total cost per unit of adding an entire new product or service, including an aliquot portion of the entire firm's embedded or historical costs.

The majority agrees that fully distributed cost and long-run incremental cost are merely variant definitions of average total cost, but argues that fully distributed cost is too "arbitrary" a measure of the latter. *Supra,* at pp. 1116–1117.

**3.** That the relevant jury instruction only permitted but did not *compel* a finding of liability if Hi-Lo prices were under fully distributed cost is clear from the face of its text: "If [prices fall below FDC], you *may* infer predatory intent." App. 1205 (emphasis added).

My first impression was that Judge Grady had clearly committed error by permitting the jury to decide for itself a matter which was the court's responsibility as a matter of law. After becoming more involved in this case I became less sure because the factual circumstances influence the choice of the test to be applied and

that only when AT & T's prices were proven to exceed fully distributed cost should the normal inquiry into predatory conduct be limited. If below this level, MCI argued, the tariff price may well have resulted from AT & T's internal manipulation and transfer of its monopoly resources among a variety of service categories to unlawfully focus upon and obliterate MCI. If above this level, MCI conceded, the prices should be presumed to reflect good faith competitive motivation.

Yet the majority holds that in most cases, where price exceeds long-run incremental cost, this wide-ranging inquiry into predatory design is not permitted.[4] This conclusion is largely a product of the majority's characterization of the cost standards used in this case as merely differing definitions of average total cost.[5] I remain convinced that such a limiting rule fails to properly credit the history of the Sherman Act and antitrust policy and also fails as an all-inclusive measure of consumer welfare. If you really wanted to know what caused the unsavory flavor of the monopoly broth, you would not just audit the chef's books of account; you would also take a look at his recipe. *City of Mishawaka v. American Electric Power Company, Inc.,* 616 F.2d 976, 986 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

### 1. The History and Goals of the Sherman Act

The majority's insistence that an arguably predatory pattern of behavior is of no concern to the antitrust laws where prices exceed incremental costs rests first on its assumption that market efficiency is the historical and normative goal of the antitrust laws. Thus, the majority dismisses concerns about the existence of vast social and economic power of monopolies *per se,* and effectively sides with one group of commentators who argue that the Sherman Act was foremost an attempt to correct the distortion of resource allocation created by large economic units. *See e.g.,* R. Bork, *The Antitrust Paradox* 61–66 (1978); R. Posner, *Antitrust Law* (1976). The majority, like these commentators, accepts the proposition that the antitrust laws are concerned only with efficiency and thus concludes that arguably monopolistic practices which do not disturb efficiency should escape liability *pro tanto.*

However, a very different story has been told by other historians and scholars of antitrust. There is a persistent strain running through the creation and political endurance of the antitrust laws which reveals them to be instruments to ensure the disaggregation of concentrated economic

---

fact selection is a jury function. It was an interesting experiment to permit the jury to determine, after the various approaches were explained to them, how best to determine predatory pricing in the unique circumstances of this case. The jury made what I consider to be an appropriate choice. I would not sanction this method generally, but it did no harm here.

**4.** The majority moderates the harshness of its rule somewhat by holding that, in certain very limited cases, non-cost evidence may be considered. *Supra,* at p. 1123, n. 59. But the majority also states that such evidence may not form the basis for an *inference* of predatory intent unless price is below long-run incremental cost. Thus, while the majority would in narrow circumstances permit direct non-cost proof of predatory intent (e.g. statements by a defendant's managers outlining a strategy to inflict damage upon and eliminate a rival through activities other than competition on the merits), a restrictive reading would suggest that proof of unlawful intent through *indirect* evidence (e.g. internal firm cost and revenue

patterns) would not be alone sufficient to establish liability. If such a restrictive reading is correct, then I believe the majority's position results in an unnecessary and unrealistic limitation upon the predation inquiry. As a practical matter I believe it will be a difficult rule for the district judge to administer with any certainty.

**5.** Throughout the trial and on appeal both sides argued that AT & T's liability for predatory pricing depended on whether a marginal or average total cost standard was applicable. As an initial matter, therefore, I question the advisability of an appellate court undertaking *sua sponte* a complicated theoretical redefinition of economic terms, as appears to have been done in this case, especially where such a redefinition works to deny recovery to a plaintiff whose cost standard was the only one professed at trial to be consistent with the basic measure adopted by the majority, i.e. average total cost.

power and to assure fairness among competitors, and not just instruments to assure neoclassical economic efficiency, as worthy and beneficial a goal as that may be. As the late Professor Hofstadter wrote,

> What makes it possible to institutionalize antitrust activity . . . is not a consensus among economists as to its utility in enhancing economic efficiency, but a rough consensus in society at large as to its value in curbing the dangers of excessive market power. As in the beginning, it is based on a political and moral judgment rather than the outcome of economic measurement or even distinctively economic criteria.[6]

That the concern with monopoly was at its origins not confined to technical efficiency arguments was made clear by Senator Sherman himself, who defended his namesake Act by noting,

> If the concentrated powers of [monopoly] are entrusted to a single man, it is a kingly prerogative, inconsistent with our form of government, and should be subject to the strong resistance of the state and national authorities. If we will not endure a king as a political power we should not endure a king over the production, transportation, and sale of any of the necessaries of life.[7]

The early antitrust cases were quick to elaborate this strain which addressed the dangers of concentrated social and economic power, and to insist upon its priority over more technical efficiency criteria. As Justice Peckham noted in *United States. v. Trans-Missouri Freight Association,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897),

> In business or trading combinations may even temporarily, or perhaps perma-

nently, reduce the price of the article traded in or manufactured, by reducing the expense inseparable from the running of many different companies for the same purpose. Trade or commerce under these conditions may nevertheless be badly and unfortunately restrained by driving out of business the small dealers . . . [M]ere reduction in the price of the commodity dealt in might be dearly paid for by the run of such a class, and the absorption of control over the commodity by an all-powerful combination of capital.

*Id.* at 323–324, 17 S.Ct. at 552.

Throughout this century, in a variety of contexts, from boycotts to vertical integration, the Supreme Court has repeatedly rejected the notion that a concern with market efficiency should be permitted to eclipse the broader, social concerns of the antitrust laws.[8] Even in times of relative economic hardship, American legal and political culture has staunchly resisted the rationalization of monopolistic economic power on the basis of efficiency.[9] So overwhelming has been the American abhorrence of the concentration of economic power (and its concomitant restriction of the range of private discretion and opportunity and tendency to trigger the responsive enhancement of Big Government) that

> despite the inconvenience, lack of predictability, and general mess introduced into the economists' allegedly cohesive and tidy world of exclusively micro-economic analysis, an antitrust policy that failed to take political concerns into account would be unresponsive to the will of Congress and out of touch with the rough political consensus that has sup-

---

6. R. Hofstadter, "What Happened to the Antitrust Movement?" in *The Business Establishment* 113, 149 (E. Cheit, ed. 1964).

7. 21 Cong.Rec. 2457 (1890). *See also* Letwin, *Congress and the Sherman Antitrust Laws: 1887–1890,* 23 U.Chi.L.Rev. 221 (1955) (tracing political history of antitrust movement).

8. *See* Pitofsky, *The Political Content of Antitrust,* 127 U.Pa.L.Rev. 1051 (1979); Schwartz,

*"Justice" and Other Non-Economic Goals of Antitrust,* 127 U.Pa.L.Rev. 1076 (1979); Blake and Jones, *Toward a Three-Dimensional Antitrust Policy,* 65 Cal.L.Rev. 422 (1965).

9. *See* Hawley, *The New Deal and the Problem of Monopoly,* 283–379 (1966) (tracing the strong influence of antitrust advocates in turning later New Deal policies away from pro-cartelization and planning practices).

ported antitrust enforcement for almost a century.[10]

With this rich history and jurisprudence stressing the wide-ranging social concern of the antitrust laws, it is difficult to entirely understand the enthusiasm with which many embrace the theory that these laws stand only for economic efficiency. Intellectual fashion no doubt plays a part. It is interesting to note in this connection that the historical and jurisprudential arguments on behalf of this narrowed horizon for the antitrust laws were not articulated with any coherence until the mid-1960's, when the "law and economics" movement began to attain an academic foothold. This new "efficiency only" paradigm was not applied to the predatory pricing area until less than a decade ago, in a seminal article by Professors Areeda and Turner.[11] While it is perhaps best left for legal historians to trace the intellectual origins and impact of the "law and economics" approach,[12] we note here only that it is at most a set of contestable premises and certainly a relative newcomer to areas marked by rich legislative and decisional history. While not negating the value of policy arguments based on efficiency, I am hesitant to abandon the jurisprudence and historical texture of the antitrust laws in order to embrace a set of seemingly hard and fast efficiency rules which present an illusion of conceptual and empirical tidiness. Instead, I would continue to permit the kind of inquiry into predatory use of economic power which this court encouraged in *Chillicothe* in order to preserve the important values embodied in the Sherman Act. I would agree with Professor Sullivan that

To argue, as do the Chicago economists, that antitrust ought to be used solely to inhibit expressions of market power in a technical economic sense, is not only to miss much in the history and development of the law, but to ignore much of its potential ... The political consensus that supports antitrust comes from other sources. Americans continue to value institutions the scale and the workings of which they can comprehend. Many continue to value the decentralization of decisionmaking power and responsibility. Many favor structures in which power in one locus may be checked by power in another. Antitrust, broadly conceived and sensitively administered, may contribute to the realization of these values.[13]

I submit that no such contribution will be made if we limit our definition of unlawful predation to the transgression of efficiency as defined by the formulae of micro-economics.

The majority makes one additional argument in support of its restriction of the predation inquiry in this case to the search for market efficiency: the existence of parallel federal regulation of AT & T. *Supra,* at pp. 1110–1111. Thus, the majority avers, this court should temper the execution of its antitrust mandate to judge AT & T's conduct in view of the knowledge that the FCC stands ready to effect technical improvement and competition in the telecommunications market. Since it is really just a weaker version of the regulatory immunity argument properly rejected by the majority, this argument suffers from the same flaw. Chiefly, it fails to account for the historically independent role that

10. Pitofsky, *supra,* at 1052.

11. Areeda and Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975).

12. Professor Horwitz suggests that the "economic analysis of law is only the most recent claimant to draw upon the prestige of the natural sciences in the effort to create a system of legal thought that is objective, neutral and apolitical ... Law-and-economics emerges to fill the intellectual vacuum left by Legal Real-

ism. It is one of the many responses to the Realist critique of all attempts to create a completely automatic and internally consistent realm of 'pure law'." Horwitz, *Law and Economics: Science or Politics?,* 8 Hofstra L.Rev. 905 (1980).

13. Sullivan, *Economics and More Humanistic Disciplines: What Are The Sources of Wisdom for Antitrust?,* 125 U.Pa.L.Rev. 1214, 1222–23 (1977).

the antitrust laws have played in our multipolar regulatory system.

A necessary tension exists between majoritarian regulation which seeks efficiency and the somewhat broader goals of antitrust policy, which seeks to protect fair competition and to restrain monopoly even where the latter is found efficient in some technical economic sense. The majority's view relies on a simplified picture of governmental telecommunications regulation as a monolithic and coordinated search for the single best policy, ignoring the less tidy reality that regulatory policy in our system is shaped by competing ideas of the good emanating from many loci. The antitrust laws, as applied by the judiciary, play a vital countervailing role in this enterprise.[14] To argue, as does the majority, that the courts should limit their antitrust inquiry while leaving to the regulatory authorities the duty of addressing the long-term problems of the market is to withdraw from the delicate interplay contemplated for our system of overlapping regulation and antitrust enforcement. If the majority approach is now determined to be the most beneficial

for society, I would prefer to have the Congress say so.

### 2. LRIC and Consumer Welfare in the Monopoly Context

Even assuming that someone's concept of consumer welfare is the only goal of the antitrust laws, an assumption about which I have reservations, I have serious doubts as to whether these ends are well protected, at least in a monopoly context, by the majority's reluctance to look at evidence other than that concerning cost and prices. In short, the majority's preoccupation with one special form of efficiency, I believe, is too narrow even as an *economic* basis for a sound antitrust policy.

The standards advocated by the majority measure efficiency solely in terms of the ability to produce a good or service for the lowest possible cost. But it would require a leap of faith in order to conclude that such efficiency is synonymous with actual consumer benefit, the avowed goal of the majority.

First, a monopolist, even if it is more efficient than any potential rival, has only limited incentives to pass cost savings along

---

**14.** This countervailing role is especially important in an area as vital to our economy as communications. This nation's law has always recognized a policy in commerce that requires existing commitments to yield in favor of creative change. *See* W. Hurst, *Law and the Conditions of Freedom* 27 (1956). Perhaps the classic application of that policy came in the *Charles River Bridge* case, where the Supreme Court held that a legislative grant to build and operate a toll bridge across the Charles River did not preclude the construction and operation of a competing bridge at a later time. *Proprietors of the Charles River Bridge v. Proprietors of the Warren Bridge,* 36 U.S. (11 Pet.) 420, 9 L.Ed. 773 (1837). Justice Taney's opinion for the Court is as timely applied to the telecommunications technology involved in the case before us as it was to the less advanced modes of communication considered in 1837:

> [I]n a country like ours, free, active, and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary, both for travel and trade; and are essential to the comfort, convenience, and prosperity of the people. A State ought never to be presumed to surrender this power [of promoting the happiness and prosperity of the community],

> because, like the taxing power, the whole community have an interest in preserving it undiminished .... No one will question that the interests of the great body of the people of the State, would, in this instance, be affected by the surrender of this great line of travel to a single corporation, with the right to exact toll, and exclude competition for seventy years. While the rights of private property are sacredly guarded, we must not forget that the community also have rights, and that the happiness and well being of every citizen depends on their faithful preservation.

*Id.* at 547–48. As Professor Hurst has noted, the *Charles River Bridge* case expresses this country's "preferences for dynamic rather than static property, or for property put to creative new use rather than property content with what it is." Hurst, *supra,* at 28.

As our history reveals, it would be unwise to assume that our regulatory agencies, bombarded with demands from multiple entrenched constituencies and guided by short-run efficiency concerns, will be as vigilant as the independent judiciary in vindicating this preference for "dynamic property." *See, e.g., Regulation* (J. Wilson, ed. 1979); Kolko, *The Triumph of Conservatism* (1967).

to its customers in the form of price reductions; this lack of incentives is due precisely to its monopoly position. Thus, under such circumstances, promoting the entry initially of seemingly a less efficient firm as a competitor could still be of great benefit to consumers.[15] Brodley and Hay, *Predatory Pricing: Competing Economic Theories and the Evolution of Legal Standards,* 66 Cornell L.Rev. 738, 744-45 (1981). A healthy competitor might generate even more efficiencies and consumer benefits.

Second, and more importantly, the exclusive use of an LRIC standard to evaluate predatory pricing ignores the fact that predation is a strategic weapon available to a monopolist facing a new entrant. Such a test is therefore insensitive to the many forms of strategic conduct by a dominant firm which have no legitimate business purpose and are only instituted to discipline or eliminate competition with accompanying long-run detrimental effects for consumers. Because of the element of strategic choice in predatory pricing it is necessary to formulate a test which avoids the indeterminacy of price theory. L. Sullivan, *Economics and More Humanistic Disciplines: What are the Sources of Wisdom for Antitrust?,* 125 U.Pa.L.Rev. 1214, 1228 (1977).

Thus, the greatest danger in attaching conclusive presumptions to a comparison of prices and costs is the resultant tendency to ignore the more subtle ways in which monopoly power can be exploited to the detriment of *both competitors and consumers.* The majority's rule may have greater validity in deciding allegations of predatory pricing in attempt to monopolize cases where the defendant lacks monopoly power. However, there are sound economic and social reasons to be wary of the market power exercised by an existent monopolist who confronts a new entrant.[16]

The most blatant predatory use of monopoly power theoretically is, of course, a quick price cut upon entry until the competitor withdraws, at which time prices are raised back to monopoly levels to recoup the temporary losses sustained. There are, however, a variety of more subtle ways in which a monopolist can exploit his power. For example, the lowering of price in anticipation of entry can be as effective a threat to new competition as actually engaging in a price war. Indeed, a respected branch of the field of industrial organization economics cautions us to be wary of the problems of this form of "limit pricing" whereby a monopolist may still make a profit but eliminate the threat or actual entry of a new competitor as the field suddenly looks less economically inviting. L. Sullivan, *Antitrust Law,* § 46(c) (1977); Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 Harv.L.Rev. 869 (1976); Scherer, *Some Last Words on Predatory Pricing,* 89 Harv.L.Rev. 901 (1976). In response to these concerns, no other than Dr. William Baumol, AT & T's principal expert witness, has advocated a rule holding any non-permanent price reduction by a monopolist to be predatory pricing. Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1 (1979). *Cf.,* Joskow & Klevorick, *A Framework for Predatory Pricing Policy,* 89 Yale L.J. 213, 250-55 (1979).

But "limit pricing" is not the only tactic which may prove availing for a predator. A monopolist producing multiple products and services may arbitrarily and systematically shift its revenues and costs between

**15.** A new entrant's inefficiency may only be a short-run phenomenon associated with its recent start in an industry. If a longer view is taken, the new entrant will progress on its "learning curve" and may, in fact, ultimately be more efficient than the dominant firm. F.M. Scherer, *Industrial Market Structure and Economic Performance* 82, 250-52 (2d ed. 1980).

**16.** Indeed, the law of section 2 of the Sherman Act has been sensitive to the abuse of monopoly power in a way that the majority discounts.

The case law has even held unlawful actions by monopolists which, while lawful in themselves, evidence a purpose sufficient to transform monopoly into the offense of "monopolization." *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir.1945) (on certification from the Supreme Court); *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

and among competitive products and monopoly products, resulting in widely divergent rates of return between these two types of markets. Such a strategy is nothing more than a disguised price reduction and serves no purpose other than to eliminate or discipline troublesome competitors. *See Borden, Inc. v. FTC,* 674 F.2d 498, 514 (6th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 2115, 77 L.Ed.2d 1298 (1983). A thinly financed competitor may be vulnerable, regardless of relative efficiency, when a monopolist is willing to tolerate rates of return which, although profitable, are nonetheless below his normal expectations and reflect a systematic marshalling of monopoly resources to eliminate a competitor. *See Richter Concrete Corp. v. Hilltop Basic Resources, Inc.,* 547 F.Supp. 893 (S.D.Ohio 1981); *In re IBM Peripheral EDP Devices Antitrust Litigation,* 481 F.Supp. 965, 991–92 (N.D.Cal.1979), *appeal docketed,* No. 80–4048 (9th Cir. Jan. 31, 1980). *Cf. International Air Industries v. American Excelsior Co.,* 517 F.2d 714, 725 n. 32 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976) ("absence of aid from other markets is a determinative factor in evaluating allegedly predatory conduct").

Recently the Sixth Circuit used this latter type of analysis in affirming the FTC's finding that a monopolist improperly used differential pricing to discipline or eliminate competitors in select geographic markets where competition existed. *Borden, Inc. v. FTC,* 674 F.2d 498 (6th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 2115, 77 L.Ed.2d 1298 (1983). Although noting that prices were set below average total cost, the court found it unnecessary to determine the appropriate cost-based test since the case involved blatant price manipulation by a monopolist.

That case, like the one at bar, presents the unique situation of a

monopolist marketing a product which could command a premium price, giving it significant pricing leverage over its competitors. ReaLemon historically has dominated the processed lemon juice market and has affected competition adversely through selective geographic price promotions and unreasonably low prices. The record supports the Commission's conclusion that Borden intended to continue its domination with the same long term effect of reducing or eliminating competition.

*Id.* at 515. The court emphasized the entire context in which Borden's differential pricing occurred: the price changes were initiated only when competitors began successfully to encroach on Borden's business, *id.* at 513; price reductions were keyed only to markets where competition existed, *id.*; the price reductions occurred in markets where costs were higher and thus, presumably, where prices should have been higher, *see id.* at 514 n. 40; and Borden realistically was able to conclude that the variety of non-competitive markets from which it could draw profits to offset its short-term losses in markets where it reduced prices promised the company could reap greater rewards in the long-run once competition was diminished, *id.* at 514. It is difficult to defend that monopolistic antagonism to competition as efficiency and of benefit to consumers.

The court in *Borden* thus upheld the FCC's determination that the totality of the circumstances showed that the monopolist improperly undermined its competitors by manipulating costs and prices between markets where competition existed and markets where it traded alone. Borden did not engage in competition on the merits but used its position in other markets to gain leverage over its competitors. Even the dissent in *Borden* would have upheld the FTC on that basis. *See id.* at 517, 521 (Kennedy, J., dissenting) (finding ambiguity in the basis of the FTC's determination).

These are merely examples of the types of anticompetitive conduct by a dominant firm which have medium- to long-run impact on competition and consumer welfare but which cannot be easily addressed by a simplistic price-cost comparison, no matter what measure of cost is utilized. Pricing above average variable cost or LRIC is at

best an indeterminate method of analyzing the motives and effects of price cuts by a monopolist. To shed light on these pricing strategies, which are the conscious decision of the corporate planners, it is only proper that a plaintiff be allowed to come forward with direct evidence of defendant's intent in this regard. Because predatory pricing involves an element of corporate strategy on the part of the defendant, mechanically applied cost standards fail to address the strategic essence of predatory pricing. Brodley and Hay, *Predatory Pricing: Competing Economic Theories and the Evolution of Legal Standards,* 66 Cornell L.Rev. 738, 756 (1981); Dirlam, *Marginal Cost Pricing Tests for Predation: Naive Welfare Economics and Public Policy,* 26 Antitrust Bull. 769 (1981). *See also* F.M. Scherer, *Industrial Market Structure and Economic Performance* 537–38 (2d ed. 1980) (rejecting all mechanical tests in favor of a wide-ranging rule of reason inquiry). More is needed to distinguish genuine competition from illegal conduct. The replay of this case here, though far from instant, confirms the correctness of the jury's initial penalty call against AT & T for "unnecessary roughness" and "unsportsmanlike conduct."

Intent evidence, if it can be found, is particularly probative of the reasons behind price changes by a dominant firm. This is the critical factor recognized by this court in *Chillicothe* and the Ninth Circuit in *Inglis* and its progeny [17] in rejecting price-cost data as the sole test for predation. While the inference of predatory intent from the evidence obviously entails an inquiry which must be done on a case-by-case basis, that task is not an overwhelming one. This circuit undertook just such an inquiry in *National Dairy Products Corp. v. FTC,* 412 F.2d 605, 618–20 (7th Cir.1969) and set forth examples of the types of record evidence which support the proof of predatory intent.

In sum, if antitrust law is to be more than applied theoretical and uncertain eco-nomics by opposing expert witnesses, then a place must be reserved for evidence of intent. Such evidence can include, as in *Borden,* a suspicious pattern of price reductions geared only to a firm's competitive markets, combined with evidence that the firm sought to offset the resultant revenue sacrifice by increasing revenues from other, non-competitive markets, *Borden,* 674 F.2d at 513, 514, or, as in *National Dairy Products,* evidence that a firm undertook research to gain knowledge of its competitor's weakness and then massively concentrated its resources in an all out strategic program of product promotion to inflict damage on the competitor, *National Dairy Products,* 412 F.2d at 618, 619. Although direct evidence of intent will rarely be conclusive, the court should also consider statements of chief actors expressing a design to inhibit competitors by means other than the predatory firm's own ability to perform effectively in the market, or, put another way, to impose calculated harm on another firm rather than primarily seeking gains for itself. *See* Sullivan, *supra,* at 111.

In response to the majority's contention that evidence of intent is inherently untrustworthy and ambiguous we can only note the at least equally inexact nature of economic and accounting evidence and the ambiguity entailed in sorting out the diametrically opposed expert testimony generated in predatory pricing cases. These two weak components need each other. It is in areas where conduct may be ambiguous, but in which intent plays a role, that the judicial forum is most appropriate. As noted by Professor Sullivan:

> A firm which seeks to drive out or exclude rivals by selling at unremunerative prices will leave human traces; the very concept is one of a human animus bent, if you please, upon a course of conduct socially disapproved. If there is one task that judges and juries, informed through the adversary system, may really be good

---

**17.** The Ninth Circuit recently applied *Inglis* for the first time. In *D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.,* 692 F.2d 1245 (9th Cir.1982), the court held unlawful predato-ry action in which a monopolist supported a subsidiary through the generous provision of credit, even where the resultant price exceeded average variable cost.

at, it is identifying the pernicious in human affairs. . . .

. . . .

Purpose and intent are always difficult to deal with, particularly so in connection with complex business conduct. But the antitrust laws need not disregard the pernicious. There is a difference between competing aggressively and effectively and competing in a predatory way and that difference has to do as much with the human animus which infuses a firm's activities as it does with the objective character of its acts.

Sullivan, *supra*, at 110, 111. I think we are making a mistake to create exclusively cost-based rules which neglect this vital teaching. When examining the conduct of sophisticated business executives manipulating monopoly power against a brash and encroaching new adversary I would not exclude evidence ordinarily considered relevant in order to satisfy one uncertain, restrictive view of economic behavior.

B. *Evidence of AT & T's Predatory Pricing*

Unlike the majority, I would hold that, within the parameters of our decisions in *Chillicothe* and *National Dairy Products,* and with the guidance of *Borden, Inc. v. FTC,* there was evidence of pricing below FDC accompanied by predatory intent sufficient to sustain a finding of predatory pricing.

The majority first attacks MCI's evidence of AT & T's below-FDC pricing as lacking the minimal "rigorous analysis" required to meet its sufficiency burden. Specifically, the majority attacks the summary and aggregated nature of MCI's figures, claiming that since only the Hi-D portion of Hi-Lo was in issue, only evidence of Hi-D costs is relevant. I cannot agree. AT & T's own proposed instructions refer to findings on the Hi-Lo tariff and not to Hi-D alone. Nor did AT & T object on that basis to the Hi-Lo instruction actually given. It is true that the evidence focused on the Hi-D routes upon which actual competition occurred. That focus was necessary because prices were reduced on the Hi-D

routes, causing private line service to register an overall loss. MCI's evidence, however, showed that MCI intended to compete with AT & T even on Lo-D routes. The Hi-Lo tariff as a whole was properly in issue.

In its proof of below FDC pricing, MCI used AT & T's own submissions to the FCC for "private line" service to establish the cost component in AT & T's overall pricing scheme. Hi-Lo was the *only* unprofitable item in the submissions. MCI's expert witness—who for more than ten years has reviewed AT & T's cost studies for the FCC and others—testified that after accounting for all other items in the cost and revenue documents AT & T had presented at trial and before the FCC, private line service was priced below average total cost by as much as $99 million in 1975. AT & T did not object to the admission of that evidence, preferring to argue a contrary position on the basis of other documents and accounting methods. The jury was presented with the opposing views and made its considered choice. The testimony and MCI's supporting documents are at least minimally sufficient to sustain that choice.

This case is unlike *Broadway Delivery Corp. v. United Parcel Service of America,* 651 F.2d 122 (2d Cir.1981), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), cited by the majority, in which summaries of costs and prices across all of the defendant's operations were lumped together without an attempt on the plaintiff's part to analyze the significance of the tendered figures. In that case, the *defendant* was the only party to offer evidence on the significance of the figures as properly adjusted. Here, MCI offered expert testimony that after making appropriate adjustments, the private line cost and revenue figures showed losing operations for Hi-Lo.

In any event, I believe there was sufficient evidence from which the jury could conclude that on Hi-D routes alone service was well below cost. Hi-D was the only portion of the Hi-Lo program that reduced rates, and it accounted for a high propor-

tion of anticipated sales. Yet despite the revenue increase from other lines, Hi-Lo experienced overall revenue deficiencies from the moment it was introduced and throughout the liability period in this case. The jury was entitled to infer that the Hi-D rate reductions resulted in prices below FDC.

I believe that the majority's attack on the use of aggregate private line revenue figures, which were unravelled by MCI's expert in a logical, step-by-step fashion is diminishing the function of the trier of fact. Especially in antitrust cases, precise internal cost and revenue figures relating to a particular function will rarely be separable, and some inferential analysis of the available cost data will almost always be required. As with its assessment of the proof of damage evidence, the majority would subject competing evidence to exacting mathematical scrutiny, a practice which will, I fear, make recovery for antitrust violations virtually impossible in many cases.

Not only did sufficient evidence show that AT & T's Hi-Lo pricing was not above the FDC "safe harbor," but there was also other evidence sufficient to submit the question of predatory intent to the jury. As we noted in *National Dairy Products,* "Literal proof of actual intent is seldom available. Resort must therefore and usually is made, in proving predatory intent, to the legally acceptable inference thereof from the direct and circumstantial evidence." *National Dairy Products,* 412 F.2d at 618. In *Borden,* the Sixth Circuit approved the inference of predatory intent from the entire context of differential pricing by a dominant firm: the price changes were instituted only where competition had begun to encroach upon the defendant's business, price reductions were keyed only to competitive markets even though costs were higher there, and the defendant could reasonably expect that it could draw profits from a variety of noncompetitive markets to allay short-term revenue sacrifices suffered for the purpose of eliminating competition. *Borden,* 674 F.2d at 513–15. MCI's evidence showed that AT & T engaged in similar pricing that was at least as manipulative as the differential, anticompetitive pricing condemned in *Borden.*

MCI adduced evidence that AT & T deliberately lowered its revenues in the markets in which it competed with MCI and raised prices in its other, noncompetitive markets, such as provision of WATS. Thus, the evidence suggested, WATS users may have paid most of the fixed costs shared between WATS and Hi-Lo service. In addition, MCI adduced evidence that this abrupt shifting of prices and revenues was aimed precisely at briskly eliminating MCI from the competitive scene. The differential pricing AT & T established for its Hi-Lo markets was based on a supposedly objective criterion, namely whether the circuit served a high or low volume market. Yet AT & T's own advisors questioned the way in which the markets were divided, noting that even by the criteria AT & T used, many of the Lo-D cities (where prices were raised) should have been classified as Hi-D locations. The evidence also revealed that AT & T advisors also expressed doubts that after the adjustments the Hi-D services would be priced in a cost justified manner. PX 2962 at Tr. 10473. From this the jury could infer that the reduced prices for Hi-D were predatory tactics designed to eliminate MCI as a competitor along those routes.[18] AT & T's goal was further to temporarily decrease its own loss from such predatory tactics by raising prices on the inaccurately constituted Lo-D

---

**18.** While not necessary or alone sufficient to support the finding of predatory intent here, it should be noted that MCI produced evidence illuminating AT & T's background motives, including statements by AT & T and operating company executives to a 1972 Florida meeting which stressed the need to prevent the effectuation of construction plans of MCI and other competitors by filing matching rates immedi-

ately and the need to "act now rather than wait until they have going business which regulators might not permit us to dislodge." I believe that such evidence is at least probative of a defendant's intent to eliminate a market entrant through the use of organizational power and monopoly resources rather than through competition on the merits.

lines where MCI was not yet operative, and by charging higher prices for other services, such as WATS.

## II. PRE–ANNOUNCEMENT OF HI–LO

The majority holds that there was insufficient evidence to support the jury's finding that the announcement of the Hi-Lo tariff twenty-one months before the price change became effective was an act of monopolization. In essence, the majority concludes that the jury was required to believe AT & T's explanation that the "regulatory context" prevented it from obtaining FCC permission to initiate the tariff sooner. As with its holdings of insufficient evidence in connection with proof of damage and proof of below FDC pricing, the majority in my view here again intervenes to express its preference as between two equally credible versions of the truth.

The jury was entitled to infer that the pre-announcement was a violation of the antitrust laws if it found that AT & T intended to deceive potential customers in furtherance of an attempt to monopolize. *See Americana Industries v. Wometco de Puerto Rico,* 556 F.2d 625 (1st Cir.1977); 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 738i at 284 (1978). The jury was correctly instructed that the time interval between AT & T's announcement and implementation of its new prices could constitute a predatory act if the reason for the interval was to discourage buyers from purchasing MCI's services. If AT & T did not expect the service to be available when it announced that it would be, the pre-announcement could be found to be a predatory act. *See ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423 (N.D.Cal.1978), aff'd *per curiam sub nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981).

MCI adduced sufficient evidence to sustain the jury's conclusion that AT & T intended to mislead the public as to the expected effective date of the new tariff. Internal AT & T documents show that even before its filing in February 1973, AT & T planned a "voluntary extension of the effective date up to March 1, 1974." While there is nothing *per se* wrong with publicizing the tariff filing as it is a matter of public record, *Cox Broadcasting Co. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), that announcement may be evidence of anticompetitive intent where, as here, the anticipated effective date of the rates announced is knowingly false. AT & T's internal documents suggest that AT & T intended to take advantage of its monopoly position to manipulate consumer response to MCI's competitive drive through a misleading announcement.

In line with AT & T's position on the pre-announcement issue, the jury was instructed to consider AT & T's argument that delays in implementation were the result of "regulatory lag" rather than anticompetitive conduct. The jury chose to credit MCI's evidence to the contrary, as it was entitled to do. *See City of Mishawaka v. American Electric Power Co., Inc.,* 616 F.2d 976 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981), in which this court noted that the "legal and practical maze" that often accompanies regulatory proceedings cannot be allowed to conceal an "illegal opportunity with a legitimate gloss." *Id.* at 983–84. The jury could infer anticompetitive intent and effect from AT & T's pre-announcement even though that action was subject to conflicting interpretations. The jury was adequately apprised of the regulatory structure within which AT & T had to operate and thus could decide where regulatory drag ended and anticompetitive delay began.

I am not sure how the majority manages to find insufficient evidence of intent to mislead, for all of the contrary evidence it cites relates only to various procedures, concededly time-consuming, through which AT & T would have to go to effect the tariff. This evidence does *not* address AT & T's clear intent, as expressed through its internal memorandum, to deliberately extend that process even longer than otherwise necessary. The majority concedes that AT

& T's own unilateral decision was at one point responsible for a delay of two months, but characterizes this delay as "minimal." This seems inconsistent with the majority's stress in its discussion of interconnections upon the make-or-break importance of even short delays or market forestallments in the highly dynamic telecommunications market. At the very least, AT & T's intent in acceding to this delay raised a question suitable for jury determination.

## III. DAMAGE PROOF

The majority holds MCI's damage proof insufficient on two related grounds. The majority first holds that MCI's damage calculation in the lost profits study was flawed because it was based upon incorrect or irrelevant data that undermined certain assumptions in the study and consequently permitted the jury to speculate as to the true extent of damage.

The majority also holds that MCI failed to discharge the requisite burden of proof on damage certainty because MCI's lost profits study and other damage proof expressed only an aggregate damage figure and thus did not permit the jury to segregate legitimate competitive losses attributable to lawful conduct from damages attributable to unlawful acts. In other words, the majority holds that MCI had an obligation to identify and segregate the specific damages flowing from *each* alleged act in order to provide a rational basis upon which the jury could reduce its total damage award in the event it found certain of AT & T's acts to have been lawful.

**19.** As the Supreme Court has recently emphasized:

Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. But our willingness also rests on the principle articulated in cases such as *Bigelow* that it does not "come with very good grace" for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.

As a result of these asserted deficiencies, the majority has ordered a new trial in order to assess damages. I believe that the majority's holding contravenes clear precedent in this circuit and will effectively permit future antitrust wrongdoers to escape liability.

### A. Disaggregation

The damage question in private antitrust suits consists of two distinct components: the fact of injury or damage—which concerns the causal link between a plaintiff's injury and the unlawful conduct of a defendant—and the amount of damage. *Fontana Aviation, Inc. v. Beech Aircraft Corp.,* 432 F.2d 1080, 1085 (7th Cir.1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 923 (1971). *See Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). Once sufficient evidence is presented related to the fact of damage, uncertainty concerning the exact amount of loss will not preclude recovery. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562–65, 51 S.Ct. 248, 250–251, 75 L.Ed. 544 (1931); *Fontana Aviation,* 432 F.2d at 1085. As a general rule, proof of damage related to each act need not be precise. *See Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 879 (7th Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 582, 584, 27 L.Ed.2d 632 (1971). A just and reasonable estimate of the damage based upon relevant data may suffice.[19] While this lightened burden does not permit

*J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566–67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981) (citations omitted). *See Terrell,* 494 F.2d at 25 (plaintiff's "[e]xpert on damages need not be armed on the right hand with a slide rule, on the left hand with a computer. He is allowed some economic imagination so long as it does not become fantasy"). The figures within the Study, the testimony of MCI's witnesses, and the arguments of MCI's counsel did not create a delusive impression of exactness. *See Herman Schwabe, Inc. v. United Shoe Mach. Corp.,* 297 F.2d 906, 912 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

a jury to base an award upon speculation or guesswork, *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–1577, 23 L.Ed.2d 129 (1969); *City of Mishawaka v. American Electric Power Co.,* 616 F.2d 976, 986–87 (7th Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981), juries in such circumstances may act upon probable and inferential as well as direct and positive proof. *Zenith,* 395 U.S. at 123–24, 89 S.Ct. at 1576–1577; *Locklin,* 429 F.2d at 879–80. This rule recognizes the inherent difficulty of proving lost sales or profits. *See Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 668 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975).[20]

Juries, however, must be able rationally to reduce estimated damages to reflect only losses directly attributable to unlawful competition. *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1353 (3d Cir.1975). Thus, where possible, the plaintiff must isolate and segregate the damage impact due to each unlawful act. *See Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226, 1242 (7th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983); *In re IBM Peripheral EDP Devices Antitrust Litigation,* 481 F.Supp. 965, 1013 (N.D.Cal.1979), *appeal docketed,* No. 80–4048 (9th Cir. Jan. 31, 1980); *Van Dyk Research Corp. v. Xerox Corp.,* 478 F.Supp. 1268, 1316 (D.N.J.1979), *aff'd,* 631 F.2d 251 (3d Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); *SCM Corp. v. Xerox Corp.,* 463 F.Supp. 983, 1018–20 (D.Conn.1978), *remanded for further proceedings,* 599 F.2d 32 (2d Cir.1979) (per curiam), *aff'd after remand,* 645 F.2d 1195 (2d Cir.1981); *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423 (N.D. Cal.1978), *aff'd per curiam sub nom.* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981).

There is, then, a tension between the need for certainty of damage proof and acknowledgement that the nature of an antitrust violator's acts may make it impossible to separate in a definite way the harm to a business caused by each separate unlawful act. *See generally* Goetz, *The Basic Rules of Antitrust Damages,* 49 Antitrust L.J. 125 (1981). The inability to disaggregate the total damages figure and allocate specific dollar amounts to each unlawful act makes the task of the fact finder difficult. This does not mean, however, that the wrongdoer can escape the consequences of its acts simply because a precise damage figure cannot be placed on those consequences. *Spray-Rite,* 684 F.2d at 1243. This tension must be resolved with an eye to the public function served by private antitrust actions. *See* Areeda, *Anti-Trust Violations Without Damage Recoveries,* 89 Harv.L.Rev. 1127 (1976).

Guidance in resolving this tension is provided by our recent decision in *Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226 (7th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983), where we held that an antitrust "plaintiff claiming injury caused by more than one of the defendant's unlawful practices need not prove the amount of damage caused by each illegal practice if the plaintiff shows that disaggregation is impracticable. [Instead, we hold that] if the plaintiff shows that such proof is impracticable, the burden shifts to the defendant to demonstrate the contrary." *Spray-Rite,* 684 F.2d at 1243, citing *Greene v. General Foods Corp.,* 517 F.2d 635, 665 (5th Cir. 1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. at 434.

This rule is predicated on considerations of sound judicial policy. For, as we noted

---

**20.** We must be mindful of the Supreme Court's admonition in *Zenith,* 395 U.S. at 123, 89 S.Ct. at 1562:

> Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.

in *Spray-Rite,* "Any other rule would permit the defendant to escape compensating the plaintiff if the defendant's wrongful conduct were sufficiently varied and effective to render more exact proof of damage impossible." *Spray-Rite,* 684 F.2d at 1243. As a result, we held, even assuming that the plaintiff in that case had proven unlawful only one of three named practices and had shown as impracticable the disaggregation of the damages ensuing from each of these practices, and the defendant failed to rebut the plaintiff's assertion by showing that disaggregation was indeed possible, recovery will not be denied to the plaintiff "merely because the jury may have found that [the defendant] combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct." *Id.* at 1243.

The majority attempts to confine the reach of *Spray-Rite,* arguing mainly that, in that case, this court affirmed the damage award only because the court was able to conclude that there was sufficient evidence to support a finding that all of the alleged acts were unlawful, *supra,* at 1163. However, this finding of sufficient evidence was mentioned by the court only in the context of a discussion of an issue unrelated to the disaggregation of damages, i.e., the admissibility of certain testimony. *See Spray-Rite,* 684 F.2d at 1252 n. 11. The *Spray-Rite* court explicitly prefaced its disaggregation holding with the statement of its *arguendo* assumption that the jury did *not* find all three practices part of the unlawful conspiracy, but rather that it found only one such act unlawful. *Id.* at 1243.

The majority also purports to distinguish *Spray-Rite* by arguing that, in that case, the possibly lawful acts which were alleged to have been part of the conspiracy were of "secondary importance" and that the "major injury" stemmed from an unquestionably unlawful act. However, nowhere does the *Spray-Rite* court indicate the relative importance of the various alleged acts. Moreover, to confine the *Spray-Rite* rule to cases where only the effects of "small ticket" items cannot be disaggregated would perversely permit exculpation only where the "monopoly broth" includes acts causing cataclysmic, rather than relatively minor, damages. The determination of what acts are or are not important in the case will again as a practical matter be difficult to administer because presumably the jury should be making those decisions rather than the court as a matter of law. I see no reason to indirectly amend *Spray-Rite.*

Applying to this case, then, the principles enunciated in *Spray-Rite,* I would hold that MCI has met its burden of proof. The damage proof proffered by MCI was claimed and appears to be the most specific and detailed that was possible given the complexities and nature of the alleged AT & T misconduct. MCI maintained throughout the trial and argues upon appeal that any more detailed proof would have been impossible. After thorough consideration of the parties' arguments, the district court ultimately decided that MCI had done the best it was able to do. I agree. Even with the cooperation of AT & T it is unlikely that the majority view could have been satisfied. Thus, the court permitted testimony as to the correctness of the proof and its related assumptions and left it to the jury to reach a damage figure solely in light of any wrongful act of AT & T. Moreover, the district court instructed the jury that the damages must be related only to AT & T's unlawful acts and must not be based upon other factors, including AT & T's lawful acts. The court also properly instructed that damages should be assessed only so long as there was a reasonable basis in the evidence for the award, *without speculation,* and only if the specific damages were tied directly to and flowed directly from the jury's findings of unlawful conduct.[21]

---

21. As Instruction 55 stated in pertinent part:

The law allows a party injured by conduct which violates the Sherman Act to collect damages even if the evidence does not reflect mathematical precision in the calculations of damages. However, estimates and projections must be grounded on assumptions that

The various unlawful acts and practices of AT & T, as well as their consequences to MCI, were so intertwined as to preclude the need for additional individualized consideration or calculation of damages. To require more in these circumstances by attempting to examine each unlawful act in a vacuum would only exacerbate any speculation AT & T now claims exists. The only reasonable and practical solution was to permit the jury, within its instructions and the evidence, to reach a single figure that would compensate MCI for the overall and combined unlawful conduct of and exclusion by AT & T. The fact that there was no specific damage amount attributable to each improper act did not deprive the jury of a rational basis upon which to render its damage award. The jury made reasonable adjustments in its figures to exclude lawful acts. Even the experts could do no more.

Once the plaintiff shows that segregation is impracticable or that its damage proof was as specific as reasonably possible, it is incumbent upon the defendant to demonstrate the contrary. See Spray-Rite, 684 F.2d·at 1242, 1243; Fontana Aviation, 432 F.2d at 1087. See also Greene v. General Foods Corp., 517 F.2d 635, 662–65 (5th Cir. 1975), cert. denied, 424 U.S. 942, 96· S.Ct. 1409, 47 L.Ed.2d 348 (1976). It is not clear that MCI's damage evidence was deficient on its face. Even more importantly, AT &

*T never suggested a more viable method of damage calculation to rebut MCI's showing that the overall damage evidence was as specific as possible and to provide the jury and court with a more certain picture of damages attributable to each allegedly wrongful act.* Instead, AT & T made a tactical choice in limiting its defense to the theory that MCI incurred no damage whatsoever.[22]

Often, the very nature of the antitrust wrong renders accurate damage calculation difficult, if not impossible. I would affirm the view of the district court that the jury should not consider each distinct aspect of AT & T's conduct in a vacuum but should treat the acts in the context of AT & T's overall conduct. AT & T's conduct should be viewed as involving a continuing course of action intended wilfully to maintain its monopoly power and to exclude MCI, rather than as separate and discrete charges.[23] It is the entire set of AT & T's actions in combination which give rise to the damage award, not any one specific act.[24] Although the number of legal and evidentiary issues presented in this appeal has required us to consider each instance of AT & T's monopolizing conduct separately, we must be mindful of the fact that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean

reflect reasoned judgments based on competent evidence. App. 1206–1207.

**22.** AT & T developed two computer models to examine the assumptions and other variables within the Lost Profits Study. The model apparently permitted measurement of at least some changes that would occur as various factors in the Study were altered. AT & T, however, employed the computer models at trial on only two issues, one concerning the revenue rate at which MCI would show a loss in 1979, and the other dealing with the level at which a revenue loss would occur had local interconnection charges been doubled in prior years. AT & T never argued the availability of the models as a reasonable method of achieving disaggregation of damages stemming from lawful and unlawful conduct.

**23.** The district court structured its instructions and special verdict form so that the jury could determine which of AT & T's allegedly improp-

er acts offended the antitrust laws and so comprised the unlawful course of conduct. The jury cannot be said to have rejected the single course of conduct viewpoint simply because it found that five of the fifteen acts did not comprise segments of that unlawful conduct. MCI's contention throughout the trial was that AT & T's unlawful acts in combination—no matter what combination—caused MCI's harm, and it was that question that the jury decided.

**24.** As the district court correctly noted: "[W]hat is often crucially important under § 2 is a pattern of conduct rather than one discrete activity." MCI Communications Corp. v. American Tel. & Tel. Co., 462 F.Supp. at 1084. See Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n, 484 F.Supp. 1195, 1208–09 (D.D.C.1980), rev'd in part on other grounds, 663 F.2d 253 (D.C.Cir.1981).

after scrutiny of each." *Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962); *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 828 (7th Cir.1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979).

The cases cited by the majority as undermining reliance upon the *Spray-Rite* rule in this case are all readily distinguishable from the instant case. In *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423 (N.D.Cal.1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981), for example, the court concluded that the defendant had demonstrated, and plaintiff had failed to rebut, that methods other than those used by plaintiff were reasonably available to calculate more accurately the injury and to disaggregate the damages.[25] The court stated that those methods, if used, would have provided the jury with a reasonable method of measuring the impact of each unlawful act. Thus, it was plaintiff's unreasonable failure to use the best possible evidence, coupled with defendant's demonstration that better methods could have been employed, which rendered the damage proof defective.[26] *See Spray-Rite,* 684 F.2d at 1243 n. 13 (distinguishing *ILC Peripherals*).

The other cases cited by the majority fare no better as authority for its argument, as each case turns on factors not present in this case, including the failure to link the alleged injury to *any* of the defendant's acts (*Momand v. Universal Film Exchanges, Inc.,* 172 F.2d 37 (1st Cir.1948), *cert. denied,* 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949); *Van Dyk Research Corp. v. Xerox Corp.,* 478 F.Supp. 1268 (D.N.J.1979), *aff'd,* 631 F.2d 251 (3d Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981)); failure to adjust projected losses to account for adverse factors other than the defendant's conduct (*Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir.1975); *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954 (M.D.Pa.1981); *In re IBM Peripheral EDP Devices Antitrust Litigation,* 481 F.Supp. 965 (N.D.Cal.1979), *appeal docketed,* No. 80–4048 (9th Cir. Jan. 31, 1980)); reliance on erroneous damage assumptions (*SCM Corp. v. Xerox Corp.,* 463 F.Supp. 983 (D.Conn.1978), *remanded for further proceedings,* 599 F.2d 32 (2d Cir. 1979) (per curiam), *aff'd after remand,* 645 F.2d 1195 (2d Cir.1981); *R.S.E., Inc.; Van Dyk Research*); and the ability to have employed more particularized damage assessments (*Coleman; In re IBM Peripheral EDP Devices*).[27] And to the extent that any of these cases can be read as contradicting the non-disaggregation rule of *Spray-Rite,* we should follow the law of this circuit.

I would hold that there is sufficient evidence to support a finding of a direct causal link between the damages actually awarded and the specific wrongful acts as a whole. Also, I would hold that the damages which were in fact proven were not speculative and were impossible to prove with further

---

**25.** The defendant offered evidence to exhibit how the damage impact of each act was reasonably calculable. 458 F.Supp. at 434.

**26.** The plaintiff's damage proof in that case was also fatally defective because it failed to account for adverse factors other than the defendant's unlawfulness. The defendant's evidence, for example, included a substantial showing of the plaintiff's mismanagement, adverse comment on plaintiff in the financial community, competition from other companies, and lawful competition from the defendant. The court found that given the plaintiff's failure to explain away the effect of any of those factors, any jury verdict rendered upon the unadjusted damage evidence would have been speculative. 458 F.Supp. at 435. Here, AT & T made similar claims which were explained away by MCI in a manner sufficient to present a jury question without additional adjustment of damage proof.

**27.** In *In re IBM Peripheral EDP Devices,* the court explicitly found that "[p]articularization of injury is possible." 481 F.Supp. at 1013. The district court in that case, after hearing all the evidence, stated that the plaintiff "could have done better. Rather than showing a general decline in profits and revenues, the damages proof could have been more closely connected to the individual acts complained of." *Id.*

specificity. I would thus reject AT & T's disaggregation argument. A defendant whose wrongful conduct has rendered unreasonably difficult or impossible the ascertainment of the exact damage amount suffered by a plaintiff may not be heard to complain of or benefit from the fact that the damages cannot be measured with exactness and precision.[28] *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); *Spray-Rite,* 684 F.2d at 1242, 1243; *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1207 (9th Cir.1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); *Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1055 (7th Cir.1974); *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 903 (5th Cir.), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973). MCI's damage proof, while not disaggregated, provided a sufficiently just and reasonable estimate of total damages based upon relevant data and thus had a rational basis in the circumstances of this case that did not require the jury to speculate in order to reach a specified dollar figure. *Mishawaka,* 616 F.2d at 987.

### B. *Assumptions*

The majority finds that several assumptions underlying MCI's Lost Profits Study were inadequately supported, and so it requires a remand for a new trial on damages. Chiefly, the majority holds that the evidence does not support the Study's assumption concerning the amount of revenue MCI could have expected to generate.

Evidence of an antitrust plaintiff's damages can be predicated upon assumptions if the assumptions rest upon an adequate base and are probative of the damage caused by the defendant. *Hobart Brothers Co. v. Malcolm T. Gilliland Inc.,* 471 F.2d 894, 902 (5th

Cir.), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973); *Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 879 (7th Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 582, 584, 27 L.Ed.2d 632 (1971); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 911–13 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). It is the plaintiff's burden to support the assumptions within its damage proof and not the defendant's to disprove them. *Van Dyk Research Corp. v. Xerox Corp.,* 478 F.Supp. 1268, 1327–28 (D.N.J.1979), *aff'd,* 631 F.2d 251 (3d Cir. 1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981).

I believe that the assumptions within the Study were reasonable and rested upon an adequate base. The assumptions were unquestionably open to challenge, and AT & T strongly challenged them before the jury and in certain motions before the district court. The assumptions possessed enough probative value to have been presented to the jury, were supported by sufficient evidence, and reflected reasoned judgments based upon competent evidence, as was required in the instruction given by Judge Grady. The assumptions thus provide an adequate basis for the jury's verdict. *See Greene v. General Foods Corp.,* 517 F.2d 635, 662, 666 n. 23 (5th Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976) (verdict upheld where defendant made no offer of clearly superior assumptions that would yield more accurate results when applied to the available data, even if plaintiff's assumptions were not "the only permissible ones or even the preferable ones").

### 1. *The Revenue Assumption*

The lost profits study assumed that after an initial period of earning revenues from

---

**28.** As the Supreme Court stated in reference to proof of antitrust damages:

[A]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery by rendering the measure of damages uncertain. . . .

The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his wrong has created.

*Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946).

private line service at $1.10 per circuit mile per month, and later $1.00 per circuit mile per month, MCI would have earned $.85 per circuit mile per month in revenues from the fourth quarter of 1976 through 1984. The lost profits study incorporated this two-step reduction to account for possible increased competition from other new entrants into the market.

MCI presented documentary evidence as well as testimony from the study's author to support the $.85 assumption.[29] The author testified that the $.85 figure represented the rate per circuit mile per month that MCI assumed it would have earned absent AT & T's unlawful practices. He said during cross-examination that he considered several factors to arrive at the figure. In addition to having lowered the figure to reflect increased competition from later entrants, he indicated that $.85 was selected on the basis of other factors, including his accumulated knowledge from working within the industry, a comparison of the figure with other competitors' rates, and a review of how the rate might be structured and what rate the market would accept. The MCI controller also testified at the time of trial to the reasonableness of the $.85 figure.

MCI also proffered an exhibit with related testimony that indicated MCI's assumed $.85 rate, as adjusted, was fully competitive with comparable AT & T private line rates. This exhibit was a formal AT & T submission in March 1977 to the FCC requesting permission to revise certain rates as of June 1977. It indicated that, based upon actual 1976 data, the average revenue rate per circuit mile per month for most of AT & T's interstate private line services was $1.26.

This bolstered MCI's contention that its lesser revenue expectations were reasonable.

The majority questions the reasonableness of the revenue assumption, its foundation, and its probativeness on several grounds, suggesting that the record demonstrates that the $.85 figure was incorrect and unreasonable. Chiefly, the majority concludes that AT & T's own private line rates, especially for Telpak service, were so low as to render the $.85 rate unreasonably high. It argues that since MCI's costs for rendering its private line service exceeded the revenue rates which AT & T was obtaining for Telpak, MCI could not possibly compete profitably for this business.

The record indicates, however, that the $.85 assumption was equal to or lower than AT & T's Telpak rates rather than significantly higher. None of the Telpak figures AT & T uses for comparison with MCI's revenue assumption take into account all the various factors that the record indicates must be considered. AT & T and MCI, for example, use different mileage bases to compute their revenue returns per circuit mile. MCI's use of *airline* miles rather than AT & T's calculations based on its billing mileage means that AT & T's revenue figures must be increased by about nineteen percent in order to convert them for meaningful comparison. Moreover, the customer must pay service terminal charges at each end of the long distance lines used for Telpak, but the figures AT & T cites as representative of its revenues do not include those charges. Those charges (as used in AT & T's and MCI's examples) can range from $.18 (for a 500 mile circuit bundle) to

---

**29.** The majority asserts that the figure "lacks a foundation" in part because the author of the Study failed to provide evidence of its validity or reasonableness. *Supra* at 1165. Yet the author, Mr. Uhl, testified that he arrived at it through his assessment of market conditions in light of his long-term study of this area of business and listed a number of detailed factors which informed that assessment. Tr. 3330, 3334–5. For the majority to now hold this testimony insufficient is to again usurp the role of the jury in weighing credible and substantiated evidence. The majority also faults MCI for not calling as a witness a consultant who had viewed Mr. Uhl's figure and had concurred as to its reasonableness. Yet, since the author was the actual source of the adjusted figure, the fact that another expert later approved of the figures does not mean the second expert must be called to lay a proper foundation for the study. In addition, it should be noted that the district court gave AT & T the option to call the consultant to testify, and that AT & T declined to do so after deposing him during a trial recess.

$.29 (for a 306 mile circuit bundle) per circuit mile per month. Further, AT & T increased its Telpak rates by eight percent in the two years after 1974, the year upon which MCI bases much of its revenue evidence. Additionally, although the revenue per circuit that AT & T receives from each Telpak customer may be computed by dividing the bundle of circuits the customer leases by the total amount paid, that is not the only manner of revenue computation. A Telpak customer must lease an entire Telpak bundle, even if it will be using fewer than all the circuits leased. The percentage of circuits actually used by a customer is called a "fill factor." The average fill factor for all Telpak users was about seventy-five percent. An AT & T expert testified that fill factors give AT & T "a practical way to determine" AT & T's average revenues per Telpak circuit mile. Just as the customer who uses less than all of its leased circuits effectively pays a higher cost per circuit mile for Telpak, AT & T's comparable revenues are higher when the fill factor is taken into account.

After making the adjustments described above, AT & T's Telpak revenue per circuit mile emerges as about $.89, and probably as high as $.93. These figures, being above MCI's assumption of $.85, demonstrate that MCI could compete with AT & T for Telpak customers without compromising the expected $.85 revenue figure for all MCI private line service.

Moreover, testimony of MCI's president and an MCI senior vice president revealed that MCI also intended to seek smaller private line customers who either had been using Telpak C or no private line services whatsoever. The provision of service to smaller users produces more revenue per circuit mile. If these goals were in fact achieved, it would have ensured that MCI could have sustained the $.85 rate. The figures also reveal that MCI's $.85 revenue

assumption was competitive when contrasted with AT & T's overall rate, which definitely would have been higher than the average Telpak rate as Telpak was but one service which was included in AT & T's total rate of $1.21 or $1.26.

The majority also contends that the jury's special finding that Telpak was not predatorily priced is inconsistent with the assumption that MCI could earn an overall revenue of $.85 per circuit mile per month. With Telpak priced *lawfully* at $.50 per mile per month (a figure the majority assumes the jury approved as lawful since it was the revenue figure MCI argued was proper), MCI would then have to match that rate in order to compete for bulk users, thereby driving down the overall revenue figure to something considerably below $.85.

By claiming that MCI must match Telpak's lower figure, the majority assumes that Telpak's lower figure is the proper one for comparison when actually that figure must be adjusted upward (to account for the detour ratio, fill factors, etc.) to be relevant for purposes of comparison with MCI's service.[30] As our foregoing brief analysis shows, the jury could reasonably conclude that MCI must compete with a comparable Telpak rate of $.87 or $.89, not $.50.

In sum, the parties presented exhaustive evidence on the reasonableness and probativeness of the $.85 assumption, and argued fully before the jury the merits and pitfalls of that evidence. MCI proffered sufficient proof to support the assumption and to permit the district court, as well as an appellate court, to conclude that the revenue assumption rested upon an adequate base. Nor is the Telpak finding inconsistent with the $.85 assumption. Moreover, I fear that the majority's detailed reevalua-

---

**30.** Moreover, at trial AT & T attempted to demonstrate that the $.50 figure given by MCI was too low, and thus not appropriate in considering whether Telpak was predatorily priced. The jury may have believed AT & T's evidence on that score because it found Telpak not to be

priced at a predatory level. If the jury found that AT & T's Telpak revenues were much higher than MCI claimed, this would be consistent with the finding that MCI could compete for those customers at the $.85 level.

tion of the conflicting evidence which was aired and argued before the jury sets an undesirable precedent for appellate courts to freely pick and choose among dissonant, but equally credible, versions of the truth. Determination of the actual figure and its use was, in my view, properly left for jury resolution.

To this extent, I respectfully dissent.

APPENDIX

In this appendix we reprint the jury instructions of the court dealing with the antitrust laws as well as reproduce the special verdict used in this case. We present these materials for reference purposes only and do not mean to suggest any implicit approval, or disapproval, of either the instructions or the special verdict.

A. JURY INSTRUCTIONS

Number As Given

I. General Instructions (OMITTED)

1. General Duties of Jury
2. Statements and Arguments of Lawyers
3. Objections by Lawyers
4. Questions by Court
5. Credibility of Witnesses
6. Impeachment of Witnesses
7. Weight of the Evidence
8. Circumstantial Evidence
9. Stipulations
10. Depositions—Use as Evidence
11. Corporation Can Act Only Through Agents
12. AT&T—a Single Unitary Enterprise

II. Antitrust Laws

13. Purpose of the Sherman Act
14. General Purpose of the Antitrust laws
15. Private Actions Under the Antitrust Laws
16. Violations of Communications Act are Not Violations of Sherman Act

III. Complaint in this Case

17. Outline of the Complaint in this Case

 A. Monopolization

18. Burden of Proof
19. The Offense of Monopolization
20. Relevant Market
21. Monopoly Power
22. Willfully Maintaining the Monopoly
23. Plaintiffs' Maintenance of Monopoly Charge
24. Competition by a Monopolist is Not Unlawful
25. Regulation Affecting Monopoly Power in the Relevant Market
26. Essential Facility Doctrine
27. FX and CCSA
28. Specialized Common Carriers Decision
29. Tying of Local and Intercity Channels
30. Interference with Customers
31. Discriminatory Interconnections Compared to Western Union
32. Interconnection for Multipoint Service
33. Interconnection beyond a Defined Distance from Plaintiffs' Terminals
34. The Level of Charges for Local Facilities
35. Inappropriate or Inefficient Interconnections
36. Late or Faulty Installations
37. Negotiations in Bad Faith
38. State Tariff Filings

39. Interference with Financing
40. Predatory Pricing
41. Telpak
42. Hi-Lo
43. Pre-announcement of Hi-Lo
44. Course of Conduct
45. Injury to Plaintiffs' Business or Property
46. Proximate Cause (OMITTED)
47. Burden of Proof on Monopolization Charge

 B. Attempt to Monopolize (OMITTED)

48. The Attempt to Monopolize Charge
49. First Element: Specific Intent
50. Second Element: Predatory Conduct
51. Third Element: Dangerous Probability of Success
52. Fourth Element: Injury to Plaintiffs
53. Intent

 C. Damages

54. Damages
55. Lost Profits May Not be Based on Conjecture
56. Plaintiffs have a Duty to Mitigate Damages
57. Deliberations (OMITTED)

 B. SPECIAL VERDICT

## II. ANTITRUST LAWS

### 13. Purpose of the Sherman Act

This case involves alleged violations of a federal law known as the Sherman Antitrust Act. The pertinent section of the Act reads as follows:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States or with foreign nations, shall be deemed [to have violated the law]. . . .

The purpose of the Sherman Act is to preserve and advance our system of free, competitive enterprise and to prevent the accomplishment or deliberate maintenance of a monopoly in any business or industry. The Sherman Act rests on the premise that our economy and the interests of consumers are best served by the unrestricted interaction of competitive forces. However, the application of the Sherman Act is modified to some extent in industries subject to public utility regulation, such as the telecommunications industry involved in this case, where other federal statutes are involved. I will explain this modification later in these instructions.

### 14. General Purpose of the Antitrust Laws

While the general purpose of the antitrust laws is to protect, encourage and foster competition as the rule of trade for the American economy, these laws were not enacted to protect particular competitors. In the normal course of free and vigorous competition, it is expected that some businesses will suffer losses and some will enjoy success. It is expected that this will occur because some will provide better services, introduce better or cheaper products or otherwise better serve the public. This is an accepted and desirable result. The antitrust laws do not seek to shield competitors from the risks or effects of lawful, vigorous competition, to penalize successful competitors, to equalize differences between particular competitors or to shackle the competitive process, and you should not apply those laws to the issues in this case to achieve any such result.

### 15. Private Actions Under the Antitrust Laws

The lawsuit filed by MCI in this case is a private civil action. A business may file a

private civil action claiming that a competitor has violated the antitrust laws and has injured it or threatened to injure it by that violation. Private antitrust actions are a vital means of enforcing the antitrust laws, because damage judgments against persons who violate the antitrust laws serve to deter others from violating the law. Thus, a private civil action protects the public as well as the particular business injured by the forbidden practices. The complaint filed by MCI in this case is such an action.

### 16. Violations of Communications Act are Not Violations of Sherman Act

You have heard evidence that certain of AT & T's conduct at issue in this case—in particular the Hi-Lo tariff and AT & T's refusal to provide connections for FX and CCSA—was the subject of FCC rulings which found that conduct to be in violation of particular provisions of the Communications Act. These FCC rulings do not prove that AT & T violated the antitrust laws. The FCC is not empowered to, and does not, determine whether the antitrust laws have been violated. You must make your own determination of whether AT & T has violated the antitrust laws by any of its conduct.

### III. COMPLAINT IN THIS CASE

17. Outline of the Complaint in this Case

Section 2 of the Sherman Antitrust Act makes it illegal for a business to monopolize, or to attempt or conspire to monopolize, any part of trade or commerce in the United States. Section 2 prohibits a monopolist from willfully misusing its monopoly power to maintain its monopoly position. MCI's complaint has two counts or parts based on Section 2 of the Sherman Act.

In Count I, MCI claims that American Telephone and Telegraph Company has monopolized a part of trade or commerce referred to in the complaint as the business and data communication services market.

In Count II, MCI claims that American Telephone and Telegraph Company attempted to monopolize that market.

MCI also alleges that AT & T's activities have caused damage to MCI's business and property.

### A. MONOPOLIZATION

18. Burden of Proof

Whenever I say that a party has the burden of proof on any proposition, or that a party must prove something, or show or establish something, or use the expression "if you find," or "if you decide," I mean you must be persuaded, considering all the evidence in the case, that the proposition is more probably true than not true. In addition, wherever a particular claim contains a number of different elements or propositions, the party with the burden of proof must persuade you on each element or proposition making up that claim.

Unless I tell you otherwise, plaintiffs have the burden of proof on each of the propositions relating to each allegation or claim they have advanced during the trial of this case.

19. The Offense of Monopolization

MCI's principal claim, which I will discuss first, is monopolization. There are four essential elements which MCI has the burden of proving in order to establish its claim of monopolization.

*First:* MCI must prove that business and data communication services constitute a market of economic significance in the sense that the products or services in that market are reasonably interchangeable with each other, taking into account the price, quality and function of the products or services. This is called a relevant market.

*Second:* MCI must prove that AT & T possessed monopoly power in the relevant market.

*Third:* MCI must prove that AT & T willfully maintained its monopoly by doing one or more of the anti-competitive acts complained of by MCI. This is called monopolizing the relevant market.

*Fourth:* MCI must prove that MCI was injured in its business or property as a

proximate result of AT & T's monopolization of the relevant market.

I will now describe each of these four elements in greater detail.

20. Relevant Market

In deciding whether MCI has shown a "relevant market," you must consider two issues: (1) what are the services or products in the relevant market and (2) what is the geographic scope of the relevant market.

A relevant market contains services which consumers regard as reasonably good substitutes for each other and to which they will readily turn as alternatives. The geographic scope of the relevant market is the area in which the firms involved do business and the area from which they draw customers.

MCI asserts that intercity business and data communication services in the United States during the period from 1969 through mid-1975 was a relevant market. MCI claims that the services in the market were intercity business and data communication services, and that the geographic scope of the market was nationwide. This market is said to consist of telecommunications services ordinarily known as private-line services and other services which can be used instead of private-line services, such as WATS and business long-distance service.

In determining whether these services did constitute a specific relevant market, you may consider whether the services offered by MCI through mid-1975 were marketed specifically to business and governmental users rather than to the general public; whether these services were marketed among distant points rather than locally; whether the services were marketed both for the transmission of voice and for the transmission of computer data; whether the types of services marketed, including various private-line services and AT & T's WATS and business MTS services, were regarded by consumers as reasonably interchangeable with each other; and whether the sales of one service marketed to these users were reasonably responsive to price changes of other such services.

Similarly, in determining whether the relevant geographic market was nationwide, you may consider whether the business of providing the services was operated or sought to be operated on a national level by MCI, AT & T, or others; whether the planning for these services was national in scope; whether the prices, rates, and terms here involved were often based on a national schedule; and whether some of the customers for these services were large businesses with need for services in many states.

Within a relevant market there may be "relevant sub-markets," which themselves may be monopolized. Thus, if you find that business and data communication services did not constitute a relevant market, you must consider whether these services or any portion of them constitute a relevant submarket. In other words, a market which would be a relevant market but for the fact that it is a part of a larger market may nevertheless be a relevant submarket.

The existence of a relevant submarket may be determined by examining such practical indications as industry or public recognition of the submarket as a separate economic entity; the services' peculiar characteristics and uses; distinct customers; distinct prices; or sensitivity to price changes. Any need to have a relevant market is fully satisfied by proof of a relevant submarket.

21. Monopoly Power

Another one of the four essential elements that MCI must show to establish AT & T's monopolization is that AT & T had monopoly power in the relevant market. Monopoly power is the economic power to exclude or limit entry of competitors into the relevant market or to control prices in the relevant market.

MCI claims that AT & T had monopoly power in the relevant market from 1969 through mid-1975 by virtue of AT & T's control over the AT & T-owned local telephone companies in most of the areas MCI sought to serve.

If you find that the business and data communication services market is a relevant market or submarket, that AT & T had control of the local telephone facilities, and that this control gave AT & T the power to exclude MCI or limit its entry into the market or to control prices from 1969 through mid-1975, you may conclude that MCI has proved the existence of AT & T's monopoly power.

MCI also claims that AT & T had monopoly power in the relevant market from 1969 through mid-1975 by reason of AT & T's large share of the market. If you find that AT & T had at least 75% of the revenues in the relevant market from 1969 through mid-1975, you may, but need not, infer from that fact that AT & T had monopoly power. However, you should consider all of the evidence on the point before drawing any such inference from the fact of market share.

You may find that AT & T had the power to exclude competitors or limit entry or to control prices without actually using the power or without using it effectively. In other words, in considering this element of monopoly power, the question for you to decide is whether AT & T had monopoly power, not whether it used the power effectively or used it at all.

Next I will instruct you about the third element, the use of monopoly power.

## 22. Willfully Maintaining the Monopoly

As the third essential element of its case, MCI claims that between 1969 and mid-1975 AT & T willfully maintained its monopoly power in the relevant market by engaging in certain practices which MCI claims to have been anticompetitive and to have had the effect of keeping MCI out of the market or unfairly handicapping MCI's ability to compete with AT & T.

These practices were allegedly as follows:
(1) AT & T refused to interconnect local telephone company facilities to allow MCI to offer FX and CCSA;
(2) AT & T refused to provide interconnections for multipoint service or service outside of a limited distance from MCI's terminals;

(3) For the interconnections it did provide AT & T charged unreasonable prices that were higher than AT & T charged Western Union for the same types of interconnections;
(4) AT & T failed to negotiate for interconnections in good faith and failed to provide efficient or appropriate equipment for interconnections;
(5) AT & T interfered with MCI's relationships with its customers;
(6) AT & T tied its local service to long distance private-line service and offered them only as a package;
(7) AT & T announced its Hi-Lo prices for private-line services before it was ready to put the changes into effect and then lowered the prices at a time and to levels which were predatory; and
(8) AT & T continued to offer the Telpak discount at below-cost levels and in ways that prevented MCI from competing fairly for customers.

## 23. Plaintiffs' Maintenance of Monopoly Charge

MCI is not challenging the acquisition of any monopoly which AT & T may have had in the relevant market prior to MCI's entry. Instead, MCI claims that AT & T sought to maintain its monopoly position after the Federal Communications Commission permitted MCI entry into the market. Therefore, the principal issue which you must decide is whether AT & T acted unlawfully to maintain a monopoly in the relevant market following MCI's entry. In reaching that decision, however, you should not draw any inference that AT & T acted wrongfully from the fact that it provided substantially all of the service in the relevant market at the time of MCI's entry.

## 24. Competition by a Monopolist is Not Unlawful

Vigorous competition on the merits of the service or product is exactly what the Sherman Act was enacted to encourage. Therefore the Sherman Act allows a regulated

firm with monopoly power to compete vigorously whenever it may be faced with competition. So long as defendant's competitive responses to plaintiffs were based on legitimate business decisions and on the merits of defendant's services, defendant cannot be found to have unlawfully maintained a monopoly. This is so even if plaintiffs were hurt by the competition and defendant sought to retain as much of its business as possible.

**25. Regulation Affecting Monopoly Power in the Relevant Market**

In determining whether AT & T possessed monopoly power in the relevant market, you may consider the effect of the FCC's exercise of regulatory authority over prices and entry, including interconnection. Similarly, you may consider the effect of the exercise by state regulatory agencies of regulatory authority over prices and entry in connection with the provision of local services and facilities. That AT & T may have had the largest share or the entire share of the telephone business in certain areas would not be sufficient to establish that AT & T possessed monopoly power if in fact regulation by regulatory agencies prevented AT & T from having the power to restrict entry or control prices. On the other hand, if the regulation was not sufficient to prevent AT & T from having the power to restrict entry or control prices, you could find that AT & T had monopoly power even though it is a regulated enterprise.

**26. Essential Facility Doctrine**

I will now discuss these specific charges of anti-competitive conduct MCI makes against AT & T. A number of these charges relate to interconnection sought by MCI from AT & T through the AT & T operating companies.

Generally, the law recognizes the right of each of us to use our property as we see fit. However, the antitrust laws make an exception to this property right in certain situations. If a business holds a monopoly of some essential facility that other businesses need in order to compete, and if the other businesses cannot reasonably duplicate this essential facility, then the business that controls the facility may be required to make that facility available to its competitors on a fair and reasonable basis. The purpose of this requirement is to promote competition. However, as I will subsequently instruct you, any such requirement is qualified where, as in this case, the terms under which those facilities are provided are subject to regulation by the FCC and state regulatory agencies.

MCI claims that the facilities of AT & T's local operating companies are essential facilities, and that AT & T refused to make interconnection with these facilities available to MCI on a reasonable basis.

AT & T's position is that it agreed to provide MCI with facilities and interconnections it believed in good faith MCI was entitled to receive on reasonable terms and conditions. With respect to those facilities and interconnections which AT & T did not provide, its position is that its failure to do so was based upon a good faith belief that it would have violated established regulatory policies and therefore that it acted reasonably in all the circumstances.

**27. FX and CCSA**

I will now explain to you the law in relation to the FX and CCSA issue.

The threshold determination you should make on this issue is whether the *Specialized Common Carriers* decision ordered AT & T to provide FX and CCSA interconnections to MCI. The question here is whether the decision, either by express language or by what is reasonably apparent from the language which was used, ordered AT & T to make those interconnections. Your further analysis of the problem depends upon how you answer this first question.

If you find that the decision did order AT & T to provide the interconnections, then you must determine whether AT & T knew or had good reason to believe that the decision constituted such an order. If you find that AT & T did know or had good reason

to believe they had been ordered to provide the interconnections, then, in this event, you should find that AT & T was guilty of an anti-competitive practice in refusing to provide the connections.

If you do not find that the *Specialized Common Carriers* decision ordered AT & T to provide FX and CCSA interconnections, this does not necessarily mean that AT & T was free of anti-competitive conduct in failing to provide them. This is because plaintiffs' entitlement to these connections does not depend upon receiving specific authorization from the FCC or upon AT & T's being specifically ordered by the FCC to provide them. Having received certificates of convenience and necessity for microwave facilities, MCI was entitled under the Communications Act to provide any service within the technical capacity of those facilities unless the FCC imposed limits on the authority conferred by the certificates. AT & T contends in this trial that it reasonably believed the *Specialized Common Carriers* decision did constitute a limitation on MCI's authority, such that MCI was not authorized to provide FX and CCSA service. It was decided by the United States Court of Appeals for the District of Columbia in the *Execunet* case in 1977, that the *Specialized Common Carriers* decision did not constitute a limitation on MCI's authority, regardless of what the FCC's intention may have been, since no hearing was held to determine whether the public convenience and necessity required any limitation. The Court of Appeals decision in *Execunet* did not address the question of FX and CCSA, but the holding of the case that the *Specialized Common Carriers* proceeding was ineffective to limit MCI's authority is nonetheless applicable to our analysis of the FX and CCSA question. I instruct you as a matter of law, therefore, that at the time MCI requested FX and CCSA interconnections it was authorized to render those services and AT & T was obligated under the Communications Act to provide the interconnections.

MCI must prove more, however, than the fact that AT & T refused to provide the interconnections. As you know, AT & T contends that it refused to provide the connections because it believed that it had not been ordered to do so, that MCI was not authorized to provide the service, and that it would have violated established regulatory policies for MCI to receive the connections. If AT & T refused the interconnections because of such reasons, believing in good faith that they justified the refusal, then the refusal to provide the interconnections was not anti-competitive conduct and cannot be considered conduct engaged in for the purpose of maintaining a monopoly.

MCI has the burden of proving that in refusing the FX and CCSA interconnections AT & T acted with anti-competitive intent, for the purpose of maintaining a monopoly, rather than for what it in good faith regarded as legitimate reasons.

28. Specialized Common Carriers Decision

What the *Specialized Common Carriers* decision meant is to be determined by its language and what is reasonably implied by that language, considering the historical context and all of the facts and circumstances known to the parties at the time. The intent of the Commission at the time is relevant, but only to the extent that it found expression in the decision or was reasonably inferable from the decision and other facts known to the parties at the time.

29. Tying of Local and Intercity Channels

The law prohibits a business from tying the sale of a product over which it has monopoly power to the sale of another of its products for which there is competition. MCI contends that customers who used AT & T's local telephone service were forced to use AT & T's long-distance service if they wanted services requiring FX and CCSA interconnections. Thus, MCI claims that AT & T engaged in such tying.

There are several requirements for determining whether an unlawful tie-in exists under the antitrust laws: first, there must be two distinct facilities or services involved; second, the defendant must have monopoly power over one product or ser-

 vice, known as the tying product or service; and third, there must be no reasonable justification for offering the products or services together other than an intent to maintain monopoly power in the relevant market.

If you find that AT & T possessed monopoly power over the market for local telephone service within one or more metropolitan areas, and that AT & T, without justification, used that local monopoly power to exclude MCI from the relevant market by tying its long-distance service to the local service, then you may find in favor of MCI on this claim.

## 30. Interference with Customers

MCI claims that AT & T specifically interfered with MCI's customers by disconnecting FX, CCSA, and other lines in April of 1974. If you find that AT & T did not believe it was acting lawfully in disconnecting these lines and disconnected them for the purpose of keeping MCI out of the market or unfairly limiting its ability to compete with AT & T, you may find in favor of MCI on this claim.

This claim involves the period between April 16, 1974 and April 24, 1974. During that period, AT & T disconnected some of MCI's customers who had obtained interconnection for FX, CCSA and outside the local distribution area services pursuant to a preliminary injunction issued by the federal district court in Philadelphia. A preliminary injunction is an equitable remedy sometimes granted by the courts until the merits of the underlying controversy can be fully addressed. As such, the issuance of such an injunction should not be construed by you as an indication that plaintiffs were held by a court of law to be permanently entitled to the interconnections at issue in this proceeding. This is illustrated by the order of the Court of Appeals which vacated that injunction and held that there was sufficient uncertainty about the dispute between the parties on the FX and CCSA question that the dispute should be decided by the Federal Communications Commission which was then hearing the matter.

At the same time you should understand that the Court of Appeals order vacating the injunctions said nothing about disconnecting these customers.

## 31. Discriminatory Interconnections Compared to Western Union

For MCI to prevail on its claim that it was provided interconnections by AT & T in a discriminatory manner compared to Western Union, MCI must prove that AT & T unreasonably discriminated against MCI with the intent of maintaining a monopoly in the relevant market. MCI's position on this claim is that AT & T acted unreasonably in charging MCI a higher price for local facilities than AT & T charged Western Union. MCI also claims that AT & T unreasonably refused to provide MCI services under conditions similar to those under which it provided them to Western Union. AT & T claims there were valid business and regulatory reasons for any difference in treatment.

In order to establish this claim, MCI must show five elements.

The first element is that Western Union was a significant competitor in the relevant market during the period between 1972 and 1975.

The second element is that Western Union was given more favorable treatment than MCI concerning similar facilities.

The third element is that AT & T did not make reasonable efforts to treat MCI the same as Western Union. You have heard conflicting evidence concerning the contractual relationship between Western Union and AT & T, efforts to renegotiate the Western Union contract and certain actions of the FCC in relation to those matters. Unless you find that defendant did not take reasonable steps to provide facilities to Western Union and plaintiffs on the same basis, you must find for the defendant on this claim.

The fourth element of this claim is that the difference in treatment involved facilities of the same or substantially equivalent cost. Plaintiffs must show that the differ-

ence in price or other treatment was not justified by a difference in AT & T's cost or by other factors in the event the facilities were different.

Finally, if MCI acted unreasonably to prevent AT & T from negotiating an agreement with Western Union that would have eliminated any difference in treatment between the two, you may not find that any difference in treatment that might have existed violated the antitrust laws.

**32. Interconnection for Multipoint Service**

MCI claims that AT & T denied it interconnection for multipoint service. According to the evidence, multipoint interconnection involved a situation where a customer ordered an AT & T private line between City A and City B and an MCI private line between City B and City C, and MCI sought an interconnection between its terminal and the AT & T terminal so that the customer could obtain service between City A and City C. To prevail upon its claim of denials of multipoint service interconnections, MCI must prove that AT & T unreasonably denied those interconnections with the intent of maintaining a monopoly in the relevant market rather than for legitimate business reasons.

**33. Interconnection beyond a Defined Distance from Plaintiffs' Terminals**

For MCI to prevail upon its claim of denials of interconnection beyond a defined distance from its terminals, MCI must establish that AT & T denied MCI those interconnections with the intent of maintaining a monopoly in the relevant market. Essentially, MCI's charge is that AT & T unreasonably refused to provide MCI with local distribution facilities beyond a defined geographic area, which MCI claims were needed to connect their terminals in the cities in which they were operating with their customers in those cities.

You may consider the nature of any guidance afforded to defendant by the FCC in its *Specialized Common Carriers* decision with respect to the kinds of local facilities to be provided. In that decision, the FCC

indicated that local facilities should be offered to the plaintiffs and other new entrants in the large cities, but did not specify what geographical limitations were involved in local services. Under no interpretation of that decision would AT & T have been obligated to provide geographical unlimited local facilities to plaintiffs.

You must decide whether the geographical limits imposed by AT & T were reasonable and whether AT & T, in setting the limits it did, acted with an intent to maintain its monopoly and to hinder plaintiffs' entry into the relevant market.

**34. The Level of Charges for Local Facilities**

Aside from its claim that it was discriminated against in relation to Western Union, MCI also claims that the level of charges imposed by AT & T for the local facilities provided to MCI was unreasonably high. To prevail upon this claim, MCI must establish that AT & T charged it unreasonably high prices for local facilities with the intent of maintaining a monopoly in the relevant market. An unreasonably high price is one that is excessive in relation to the cost of providing the service.

**35. Inappropriate or Inefficient Interconnections**

For plaintiffs to prevail on their claim that they were provided with inefficient or otherwise inappropriate equipment and procedures for interconnections, plaintiffs must establish that defendant knowingly furnished inefficient or inappropriate services or equipment with the intent of maintaining a monopoly in the relevant market. The basic controversy here concerns the equipment used by the Bell operating companies to interconnect with plaintiffs, including such things as connector blocks and equipment interfaces, the various kinds of signaling used by the Bell operating companies, the configuration of certain interconnections, such as those for Central Office Centrex Service, the provision of engineering information and the procedures for coordination, installation, testing, and repairs.

### 36. Late or Faulty Installations

During the presentation of plaintiffs' case, evidence was presented relating to the actions of certain employees of defendant which resulted in such things as delayed installations, or improperly installed facilities, from which plaintiffs claim a deliberate pattern of anti-competitive conduct can be inferred. If you find that these things occurred, you should view them in the context of the overall number of transactions between the parties during the relevant time period. Plaintiffs have the burden of proving that these actions reflected a deliberate policy made and enforced by defendant's officers.

### 37. Negotiations in Bad Faith

Plaintiffs claim that at various times between 1971 and 1973 defendant pursued a deliberate policy of bad faith negotiations. To prevail upon this claim, plaintiffs must establish that defendant negotiated in bad faith for purposes of delaying plaintiffs' entry into the market and with the intent of maintaining a monopoly in the relevant market.

### 38. State Tariff Filings

MCI claims that the filing by AT & T operating companies of tariffs with state regulatory agencies in the fall of 1973, offering local facilities to plaintiffs, Western Union and all other specialized carriers on the same terms and conditions, violated the antitrust laws. In order to sustain this claim MCI must prove by clear and convincing evidence that AT & T did not believe that the state agencies had jurisdiction and that the tariffs were filed in bad faith for the purpose of hindering and delaying MCI's efforts to compete. Clear and convincing evidence means evidence that compels your belief and leaves little doubt that a particular proposition is true.

### 39. Interference with Financing

Plaintiffs claim that a Bell System employee spoke to a banker about new entry and competition in the telecommunications industry with the intent of interfering with plaintiffs' ability to obtain financing. Plaintiffs allege that this effort was a willful act by defendant committed in an effort to maintain its monopoly. In order for plaintiffs to prevail on this claim, plaintiffs must prove that the incident with the banker was a deliberate effort to delay and hinder plaintiffs' entry into the market by interfering with its financing.

### 40. Predatory Pricing

Because price reductions tend to benefit consumers, the antitrust laws do not under all circumstances prohibit a monopolist from reducing its prices. But because the monopolist has the power to injure competition and competitors by reducing prices unfairly, the antitrust laws require careful review of price reductions.

For you to conclude that AT & T's conduct in reducing prices shows willful maintenance of its monopoly, you must find that there was a special quality about AT & T's conduct which makes it unfair or exclusionary. This is called "predatory pricing."

One example of predatory pricing would be the monopolist who sells at a loss temporarily in order to force weaker competitors out of the market, intending to recoup his losses by raising prices again when the competition is eliminated.

### 41. Telpak

MCI contends that the Telpak tariff rate was below cost and was unprofitable for AT & T between 1969 and mid-1975. In order to conclude that Telpak was priced below cost, you must decide whether to compare the Telpak price to AT & T's average costs or its marginal costs. In this trial, average costs have also been called fully distributed or embedded costs and marginal costs have also been called incremental or long-run incremental costs. In arriving at what you believe to be the true cost of providing this service, you may consider the views of experts who have testified at trial and exercise your own judgment in light of all the testimony you have heard. If you conclude that Telpak was intentionally priced below

what you find to be the appropriate cost between 1969 and mid-1975, you may find that Telpak was predatory. On the other hand, if plaintiff has not shown Telpak to have been priced below what you believe to be the appropriate cost standard, you should find for defendant on this issue.

### 42. Hi-Lo

Predatory pricing may exist when a monopolist arbitrarily lowers prices in areas where it faces competition and either raises or does not lower prices in areas where it does not face competition. MCI contends that AT & T's choice of the "high density" routes in the Hi-Lo tariff was not based on legitimate cost differences but rather was predatory pricing intended to prevent competition by MCI and other entrants.

The test for determining whether Hi-Lo was predatory is the same as for Telpak. Again, it is a question of whether the price covered what you consider the applicable cost. If it did, you may not infer predatory intent; if it did not, you may infer predatory intent.

### 43. Pre-announcement of Hi-Lo

The announcement of a price reduction by a firm with monopoly power a long time before it intends to put the reduction into effect can be a predatory act. This is sometimes called pre-announcement. The reason pre-announcement can be anti-competitive is that the pre-announcement may hang over the market—that is, may prevent or discourage buyers from switching to a new competitor while they wait for the announced price reduction to go into effect.

MCI contends that AT & T announced its Hi-Lo rate reduction at least one year before AT & T intended to put it into effect and that the reason for the time interval was to discourage buyers from purchasing services from MCI. AT & T contends, on the other hand, that the time interval was reasonable and was required by applicable regulations and legitimate business considerations.

Plaintiffs have the burden of proving that the announcement of Hi-Lo was done not for legitimate reasons but for the purpose of maintaining a monopoly.

### 44. Course of Conduct

In considering whether AT & T has willfully maintained its monopoly power, you should not consider each distinct aspect of AT & T's conduct in a vacuum but in the context of all AT & T's conduct.

### 45. Injury to Plaintiffs' Business or Property

The final element necessary to MCI's proof that AT & T monopolized the relevant market is proof that AT & T's conduct has injured MCI. What you should determine is whether MCI suffered financial or economic harm in any way which was proximately caused by AT & T's conduct. MCI claims that it was injured by AT & T's conduct in several ways, including its inability to serve customers; increased expenses; suspension of its construction program; and loss of revenues, profits, and opportunities for growth. If you find that any such injury was sustained and was proximately caused by AT & T's conduct, you should conclude that MCI has made out this element of its case.

### 47. Burden of Proof on Monopolization Charge

On the monopolization charge in Count I of the complaint, the plaintiffs have the burden of proving each of the following propositions:

First, that the defendant had monopoly power in a relevant market;

Second, that the defendant acted, or failed or refused to act, in one of the anti-competitive ways claimed by the plaintiffs as stated to you in these instructions;

Third, that in so acting or failing or refusing to act, the defendant intended to maintain a monopoly in the relevant market;

Fourth, that the plaintiffs were injured in their business or property;

Fifth, that the anti-competitive conduct of the defendant was a proximate cause of the injury to the plaintiffs' business or property.

## C. DAMAGES

### 54. Damages

If you find that MCI is entitled to a verdict, the law provides that MCI may be fairly compensated for all damages to its business and property which were proximately caused by AT & T's conduct you find to be in violation of the antitrust laws.

This damage is to be measured by the amount of money which MCI would have earned in the past and in the future if AT & T had not violated the antitrust laws, less the amount MCI has actually earned and can be expected to earn.

If you find that as a proximate result of AT & T's violations, MCI's earnings in the past and in the future are less than they otherwise would have been, then the present value of that difference is a proper measurement of MCI's damages. MCI contends that the earnings called net cash flows are the proper basis for calculating damages. Another approach which the law recognizes is the net profits approach. You may adopt either approach. You should apply appropriate adjustments to allow for the fact that receiving an award of future profits now would allow MCI to earn interest on the money between now and the time in the future MCI would have earned those profits. You have heard testimony about the appropriate way to make this adjustment.

The fact that MCI's business may have been new or unestablished does not prevent you from determining its lost earnings. In determining MCI's lost earnings, you may consider the risks involved in the business world, the previous experience and performance of MCI's officers in the business world, the experience of MCI in the actual conduct of its business, the competition in the market, the overall level of sales in the market, and any other factors which are relevant to the earnings MCI would reasonably have made in the past and in the future if AT & T had not violated the antitrust laws.

MCI's right to be fairly compensated should not be affected by any difficulty you may have in determining the precise amount of the recovery, so long as there is a reasonable basis in the evidence for your award.

MCI will have to pay taxes on any award you make. Therefore, if you decide MCI is entitled to damages you should not reduce your award on the assumption that the money will be tax-free.

Any damages you do award must have a reasonable basis in the evidence and cannot be based upon speculation, guess or conjecture.

### 55. Lost Profits May Not be Based on Conjecture

MCI contends that except for the alleged unlawful actions of AT & T, MCI would have constructed and operated its microwave system more rapidly and on a larger scale than it has. MCI also contends that it would have had greater profits and cash flows than it in fact experienced.

AT & T contends that MCI's failure to construct the larger system and to construct it more rapidly was due to lawful competition from AT & T and from causes unassociated with AT & T, such as MCI's financial difficulties, construction costs, MCI's own inefficiencies and other matters.

The Lost Profit Study is based on a forecast of the cash flows or profits MCI alleges it would have achieved over a period of time but for AT & T's allegedly anti-competitive conduct, compared with the cash flows and profits MCI actually achieved and has projected it will achieve over the same period. The projections are based upon a series of interrelated assumptions involving costs, revenues, length of circuits, local interconnection costs, marketing and sales efforts, the state of competition and other factors.

You have heard conflicting testimony concerning many of the basic assumptions

underlying these projections. As to each of these assumptions, MCI must establish that the assumptions it has made are reasonable.

The law allows a party injured by conduct which violates the Sherman Act to collect damages even if the evidence does not reflect mathematical precision in the calculations of damages. However, estimates and projections must be grounded on assumptions that reflect reasoned judgments based on competent evidence.

### 56. Plaintiffs have a Duty to Mitigate Damages

The law requires that a company faced with the possibility that damages may result from the business conduct of another may not merely sit back and do nothing to protect itself economically. It must protect itself by acting in a commercially reasonable and responsible manner to minimize the amount of damages incurred. This self-protection is called mitigation of damages.

AT & T contends that the FCC had the power to resolve many of the alleged unlawful acts of which MCI complains and that if MCI had filed complaints with the FCC, or formally objected to tariffs of AT & T, the FCC could have resolved any disputes over FX, CCSA, local distribution areas, the terms and conditions of furnishing local distribution facilities, and multipoint service. MCI denies this contention and argues that AT & T encouraged it to continue negotiating rather than resorting to the FCC.

Unlike the other issues about which I have instructed you, AT & T has the burden of proof on mitigation. That is, AT & T must prove that MCI did not mitigate its damages. If you find that MCI could have avoided some or all of its economic losses by complaining to the FCC and that MCI acted unreasonably in failing to complain to the FCC, you cannot award MCI the damages it could have avoided.

### SPECIAL VERDICT

Your general verdict will be accompanied by answers to the following series of questions. Please bear in mind what I have told you about the elements of each of the claims made by plaintiffs against the defendant and what I have told you about the burden of proof.

Please answer the following questions "yes" or "no."

1. Do you find that plaintiffs proved the existence of a relevant market?

Yes __X____
No _____

If your answer is "no," you need answer no further questions.
If your answer is "yes," then answer Question No. 2.

2. Do you find that defendant had monopoly power in the relevant market?

Yes __X____
No _____

If your answer is "no," you should answer Question No. 3. If your answer is "yes," skip Question No. 3 and go to Questions 4 and 5.

3. Do you find that defendant willfully attempted to monopolize the relevant market?

Yes _____
No _____

If you have answered this question and your answer is "yes," then proceed to Questions No. 4 and 5. If you have answered the question and your answer is "no," then you need answer no further questions.

4. In relation to the predatory pricing issue, please mark what you find to be the proper cost standard.

____X____ Average Costs (also called fully distributed or embedded costs)
_____ Marginal Costs (also called incremental or long-run incremental costs)

1208

5. As to each subpart of this question, please answer "yes" or "no." Do you find that defendant willfully maintained [or willfully attempted to maintain] its monopoly by committing any of the following acts charged in the complaint:

(a) Refusing FX and CCSA interconnections to MCI (Instructions No. 27 and 28)

Yes __X____
No _____

(b) Tying local service to AT&T long-distance service (Instruction No. 29)

Yes __X____
No _____

(c) Interfering with MCI customers by disconnecting FX, CCSA, and other service (Instruction No. 30)

Yes __X____
No _____

(d) Discriminating against MCI and in favor of Western Union on interconnection (Instruction No. 31)

Yes _____
No __X____

(e) Denying interconnection for multipoint service (Instruction No. 32)

Yes __X____
No _____

(f) Denying interconnection beyond a defined distance from MCI's terminals (Instruction No. 33)

Yes __X____
No _____

(g) Charging MCI unreasonably high prices for interconnection (Instruction No. 34)

Yes _____
No __X____

(h) Providing inappropriate or inefficient equipment or procedures for interconnection (Instruction No. 35)

Yes __X____
No _____

(i) Late or faulty installations (Instruction No. 36)

Yes _____
No __X____

(j) Negotiating in bad faith for an interconnection agreement (Instruction No. 37)

Yes __X____
No _____

(k) Filing state tariffs in bad faith (Instruction No. 38)

Yes __X____
No _____

(l) Interfering with MCI's financing (Instruction No. 39)

Yes _____
No __X____

(m) Predatory pricing of Telpak (Instruction No. 41)

Yes _____
No __X____

(n) Predatory pricing of Hi-Lo (Instruction No. 42)

Yes __X____
No _____

(o) Pre-Announcement of Hi-Lo (Instruction No. 43)

Yes __X____
No _____

If you have answered all subparts of Question 5 "no," you need answer no further questions. However, if you have answered any one or more of the subparts "yes," then answer Question 6.

6. Do you find that plaintiffs were injured in their business or property as a proximate result of any one or more of the defendant's acts as to which you have answered "yes" in Question No. 5?

Yes __X____
No _____

If your answer to Question No. 6 is "yes," then answer Question No. 7. If your answer to Question No. 6 is "no," do not answer Question No. 7.

7. What do you find to be the monetary amount of that injury?

$ 600 million

If you completed Question No. 7, fill in the amount on this verdict form and sign it.

### VERDICT IN FAVOR OF PLAINTIFFS

On the complaint, we, the jury, find for plaintiffs, MCI, and against defendant, AT&T, in the amount of:

$600,000,000.00